UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Patricio Flores and Jose Encalada,               Case No. 09-cv-838
as Co-Trustees and Personal Representatives
for the next of kin of Maria Iñamagua Merchan,


                    Plaintiffs,               **AFFIDAVIT OF CHRISTOPHER R.
                                              WALSH AND ALLAN INGENITO,
                                              M.D., REGARDING EXPERT REVIEW
                                              AND EXPERT IDENTIFICATION**

            v.

The United States of America;  The U.S. Department
of Homeland Security, Immigrations and Customs
Enforcement ("ICE"); Scott Baniecke;  an Unknown
Number of Unnamed and Unknown Agents of ICE;
The County of Ramsey, Minnesota; Robert Fletcher;
Ramsey County Adult Detention Center;
Ramsey County Sheriff's Department; Ramsey County
Department of Health;  Robert W. Fulton;
"XYZ" or Ramsey County "Family Practice Clinic"–
Unidentified Medical Clinics I-V;  Drs. John Doe or Jane Does I-V--
Unidentified Jail or Contract Medical Doctors;  Robert Moxley-
Goldsmith;  Erika Thompson, R.N.;  Chris Strand;  Kelli LNU,
--Unidentified Jail Nurse;  John Roe or Jane Roes—Unidentified
Jail Nurses I-V;  Mary Roby;  Jill Jones;  T. Bennet;
Cheryl Caumiant;  John Poe or Jane Poes I-V--Unidentified Ramsey
County Sheriffs, Deputies, Correctional Officers and Guards,

                    Defendants.

---

STATE OF MINNESOTA     }
                       }ss.
COUNTY OF HENNEPIN     }

       Christopher R. Walsh, being duly sworn, deposes and states as follows:

1

1.      That I am the attorney for the Plaintiffs in the above-referenced matter, who are relatives of the Decedent, Maria Iñamagua Merchan.  I am licensed to practice law in the federal and state courts in Minnesota.  I am familiar with the files, records and proceedings herein.

2.      That I submit this Affidavit pursuant to Minn. Stat. § 145.682 subd. 3(a) and subd. 4(a).  Previously, I requested from the Court an extension of the 90-day deadline set forth in Minn. Stat. § 145.682 subd. 3(b):  Plaintiffs moved the Court for a good cause extension of the time to serve upon Defendants one or more Affidavits of Expert Review within 90 days after service of the Summons and Complaint or commencement of this action, whichever is required by law.  Plaintiffs also moved the Court for a good cause extension of time to file one or more Affidavits of Expert Identification required by Minn. Stat. § 145.682 subd. 4.  See Notice of Hearing dated September 21, 2009, (U.S. Doc. No. 34).  That motion was noticed less than ninety days after the action was served on the malpractice defendants Advanced Practice Solutions, P.A., and Gregory H. Salmi, M.D.

3.      On October 23, 2009 the extension motions were heard by the Magistrate Judge Susan R. Nelson, and are still under advisement.  At that time Plaintiffs' expert neurologist Allan Ingenito, M.D., was out of the country, and Plaintiffs had been unsuccessful in locating a nurse, jail doctor or pathologist (medical examiner) who would testify against Defendants or who could form an opinion about the conduct of unidentified healthcare professionals.  On December 10, 2009 the Court will hear Plaintiffs' Motion to Amend Complaint, Join, Add, or Drop Parties, To Supplement the Pleadings, and for Other Relief.  My affidavit here submitted is also filed in support of the Motion to Supplement.

4.      Since filing the lawsuit and bringing the above described motions for good cause to extend time limits or supplement the pleadings, Plaintiffs and I have made substantial progress

2

in retaining and identifying experts despite the unusual difficulties presented in this case. For example, certain medical records including those dated March 5 and 6, 2006 are illegible. One cannot tell if Dr. Salmi initialed them, or a nurse. To this date there are still Ramsey County nurses whose names, type of license (LPN or RN?), identities and conduct are unknown, or who were just recently identified by Ramsey County in initial disclosures dated November 5, 2009. In those disclosures sent more than three years after my medical record and identity requests, Ramsey County for the first time identified Marjorie Kern, Sara Ceniceros, nurses who apparently dispensed medication to Ms. Merchan. Dr. Ingenito and Plaintiffs' nursing malpractice expert, Shelley Bhola, R.N., have informed me that they could not fully prepare or identify their opinions on healthcare malpractice, without having such basic information: names and legible records of nurses and doctors, showing who they were and what they did or failed to do.

5.      Nonetheless, I submit this Affidavit pursuant to Minn. Stat. § 145.682, and reserve the right to procure additional information from Defendants and witnesses either through motion to compel, subpoena or discovery depositions inquiring into who created, signed, initialed, translated, assessed and diagnosed in the illegible records. I expect to call the following expert in the areas of neurology, psychiatry and medicine to testify at trial as to the issues of failure to diagnose and treat, medical malpractice, causation of harm and death to Maria Iñamagua Merchan: **Allan Ingenito, M.D., The Minneapolis Clinic of Neurology, Ltd., 3833 Coon Rapids Blvd., Suite 100, Coon Rapids, MN 55433**.

6.      Additionally, I expect to call the following expert in the areas nursing and nursing malpractice to testify: **Shelley Bhola, R.N., 4558 141st Street W., Apple Valley, MN 55124**. Plaintiffs will submit separate affidavit(s) of Expert Review and Expert Identification regarding

Nurse Bhola. As stated herein, some of the nurses remain unidentified or have evaded service of process of the Summons and Complaint, so we respectfully submit that the time deadlines have not begun to run for expert review affidavits to be served and filed under Minn. Stat. § 145.682 regarding nursing malpractice.

7. I believe there has been a veil of government secrecy, lack of accountability, and fraudulent concealment by the Defendants who withheld, delayed producing, and/or redacted key medical records, doctors' orders, and nurses' notes until after this lawsuit was filed. (See Civ. Filing Doc. No. 77-3, Ramsey Cty. Exh. 14, my letter of April 10, 2006-- p. 2; Exh. 15, my letter of August 14, 2006 at p. 6; Exh. 16, Ramsey County's letter of August 25, 2006 at pp. 33-35 of 66.

8. Despite my repeated requests for all healthcare and detention records, both in writing and by telephone, prior to this lawsuit the Ramsey County Defendants produced only three pages of illegible nurses' notes. See Id, Attachment 8. **Without excuse or explanation Defendants withheld for more than three years, the doctor's orders, doctor's progress notes, medication charts, signature sheets, and they completely omitted the written notes of March 5, 2006 where Ms. Merchan specifically asked for a doctor, and complained that the severe and chronic headaches, were not effectively treated by Tylenol or aspirin.** (Later produced on May 4, 2009, See page 61 of 66). There has been no explanation from Ramsey County as to why these crucial pages were not given to the family. (At the same time, Ramsey County did apparently provide them to the Department of Homeland Security because they are referenced in the June 2008 OIG report). I believe many material facts including those in bold above were intentionally concealed from me and the family. Ramsey County and ICE knew they were going to be sued, and knew I would need to find malpractice experts. (Letters,

4

Doc. 77-3 above). Yet they omitted to tell me and the family of Decedent material facts in order to gain advantage and frustrate our investigation.

9. All three sets of Defendants have now brought motions to dismiss seeking to capitalize on that advantage. Individual Defendants such as Gregory Salmi, M.D., Cheryl Caumiant, nurses Mary "Kelli" Logan, Corrine "Chris" Strand, also benefited from Ramsey County's fraudulent concealment of their identities as it delayed or prevented service of process upon them. In 2006 up to the date we filed this lawsuit, Defendants were claiming in news reports and a Homeland Security OIG investigation that Ramsey County could not have diagnosed or treated Ms. Merchan's "pre-existing condition" and "there was nothing they could do for her." (Doc. 77-2, Exh. 12, Bob Fletcher news quote).

10. Myself and the family reviewed these articles, reports, statements and correspondence of Defendants, which made false and misleading statements. Plaintiffs relied on the statements to their detriment. Some of the statements were described to potential expert witnesses who were either discouraged or delayed in giving opinions on malpractice. Ramsey County claimed it followed head injury "protocol." This was false (Doc. 77-2, p. 10-11), but the County conveniently failed to produce the protocol (Doc. No. 78-1, pp. 32-33) until after the lawsuit was filed. ICE, OIG, and DHS though they made several recommendations for "improvement" stated that "neither more timely medical treatment for the head trauma nor a more timely initial medical exam would have ensured detainees recovery from neurocysticercosis." (Doc. No. 77-2, pp. 12-13 DHS-OIG report dated June 2008. But Defendants omitted to tell the family or the public, the material facts, many of which rebut their defenses to malpractice.

11. Defendants refused to give Plaintiffs the crucial records showing that the patient was complaining of severe headaches for more than one month before her condition became life

5

threatening, and withheld the doctor's orders relating to those very complaints, assessments and symptoms. For more than one month Ms. Merchan was complaining of "severe headache not relieved by aspirin, acetaminophen (Tylenol) or ibuprofen." (See, Signs of a more severe head injury, no. 1) Ramsey County Adult Correctional Facility, head injury protocol, Doc. 78-1, p. 32). But even after my five letters to the County, it wouldn't tell me that. The protocol was produced in November 2009. Id. Dr. Ingenito and Nurse Bhola now have some of the above facts, doctor's orders, nurse's notes, medication charts, and patient complaints that Defendants concealed. They now have some of the protocols, policies, standards and procedures that Defendants claimed they were following relating to the standards of care in the industry or profession. But Plaintiffs' experts needed these before the lawsuit to be able to write timely Affidavits of Expert Review.

12.     Despite my letters and requests Defendants refused to put names to the illegible signatures or initials on the records they belatedly produced. (See my letters dated April 2, 2007, Doc. 78-1 at pp. 37-38 of 66, and above). I and my staff also made several phone calls to Ramsey County, the Department of Homeland Security, the Office of the Inspector General, and others, seeking more medical records, detention documents, and names of perpetrators.

13.     There was no response to my phone calls to the Ramsey County attorney's office. I warned them they may be liable for spoliation of evidence, and that I may have to serve a motion or a subpoena, but no records were produced. When my investigator tried to get records or identities directly from the jail or the individual nurses or guards, Ramsey County threatened me with an ethics complaint for contacting a "represented party." See letter of Darwin Lookingbill, Esq. and my response. (Docs. __). In telephone conferences with Ramsey County, I asked if any of the employees such as Ms. Caumiant or Ms. Thompson, had private

6

counsel since they were being sued individually.  No, they said I must communicate through the Ramsey County Attorney's office, even when attempting to get medical records or locate someone for service of process.  And yet Ramsey County would not give the information.  I inquired as to if Ramsey County was really representing these persons why would it not accept a summons and complaint for them?  I have been practicing law nearly twenty years and I have never experienced a case with more difficulty, delay and obstruction in obtaining basic medical records, identity of treating healthcare professionals and defendants, evasion of service of process, and attempts to impede discovery.

14.     I wondered who was representing the jail doctor, nurses and guards if their employer, Ramsey County had ignored or denied my requests for their medical and detention records for three years?  At some point I was told that County Attorney Leske had retired.  But this was no excuse for hiding the truth from Ms. Merchan's family and concealing records showing Ramsey County had known about the victims' serious headache complaints and other symptoms for several weeks, but it later publicly claimed "there's nothing we could do."  I sent a letter and circled the portions of the nurses' notes, referring to "M.D. orders," other medical records and missing names of the people and entities I suspected committed malpractice.  But a suspicion without having the actual doctor's orders, records or name does not suffice under Minn. Stat. § 145.682, nor could Dr. Ingenito review a potential malpractice claim when the doctor's orders and identity and the "jail clinic" itself were concealed.  So I sent more letters after the lawsuit was filed.  (See, Doc. 78-1 at pp. 55-56 of 61).  Ms. Kugler responded twice claiming that our medical authorization was expired.  This was false.

15.     In fact my letters of 2006 and 2007 were sent with valid medical authorizations.  The fact is Ramsey County ignored my requests until after the one-year expiration period had passed

7

and it did not ask for a new authorization until 2009.  In my letter dated April 6, 2009, sent a new authorization, but Ramsey falsely claimed it was expired.  See Doc. id p. 42.  The Ramsey County Attorney's office now shifted reasons and claimed that it would respond to formal discovery.  See, id Exhs. 20, 21 at pp. 53-55.  To the contrary, it later moved to delay formal discovery.  It finally sent me the Doctors' Orders and Doctor's Progress Notes on May 4, 2009.

16.    Given the Defendants' misstatements, concealment and inexplicable delays, I was concerned that there were still more withheld records.  As it turned out there were.  See Nurse Erica Thompson's two-page "Addendum" to notes of April 3, 2006.  The Addendum, in apparent violation of HIPPA and other laws, was not produced until Ramsey County's letter of June 8, 2009.  I did not receive it in the mail until June 18, 2009.  See also, Exhibits on Motions to Dismiss, including health services standards, head injury and medical emergency protocols).  I sent what I had to Dr. Ingenito, but it was incomplete and we needed more time to figure out if there were more key records being withheld, to force their disclosure and to process and review the large volume of records some of which were illegible or redacted.

17.    Despite my multiple requests, crucial doctors' orders, progress notes, names of doctors, clinic and nurses were not produced by Ramsey County until after the lawsuit was filed.  If the Court agrees that this was a serious misfeasance, mistake or fraudulent concealment by Defendants, then this should be grounds by itself for a good cause extension of the 90-day deadline under Minn. Stat. § 145.682 subd. 3(b) and the 180-day deadline under subdivision 2, clause 2 of that statute.  The Court has broad discretion under that statute.  If the Court disagrees, then the delays and obfuscation by Defendants, combined with Plaintiffs' and my excusable neglect should further support our good faith grounds for extension here.

18.     We didn't bring a FOIA or MGDPA or HIPPA lawsuit, we didn't hire a team of high-priced investigators or process servers, I didn't hire APS International to repeat or re-do my medical and detention records requests.   This would have cost several thousand dollars. Perhaps that was neglect, but I am a sole practitioner and I can't afford to spend money and time on collateral lawsuits, or forcing the government to do what it should honestly do in the first place.  We thought the Defendants would answer a simple question that every patient in every hospital is entitled to know:  "Who was supposed to take care of my mother?"  And another:  "What did they do for my wife during those 38 days in your care and custody?"  To date those questions have not been fully answered, and indeed Maria's written pleas to be examined by a doctor and desperate requests for effective medical treatment were concealed by Ramsey County for more than three years.  But we now have enough information on the government healthcare standards involved, medical records, the nurses' assessments and doctor's progress notes and orders, the identities and conduct of the healthcare professionals, so that experts can conduct an informed review.  Dr. Ingenito has performed the review and the Plaintiffs now respectfully request to serve and file this affidavit which supplements the pleading and complies with statute.

19.     That the Affidavit of Expert Review of the facts of this case required by Minn. Stat. § 145.682 subd. 3(a) could not be reasonably obtained before this action was commenced, for the reasons described herein and in my Affidavit of No Expert Review dated April 10, 2009.  The Affidavit of Expert Identification required by §145.682 subd. 2, clause two could not be reasonably obtained for the reasons described herein, in the Affidavit of Shannon Wadding dated October 22, 2009 (Doc. No. 55) and the materials filed regarding Plaintiffs' Notice of Motion for Extension of Time to Serve Complaint on Remaining  or Unidentified Defendants Under Fed R.

9

Civ. P. 4 and 15 and for Extensions of Time to File Affidavits of Expert Review and Expert Identification Pursuant to Minn. Stat. § 145.682 Subds. 3 and 4.  (See Doc. Nos. 34, 77-3, __).

20.     At the time the lawsuit was filed on April 10, 2009, we met the statutes of limitation, but Defendants had withheld or concealed medical and detention records and the identities of the officers and agents of the United States and Ramsey County, as well as the identities of Advanced Practice Solutions, P.A., and Gregory Salmi, M.D., who were responsible for not complying with healthcare standards and contracts, deviating from the applicable standards of care in medicine and nursing, for the civil rights violations, injuries and death of Ms. Merchan. The existence of Advanced Practice, P.A. and Dr. Salmi was completely unknown to me prior to filing the lawsuit.  My clients, the surviving next of kin of Ms. Merchan, were not aware of them either.

21.     I never had met Maria Inamagua Merchan, prior to, or during the time she was detained by Defendants ICE and Ramsey County.  While she was hospitalized and comatose at Regions Hospital I did visit her by her bedside.  Of course, she could not communicate anything to me at that time.  I spoke with some of Maria's family members at the hospital who had telephoned the jail prior to Ms. Merchan becoming incapacitated.  They were experiencing grief and uncertainty, and did not know or understand what happened to their loved one.  It was difficult for me or the family to get answers about how Maria's injuries, untreated disease, and later her death occurred.  I also attended the funeral and tried to be respectful, not prying for information, but letting the family grieve.  In the months and years following her death, many of Maria's family members have left the State of Minnesota or returned to their native country of Ecuador. I still do not have telephone numbers or addresses for several of them.  I just regained contact with Maria's mother in Ecuador, she wants me to represent her in this matter and to recover her

10

own medical and detention records.  She had a "brain operation" at Hennepin County Medical Center before she was deported, and she wants me to gather those records.

22.     Shortly before Maria's death and afterwards, I generally inquired, if Maria had communicated to family members, either in the jail visits or telephone calls, the names of any of nurse or doctor who was supposed to treat her, if she complained of symptoms, and what the unknown people at the jail did or failed to do.  The family members I spoke to, or through Martha Urgiles translating and inquiring, did not know any names of jail staff, nurses or doctors. Despite the tragic news being on the television and the newspapers, no doctors, nurses or jail staff in control of healthcare services came forward and met the family to give them information or simply identify themselves.  I even wrote Ramsey County Adult Detention before Ms. Merchan died but no one had the courtesy to even respond until August of 2006, and then no doctors were identified, and doctor's orders, and medication charts were not even produced.

23.     During our pre-suit investigation, the family was not sure whether to proceed with a healthcare malpractice claim, nor was I.  We did not have enough information.  They did believe that Maria was asking for a doctor, was denied medical treatment and was mistreated, and her civil rights were violated as did I.   But they were uncertain whether they should file a malpractice lawsuit, when the government was telling us there was **"nothing we could do"** about her **"preexisting condition."**  I had to very thoroughly investigate the nature of the disease of neurocysticercosis, and how to diagnose and treat it, as well as head trauma and hydrocephalus and find experts on the issues of malpractice.  Meanwhile the government and its contractors were withholding records which later showed that it knew or should have known of the symptoms of her disease and injury and there **were many things they could have done** to save her.

11

24.     The potential malpractice defendants' identities and actions were obscured during the 38 days Ms. Merchan was detained, during the 10 days she was at Regions Hospital, during the months and months my letters and record requests went unanswered, partly answered, or redacted.  Based on my investigation, the lack of an explanation for Ramsey County ignoring my records requests and phone calls that were made over a three year period, its motives seem clear.  The records it belatedly sent in May and June of 2009, were sent three years late without any excuse.  These delays, whether a mistake or a fraudulent concealment, have prejudiced my effort to timely find and retain experts in the areas of medical and nursing malpractice.  Potential expert doctors and nurses have asked me, who are the healthcare providers, and what are the names of the medical doctors and nurses, so that they can do a conflict check and for other reasons.  Is the doctor a specialist, is the nurse an R.N, what are the ICE, Ramsey County and Advanced Practice policies and procedures in detaining, diagnosing and treating patients who are immigrants waiting to be deported?  But I was not dealing with a normal hospital or a cooperative medical facility.

25.     Even now, seven months after this lawsuit was filed, Defendants have moved the Court and been partly successful in limiting discovery which includes basic and essential information needed to complete malpractice affidavits required under Minn. Stat. § 145.682.  For example, licensed practical nurses, cannot "assess" patients, while registered nurses can.  Correctional officers are not qualified to give nursing care, but policies, standards and records recently disclosed here, show they were the gatekeepers to health care.  But Quinn Henson says they told the screaming Ms. Merchan, "You'll get nothing 'till you see a nurse.  They held the keys to that cell, and the keys to life for Ms. Merchan.  For example, after knowing she fell directly backwards on her head from a height, a day nurse simply tells nurse Thompson, she "bonked"

her head.  Ms. Thompson's undated "Addendum", p. 1.  After knowing, Ms. Merchan had refused the ineffective medication for headaches in morning and afternoon of April 3rd, they asked Ms. Thompson to push more meds at 4:00 p.m.  After hearing her crying, seeing the lump on the back of her head, noting her complaints of headache, nausea and dizziness at 4:00, all they gave was ibuprofen and an ice pack and left her in her cell for four more hours.  See, Id.  There is no testimony on when Ms. Thompson's Addendum was prepared but Ramsey County sent it to me three years and 63 days after I requested it.

26.     After sending records to potential experts, I have been asked, who is the doctor?  Is this person a nurse, registered nurse or guard?  Who do they work for?  Where are the doctor's orders?  Embarrassingly, because of the withheld, belatedly produced, illegible and incomplete records, I could not answer those questions.

27.     Different standards of care apply to different healthcare providers.  Without having full names and credentials, without have complete or legible doctors orders and nurses notes, without knowing that Advanced Practice or Dr. Salmi even existed, it delayed me, the Plaintiffs', and their potential experts in completing expert affidavits.  This is why I asked for more time from the Court.  In state court I could have immediately served interrogatories and document requests with the Summons and Complaint, forcing Defendants to answer these basic questions.  In federal court where this Minnesota statute § 145.682 is being applied, I cannot serve any discovery until after the Rule 26 Scheduling Order is issued by the Court.

28.     Because of the language barrier, forced detention with no access to healthcare, resulting incapacitation and death of Ms. Merchan, Defendants themselves were the only ones who could reveal the identity of all the potential or unnamed defendants in this lawsuit.  Because neither me, nor my independent contractor staff, had ever heard of Advanced Practice Solutions, P.A. or

13

Gregory Salmi, M.D., we could not write them or consult with potential malpractice experts about them prior to filing the lawsuit. The only note referring to a "G. Salmi" was produced three years late by Ramsey County, after the lawsuit was filed. Ramsey County Exh. 22, Opposing Plaintiffs' Motion to Extend, pp. 57-60. I still can't tell whether the Doctor's Progress Notes and Orders say "GS" or some other initials. See, pp 59-60.

29.     The Federal Defendants and Ramsey County both delayed responding to our requests and refused to give information identifying the doctors, medical screening professionals, and nurses. Last names, nicknames or scrawled initials in detention records were all we had to go on. See, Id;  The United States Office of the Inspector General (OIG) has said that its ICE Detention Facilities need to improve in several respects, including its recommendation that detention facilities use electronic health records ("EHR"). Exh. __ . The one set of records Ms. Kugler sent me electronically after the lawsuit was filed were garbled and indecipherable.

30.     Four months after my request in April of 2006, Ramsey County produced some of the nurses' notes that were only partly legible. There was a jail doctor and a jail clinic as vaguely described in the incomplete medical records Ramsey County had produced. To date, Plaintiffs have still not received from Defendants all the relevant medical records, ICE intake records, Ramsey County detention records, DRO/Initial Healthscreen, and evidence I requested more than three years ago. Plaintiffs need those records to obtain full and fair expert witness review on issues of the identities of the healthcare professionals, history of this patient, the standards of care, deviation from standards of care, and causation.

31.     Despite requests I made in 2006, 2007, 2008 and 2009, in phone calls, emails, letters, through authorizations, under FOIA and other laws, Defendants have declined to identify full names of ICE agents, guards and nurses or the addresses of negligent parties which we need to

14

provide to potential experts (and process servers). These delays, denials, redactions, and refusals by Defendants have in turn delayed or prevented me in getting full information to Plaintiffs' potential expert witnesses. Therefore, Plaintiffs opposed the Defendants' motions to delay or deny Rule 26 discovery. Therefore, Plaintiffs ask the Court for a good cause extension of the expert review and expert identification requirements of Minn. Stat. § 145.682.

32. Therefore, we ask for 45 days to correct any alleged deficiencies in the Expert Review Affidavit submitted today. Today's affidavit, filed within 90 days of serving the lawsuit on Gregory Salmi, M.D. seeks to comply with both the expert review and expert identification aspects of § 145.682. We ask that Defendants give specific notice to Plaintiffs in writing of any deficiencies they may claim with either expert review or expert identification. In most cases in my experience, 180 days after a lawsuit has been served or filed, my Plaintiffs have been able to conduct document discovery with Defendants, serve subpoenas on witnesses and seek any medical or other records we believe are being withheld. This is an unusual case with multiple Defendants to be served, and multiple motions from them seeking to dismiss, delay, deny or defend these claims. Plaintiffs plan to supplement and more specifically identify their experts' opinions when the upcoming document requests are answered by Defendants and the missing information is provided.

33. I have reviewed and discussed the facts of this case with an expert in the fields of neurology and medicine, Allan Ingenito, M.D. A true and correct copy of Dr. Ingenito's curriculum vitae is attached hereto as Exhibit 1. The substance of the facts which Dr. Ingenito will testify to are contained herein and described as follows.

34. Dr. Ingenito is board certified, by the American Board of Neurology and Psychiatry. His qualifications provide a reasonable expectation that his opinions could be admissible at trial in

this matter.   Despite the incomplete nature of the pre-suit information given to Plaintiffs by

Defendants, prior to filing the lawsuit I provided Dr. Ingenito with:

1. Medical records and bills from:
   (a)     Ramsey County Medical Examiner (Autopsy Report);
   (b)     St. Paul Fire and Safety Services;
   (c)     Regions Hospital; and
   (d)     West Side Community Health Services.
2. Ramsey County Adult Detention (containing only jail nurse and guard notes);
3. U.S. Department of Homeland Security OIG Investigation report June 2008;
4. Documents received in response to FOIA request to Homeland Security/ICE;
5. Medical Bills for Ms. Iñamagua.

35.     Dr. Ingenito informed me that though the above information was incomplete, I could file

my Affidavit of No Expert Review identifying him as an expert and stating his preliminary

opinions.  He still needed the doctor's orders, identities of medical staff and jail clinic, doctor's

progress notes, medication and prescription records.  So I continued to press Defendants to

produce these items.  Defendants provided additional records on May 4, 2009, June 8, 2009, and

as referenced and cited herein.  These important doctor's progress notes, doctor's orders and

medication charts were provided to Dr. Ingenito, as were additional records Defendants filed

through ECF in October and November 2009, including federal and county health services

standards, and "Access to Medical Care Standards".

36.     Dr. Ingenito reviewed the Autopsy report of the Ramsey County Medical Examiner,

which indicates that the Decedent died of neurocysticercosis, the Regions Hospital medical

records of Mark Lund, M.D., the neurologist diagnosed the patient with hydrocephalus and

neurocysticercosis and described the "dubious activities" of Ramsey County Adult Detention

Center relating to Ms. Iñamagua Merchan before she was brought to Regions.  Dr. Ingenito

reviewed a large volume of medical records, jail records, governmental reports, healthcare and

detention standards, IGSA healthcare standards, and medical bills related to this matter.  Before

and after filing the lawsuit I spoke to Dr. Ingenito. He informed me that the initial records provided to him (from me by way of Defendants) were incomplete in that they did not identify the medical doctor or "jail clinic," contained no doctor's orders, no medication charts and other deficiencies described above. Despite any deficiencies or omissions in the records produced to date, Dr. Ingenito states that he will testify as to his opinion that one or more of the Defendants deviated from the applicable standard of care and by that action caused injury and death to the Decedent. See, Minn. Stat. § 145.682 subd. 3(a).

37.    Allan Ingenito, M.D., states the following opinions after he reviewed the above-described records and exhibits, autopsy records, Regions Hospital records, paramedic records, Immigration and Customs intake records, Ramsey County Adult Detention records, head injury protocol, Ramsey County doctor and jail nurse notes, Homeland Security Report and other material. He states to a reasonable degree of medical probability that, given the signs and symptoms the decedent presented, the medical staff of Defendants should have investigated the patient's complaints in early March of 2006, including severe headaches that were not resolved with medication such as the Tylenol prescribed for many days as shown in the LEC Medication Chart.

38.    The signs and symptoms which continued into April of 2006, and the failure of Defendants including Advanced Practice and Dr. Salmi to take a history, examine the patient, or order diagnostic tests, caused Defendants to misdiagnose decedent with migraine or muscle contraction headaches. These failures, along with the nurses making insufficient assessments and declining the patient's specific requests, to see a doctor prevented Defendants from forming the correct diagnosis of neurocysticercosis. On April 3, 2006 following the head trauma, the medical staff should have recognized the possibility of hydrocephalus as her condition worsened over a six hour time period.

17

39.     The progressing symptoms of the potential neurocysticercosis and hydrocephalus should have been recognized by medical staff after the patient was in Defendants' custody for 38 days with no improvement in her symptoms.   The worsening of her headaches and associated complaints, refusal to take medication, requests to see a doctor, the fall from her bunk bed and head trauma on April 3, 2006, should have been recognized by medical staff, diagnosed and treated promptly.   Defendants should have allowed emergency medical treatment on April 3, 2006, particularly after the head trauma, tenderness and edema at the back of the back of the head, and complaints of headache, nausea and dizziness.

40.     The standards of care in neurology and medicine require that a doctor, with the assistance of nurses, healthcare professionals and translators must:   1)   take a careful medical history– including family history and country of origin;   2)   perform a physical and neurological examination;   3)  order immunological and blood tests where indicated;   4) order computerized tomography (CT) or magnetic resonance imaging (MRI) scans where symptoms indicate;   4) make a diagnosis and prognosis;  5)  prescribe medications and other treatment including surgery when necessary.   If immunology and blood tests show a parasitic infection, additional diagnostics and treatment are required by the standards of care.  If detailed pictures of the brain from imaging tests reveal cysts, lesions, hydrocephalus or other abnormalities, referral to a neurologist, infectious disease specialist, or brain surgeon for further evaluation and treatment is indicated.

41.     Cysticercosis or neurocysticercosis is the most common parasitic infection of the central nervous system worldwide.  It is a disease caused by larval cysts, usually from the tapeworm Taenia solium. It is usually transmitted by ingesting food or water contaminated with Taenia solium eggs. Digestion dissolves the outer coat of the eggs which liberates the oncospheres. They

cross the intestinal wall and invade the bloodstream where they migrate to different parts of the body. The disease is rarely fatal, and many subjects live a long life with proper treatment.

42.    This patient was from Ecuador, and government agents and medical staff knew or should have known it, because she was being held for deportation back to that country. The standards of care for treating a North American-born, English speaking, misdemeanor DWI suspect, complaining of headaches, and who is incarcerated for a few days, are one thing. Aspirin or ibuprofen might work for a hangover, muscle contraction headaches, or menstrual cramps. The standards of care which a physician and medical staff must follow for a 38-day detainee from Ecuador, complaining of severe and recurring headaches, a skin condition, and other symptoms for several weeks without relief are a different thing altogether.

43.    **The following steps demonstrate how to diagnose cysticercosis, and are part of the standard of care** a physician must adhere to, particularly in treating patients from Latin America, a high risk area for parasitic infection.

1)  Observe recent onset seizures, headaches, cognitive impairment, confusion, stupor and increases in intracranial pressure. Seizures occur in 70 percent of cysticercosis cases and usually become generalized. Cysts can frequently be palpated under the skin and ocular cysts also may be present.

2)  Check the patient history for living in or traveling to an area where Taenia solium is endemic. This includes Africa, Asia, Mexico, Central and South America, Spain and Portugal. Patients from other areas may receive Taenia solium from an infected cohabitant. A careful medical history must include family medical history, to screen out potential diseases or infections that might afflict one family, household or community.

3)  Confirm a diagnosis of cysticercosis by detecting antibodies for Taenia solium. An enzyme immunitransfer blot assay of the blood serum is more than 90 percent sensitive.

4)  Use the complement fixation (CF) test to detect antibodies for Taenia solium in cerebrospinal fluid. This test is also highly sensitive and should be performed with the immunitransfer blot assay for increased accuracy.

5)  Perform a Computed Tomography (CT) or Magnetic Resonance Imaging (MRI) scan to diagnose neurocysticercosis. An MRI scan is more sensitive in depicting the cysts, but the CT can reveal hydrocephalus, which can indicate intraventricular cysts.

44.    Dr. Ingenito will testify that Defendants failed to take a medical history regarding many important questions for this 30-year-old woman from Ecuador and failed to perform any screening or checkup for past and present illnesses.  From reviewing the medical records produced to date, it appears no healthcare screening or medical history forms were prepared regarding Ms. Merchan.  Ramsey County as a service provider under the IGSA had certain duties.  Certain contractual duties are also instructive on the standards of care for the physicians and nurses at the Adult Detention Facility here:

Onsite health care services shall include **arrival screening within 24 hours of arrival at the Facility**, sick call coverage, provision of over-the-counter medications, treatment of minor injuries (e.g. lacerations, sprains, contusions,) treatment of special needs and mental health assessments. Detainees with chronic conditions shall receive prescribed treatment and follow-up care.  **Arrival screening shall include at minimum,** TB symptom screening, planting of the Tuberculin Skin Test PPD, **recording the history of past and present illnesses** mental and physical.

Doc. No. 66-3, p. 6.

45.    Here, Defendants have produced no medical records, nursing charts, or medication sheets from February 24 2006, when Ms. Merchan was arrested, until March 5, 2006.  But it is clear that no initial health assessment or arrival screening was performed, as noted in the OIG report. Though later records indicate "migrane" [sic] and muscle contraction headaches were assessed by nurses on March 6, 2006, there is no indication that any history regarding any illness (including the headaches, rash symptoms) was ever taken from the patient.  A history taken with reasonable care and promptness might have revealed evidence of a contagious disease such as cysticercosis.  Medical staff should have questioned this patient from Ecuador, who had a cellmate and mother from Ecuador at the same facility, regarding any history of illness, but

contrary to federal and county standards, and the standards of care, none was ever taken. Country of origin is a very important part of a history. Without a proper and thorough history for this patient, it appears that nurses were only guessing when they wrote "Inmate has a reported hx of migraines." There is no information in records produced by Ramsey County that this patient had been ever been seen or treated for migraines prior to being detained by ICE on February 24, 2006 and Defendants apparently did not have any of her prior medical records from Minnesota or Ecuador. Dr. Ingenito has reviewed the medical records obtained and described in Paragraph 34 above. He found no reference to a history of migraines or muscle contraction headaches in Ms. Merchan's medical records from prior to her detention.

46. Medical forms in an initial screening of this patient, (none have been revealed to date) should have asked who her local doctors were, and what conditions she treated for. A history of eating pork, or any white substances in her stool (proglottids) would also have been important. Eating pork with tapeworm larva or close personal contact with, or perhaps food preparation by, a tapeworm carrier are two methods of transmission of the disease. There is no record of any of the questions paragraph 38, clause 2) above being asked of Ms. Merchan in a patient history on February 24 or 25, 2006 when a medical screening should have been done, nor in March 2006 when Ms. Merchan was complaining of headaches.

47. Almost all patients who present to medical staff have some kind of "preexisting condition." A history, examination, diagnostics, medical record review, diagnosis, a course of treatment, prescriptions and prognosis are all ways to discover and properly treat preexisting diseases and conditions. ICE and Ramsey County have produced blank forms, and healthcare contracts, standards and protocols but there is no indication any were used with this patient. Reasonable standards of care require that an initial health assessment should be done, in a prison

21

setting where the patient is in custody and can't see a doctor of her own free will. Here, not only was Ms. Inamagua Merchan from Ecuador, witnesses indicate that her mother/cellmate Aurora Merchan had a brain operation, took medication and may have had the same disease of neurocysticercosis.

48.     Dr. Ingenito will testify that Defendants failed to screen for, or take a personal or family history regarding chronic or severe headaches, seizures, nausea, vomiting or symptoms of neurocysticercosis, brain infection, parasitic, contagious, or neurological diseases. Records are unclear as whether Spanish translators were provided for Ms. Merchan during all of her healthcare assessments with nurses. Though Erica Thompson, R.N.'s undated and unsigned, April 3rd Addendum indicates there was an interpreter for some of the patient contacts most of the records are silent on use of interpreters. Apparently, a cellmate told a guard that Ms. Aurora Merchan had a brain infection or operation and took medication for the condition, but this was noted on April 4th after the decedent was removed from the detention facility.

49.     Seizures and dizziness, a tell-tale sign of brain infection, may have been overlooked by Defendants. At some point a cellmate told the guard that Ms. Merchan "let go" and fell from her upper bunk bed. The fall could have been the result of seizures or dizziness, but again there was no contemporaneous history with an interpretor taken from the patient of exactly what caused the fall. Regular access to interpreters would have improved the communication here, before the disease and injuries became fatal. Other than two Inmate Medical Request Slips in March 2006 there is no record of the patient's complaints being translated. Though the March 5 Request is apparently signed and dated by the patient, the March 23 Request is not, and there is no signature by a translator for any of the records in her entire chart. Communication with the patient is essential, so a translator to help with all aspects of the history, examination, and treatment of this

22

patient should have been provided.  If you can't communicate then you can't provide medical care up to acceptable standards.

50.    Even where nurse-patient verbal communication was limited or poor here, physical examinations, assessments and observations if acted upon quickly would have led a nurse using reasonable care to call paramedics much earlier and get her to an emergency room doctor.  There is no indication of any attempt to call a doctor, including Advanced Practice or Dr. Salmi  on April 3rd.  Nor was there any record of a call to paramedics or emergency doctors at Regions from 2:00 p.m. to until after 8:00 p.m.  Waiting six hours and simply visually "observing" a patient with the above symptoms and who walks the wrong way, seems disoriented, and then delegating care to Correctional Officers to observe the patient, was below the standards of care. Communication with, and attending to the patient, not just during "med pass rounds" was required by the standards of care, after the signs and symptoms Ms. Merchan presented.

51.    On March 5, 2006 Ms. Merchan had signed a "Ramsey County Inmate Medical Request Slip stating, "I want to see the Doctor because I have migrane [sic] headaches and Tylenol or aspirin don't do anything for me."  The identities of the doctor, nurse or guard who created or reviewed these records is not clear.  Therefore, it is difficult to say which standard of care is to be applied here, that of nursing or medicine.  But it is clear that medical staff and most likely, Dr. Salmi, as of March 5, 2006 were aware that Ms. Merchan had severe, chronic headaches.

52.    In the "Doctors Progress Notes" dated March 6, 2006, the writer used the "SOAP" system in a cursory fashion.  Under Subjective:  the only history taken is the patient had been complaining of headaches for the "past four days or so."  The headaches were in the "Back of head and around to front, bilaterally."   The only Objective examination noted was the "PERRLA" (pupils equal and reactive to light) and "Tender to palpation bilaterally."  Something

23

is referenced regarding the paracervical muscles, but no other physical examination was referenced. The Assessment by the nurse or diagnosis by the doctor was "muscle contraction headaches." This was an incorrect assessment, and a misdiagnosis if Dr. Salmi approved it. (The initials are unclear and Defendants did not produce a signature sheet). See Ramsey County Adult Detention Center Doctor's Orders dated March 6, 2006.

53.    Finally, in the Plan section of the SOAP analysis it refers us to the "Doctor's Orders" dated 3-6-06. There, someone (initials illegible) charted the following prescription: **"**Robaxin, 750 mg bid x 5d (twice per day for five days); and Ibuprofen 600 mg bid x 5d. (twice per day for five days)." This was an ineffective plan or treatment for the severe headaches here. The medication chart shows the patient refused these medications four times on March 9 and 10. The only doctor's prescription for the headaches was the above medication. Robaxin, prescribed for muscle contractions or headaches, combined with ibuprofen would not effectively treat a brain infection and such medications did not in this case as the charts and records show.

54.    The nurses later charted a "rash," and hear the patient's complaints about a "rash", which was not effectively treated by the benadryl and hydrocortisone cream prescribed from March 6 through April 3, 2006. (See Ramsey Law Enforcement Center ("LEC") Medication Sheet for March 2006). Nor was it effectively treated by the prescription to wash her clothes or wear long underwear. Under the circumstances, the skin condition which was charted by nurses and guards was probably cysticercosis. The cysts could have been palpated under the skin. The nurses did not chart or make any notes that they touched or palpated the skin of this patient. There is no record that Dr. Salmi or any physician employed by Defendants, physically examined the patient regarding the rash "all over her body" and pruritis which is charted for several days in late March

and early April. Dr. Salmi approved the prescriptions, apparently by telephone. Defendants failed to diagnose or effectively treat these probable cysts resulting from cysticercosis.

55. Next, though the nurses and guards noted headaches and dispensed acetaminophen (Tylenol), aspirin or ibuprofen, these were not common tension headaches or muscle contraction headaches. Dr. Ingenito states to a reasonable degree of medical certainty that these headaches were caused by the disease neurocysticercosis. Nurses described or assessed them as "migrane [sic] headaches" or "muscle contraction headaches," but this is was a deviation from the standards of care, and an incorrect assessment. Though "migraine-type" headaches are symptoms of many diseases, this is not a diagnosis. Nor can there be effective treatment without a diagnosis–as the nurses or jail staff charted, the patient complained that "Tylenol [acetaminophen] or Aspirin don't do anything for me" on March 5, 2006. The medication did not treat her continuing and worsening symptoms because the nurses failed to properly assess the patient or refer her for a full medical examination and diagnosis.

56. As of March 5, 2006, the medication did not work and she wanted to see a doctor. Yet the next day the staff prescribed and dispensed more headache medication and a muscle relaxant and continued to dispense them until March 12, 2006. For two days after that Acetaminophen was dispensed by a nurse (March 13, and 14th). See LEC Medication Chart. Doc. No. __. But there is no record of why, after the "5-day" prescription headache medications (ibuprofen and robaxin) expired or was stopped on March 12, no other follow-up examination or treatment was considered for this patient. There is no record that the patient's headache complaints ever subsided.

57. A differential diagnosis performed according to the standards of care, by a medical doctor, in Dr. Ingenito's opinion, should have raised the possibility of an active central nervous

system ("CNS") process in this patient. Had proper blood tests and brain scans been timely performed, they would have confirmed a diagnosis of neurocysticercosis, by demonstrating the existence of the infection and cysts in patient's body, and showing a picture of the lesions or larva in her brain. Defendants deviated from the standards of care when they failed to diagnose and treat neurocysticercosis.

58.    If Defendants had followed the standards of care in March of 2006, it would have, to a reasonable degree of medical certainty, led to a proper diagnosis of brain infection, and more specifically neurocysticercosis. Less life threatening conditions such as migraine or muscle contraction headaches should have been ruled out. Prompt treatment after a medical screening, health assessment or intake (never performed here) and follow-up after continuing patient complaints would have revealed the true cause of Ms. Merchan's severe headaches, tenderness at the back of the head on March 6, 2006 and other symptoms the patient displayed for more than one month while detained.

59.    The nursing assessment, doctor's progress notes, doctor's orders and doctor's prescriptions overlooked the cause of the headaches and other symptoms. A headache that is mild to moderate, not accompanied by other symptoms, and which responds to home treatment within a few hours may not call for further examination or testing. If a neurologic examination is performed, a tension headache demonstrates no abnormal findings. Here no medical or neurological examination was ever performed by Defendants, despite the patient's recurrent and chronic headaches, written requests to be examined by a medical doctor, "rash" or cysts under the skin, increasing agitation and refusal to take Tylenol because it didn't relieve her symptoms, report of fall from a top bunk bed, head trauma, dizziness, nausea, altered consciousness, vomiting and other symptoms.

60.     In March and early April of 2006, the fact that the symptoms did not respond to the nurses' care or doctor's prescriptions, should have led the medical staff to change their assessment and bring in a medical doctor, such as Gregory H. Salmi, M.D., or other contract employees of APS, or neurologist for an actual diagnosis. A medical doctor should have been consulted, to rule out other disorders that can cause headache, in this case. Here, where the headaches were severe, persistent (did not go away), and other symptoms (such as rash) accompanied the headaches, a full medical and neurological examination should have been promptly performed within a few days after her severe headaches were reported on March 5, 2006. On April 3, 2006, when recurring headaches were again charted, the patient refused Tylenol, and suffered a blow to the head, Ms. Merchan had an urgent need to been seen by a medical doctor for a full medical and neurological examination. Defendants again failed to properly assess, examine, diagnose or provide treatment.

61.     Headaches that disturb sleep, occur whenever the person is active, or that are recurrent or chronic may also require examination and treatment by a health care provider. Here, according to medical records, witnesses and family members, the headaches lasted for more than one month. If the initial treatment is ineffective, consideration of re-evaluation of the diagnosis is necessary. Using Ibuprofen, Robaxin, Tylenol, or aspirin in the time periods involved should have had some impact in treating simple muscle contraction headaches or even migraines. A muscle contraction headache, also known as tension headache is a condition involving pain or discomfort in the head, scalp, or neck, usually associated with muscle tightness in these areas.

62.     Tension headaches are not associated with structural changes in the brain and are usually successfully treated with such medication. Here, to the contrary, four different medications were tried, but did not relieve the headaches which were charted or referenced for about two weeks in

27

March of 2006. No medical records have been produced from February 24 to March 5 of 2006, and there are strange gaps in the records from March 6 to April 3, 2006. Nurse Thompson indicated "will restart Ibuprofen" on March 31, 2006, and "See M.D. orders." That Progress note was not approved or initialed by any doctor. If there were standing orders on aspirin or acetaminophen there is no charting that it was given by a nurse after March 14, 2006, but the records may be incomplete.

63. There are guard or nurse notes that the patient refused headache medication on the morning of April 3, 2006 but there little charting as to what it was, or whether it was offered in the prior week. There is no corresponding doctor's order restarting Ibuprofen, and no doctor's orders regarding Ms. Merchan's complaints of headaches, if any, from March 6 to April 3, 2006. No medical doctor examined Ms. Merchan at the jail during that time period. But April 3, 2006 records describe the "very bad" headaches Ms. Merchan had been suffering all day.

64. Maintenance of truthful, complete and accurate medical, nursing and medication chart records is essential to effective patient diagnosis, care and treatment. Without them treating doctors and nurses cannot perform their duties at the applicable standards of care. The medical staff here deviated from standards of care in failing to maintain adequate records, fully document their assessments or diagnoses, failing to monitor patient compliance or refusal to comply with the medications ordered, failing to record any follow-ups to see if the treatment was effective. The March 6, doctor's progress notes and orders, are illegibly initialed. If this was Dr. Salmi or a "John Doe" medical doctor, the charting and the incomplete Subjective, Objective, Assessment and Plan were below the standards of care and lacking in detail.

65. Regardless of whether the March 6th, notes and orders, were by a nurse or unidentified doctor, treatment plan proved to be ineffective. Still medical staff made no change in the

28

diagnosis or treatment plan, for Ms. Merchan.  For example, the headache medications had no effect in treating Ms. Merchan's symptoms reported beginning four days before March 5, 2006 through April 3, 2006 when they clearly became life threatening.  In fact, the patient again refused Tylenol on the morning of April 3rd, and had previously refused it complaining that it gave her no relief.  Though guards and nurses described her as "hysterical," uncooperative, or refusing treatment or commands there is no evidence that Ms. Inamagua was an unreliable historian or that she was faking her headaches, pain or symptoms.

66.     The ibuprofen dispensed on the evening of April 3rd, was well after the guards and nurses were aware of the patient falling and hitting her head. The medications were contraindicated here, and did not treat the head trauma, the ruptured cyst in patient's brain, or the life-threatening swelling in the brain (hydrocephalus).

67.     Neurocysticercosis is treatable with high success rates, if appropriately diagnosed in a timely manner.  However, it appears that no medical doctor fully or properly examined Ms. Merchan during her 38 days of presenting these symptoms, which became progressively worse. Though Dr. Salmi (or some other physician or nurse with illegible initials) may have signed or initialed the certain charts on March 6, 2006, it is clear that after that date no physician in Defendants employ examined Ms. Merchan.  There was no monitoring or follow up on the March 6, assessment of muscle contraction headaches, nor was there any medical examination of the patient's "rash" or skin condition charted several times beginning March 23, 2006. Headaches in combination with rashes (cysts under the skin) were also warning signs of neurocysticercosis.  But nurses cannot diagnose such conditions or the underlying disease, here neurocysticercosis.

29

68.    It is a breach of the standards of care and outside the scope of practice for licensed nurses to "diagnose" or attempt to diagnose a patient.  Here, the nursing assessments, and attempts to follow a treatment plan, done without doctor review or a physician examining the patient, were a deviation from the standards of care.  Nor can a diagnosis be made *in absentia* by a physician.  The nurses' assessments that Ms. Merchan was suffering from "muscle contraction headaches," "migraine headaches" and a "rash," without apparently relying on an examination and diagnosis by a licensed medical doctor, deviated from the standards of care in nursing.  These missed assessments, lack of appropriate treatment, failure to monitor the patient and ensure she was seen by a medical doctor, proximately caused the death of Ms. Merchan.

69.    For Dr. Salmi (or the unknown John Doe physician of March 6th) to initial and approve medication which was ineffective for this time period, without taking a proper history or performing a medical examination, without using diagnostics such as blood tests and brain scans, led to a misdiagnosis of the patient, and was a deviation from the applicable standards of care in medicine.  The misdiagnosis, and later apparent telephone diagnosis and called-in prescriptions without monitoring the patient, did prevent the appropriate treatment from being rendered, including anti-parasitic drugs or surgery, which then proximately caused the death of Ms. Merchan.

70.    There is no record that Gregory Salmi, M.D., or any other physician employed by Advanced Practice Solutions, P.A., a jail clinic, the federal or the Ramsey County Defendants, ever fully examined the patient before she was taken to Regions Hospital by paramedics after 8 p.m. on April 3, 2009.  The cursory notes with Dr. Salmi's initials or signature, merely approve the medication on or about March 6, 2006, and do not meet or follow the minimum standards of care set forth herein.

30

71. Human neurocysticercosis occurs when the larval cysts (from pork tapeworm) develop in the brain. It is considered to be the most common parasitic infection of the human nervous system and the most frequent, preventable cause of epilepsy in the developing world. It is readily diagnosed if clinical suspicion and proper diagnostic tests are used, such as immunological tests, blood tests and CT scans. In 2006, blood tests were readily available and inexpensive. When computed tomography (CT) scans began being used in the 1980's, many patients with seizure disorders or hydrocephalus, which would otherwise have been thought to be idiopathic, were recognized as having neurocysticercosis. These findings led to the current recognition that neurocysticercosis is a major cause of neurologic disease worldwide, particularly in the countries of Central America. In 2006 CT and MRI scans were readily available and part of standard medical and neurological practice, but were never considered or ordered in this case by Defendants. By the time scans were performed at Regions Hospital, and a proper diagnosis was made on April 3 or 4, 2006 the hydrocephalus was irreversible and it was too late to save the patient's life.

72. To a reasonable degree of medical certainty, Dr. Ingenito will testify that if Ms. Merchan's requests to be examined by a doctor had been heeded, and the standards of care in nursing and medicine followed, a correct diagnosis of neurocyticercosis would have been made. Then the appropriate and lifesaving treatment should have been prescribed. The appropriate treatment, to a reasonable degree of medical certainty would have prevented Ms. Merchan's condition from becoming life threatening and urgent on April 3, 2009. **Below are the standards of care for treatment** that were breached by Defendants Immigration & Customs Enforcement (and their unidentified medical staff if any), Defendants Ramsey County and its Department of Health, doctors and nursing staff, Advanced Practice Solutions, P.A., and Gregory Salmi, M.D.,

causing Ms. Merchan's injuries and death.   An appropriate protocol to treat cysticercosis includes:

1)  Once cysticercosis is diagnosed, the healthcare professional should administer a single oral dose of 5 to 10 mg/kg praziquantel to treat an adult tapeworm infection.

2)   Treat patients with live brain cysts with albendazole or praziquantel. Albendazole is frequently preferred because of its greater effectiveness in eradicating brain cysts. The normal dosage of albendazole is 15 mg/kg/day orally divided into two daily doses not to exceed 800 mg per day for eight to 30 days. Praziquantel is orally administered with a normal dosage of 50 to 100 mg/kg/day divided into three daily doses for 30 days.

3)   Decrease the adverse effects of anti-parasitic treatment with corticosteroids such as dexamethasone or prednisone. Control any cerebral edema with corticosteroids before beginning anti-parasitic treatment.

4)   Address the symptoms of calcified brain cysts. Seizures should be treated with anticonvulsants until the cysts have resolved and the patient has been free of seizures for one to two years.

5)  Consider surgery in cases that do not respond to medical treatment.  Address emergency symptoms of ruptured brain cysts and hydrocephalus. Remove large solitary cysts or mobile ones that may cause ventricular obstruction. Shunts also may need to be placed in cases involving hydrocephalus or intraventricular cysts.

73.    In older children and adults, common signs and symptoms of hydrocephalus include: Headache; Nausea; Vomiting; Blurred or double vision;  Problems with balance, coordination or gait;  Sluggishness or lack of energy;  Slowing or regression of development;  Memory loss; Confusion;  Irritability;  Changes in personality;  Impaired performance in school or work. Hydrocephalus produces different combinations of these signs and symptoms, depending on its cause, which also varies by age.  The underlying causes of the condition of hydrocephalus are widely variable, but neurocysticercosis, head trauma or a combination of the two, can certainly cause it and are germane to this case.

74.    Hydrocephalus is  caused  by  excess  fluid  buildup  in  the  brain.    Constructive hydrocephalus results when the flow of cerebrospinal fluid is disrupted--for example, when a

channel between ventricles becomes narrowed--or when your body doesn't properly absorb this fluid.  Factors that increase a patient's risk of hydrocephalus include:  Lesions or tumors of the brain or spinal cord;  Central nervous system infections;  Bleeding in the brain;  Severe head injury; and here, cysts or larva in the brain.  Regions Hospital and Autopsy records indicate only the cyst found in the left lateral ventricle of Ms. Merchan's brain was ruptured.  The two others were intact.  This was a young and otherwise healthy woman with a good chance for recovery, with few complications.  Prompt medical treatment would have effectively treated the parasitic infection with drugs and prevented the cysts in her brain from rupturing or becoming symptomatic.  Prompt medical treatment, including antiparasitic drugs and surgery, would have removed the ruptured cyst, reduced and controlled the hydrocephalus and treated the neurocysticercosis.

75.     Because no medical doctor fully examined Ms. Merchan during the 38 days she was detained, and because neither ICE, Ramsey County, Advanced Practice Solutions, P.A., nor Gregory Salmi, M.D., nor the unidentified John Doe healthcare staff, performed an examination or medical screening on Ms. Inamagua Merchan, the above risk factors for hydrocephalus were overlooked, neglected or ignored by Defendants causing her symptoms of brain infection to progress untreated.  In fact the assessments and course of treatment administered by the nurses, went basically unchanged for several weeks.  Nor did Dr. Salmi change his diagnosis or prescription after early March 2006.

76.     Ramsey County and its medical staff restarted ibuprofen on March 31, 2006 "PRN for seven days."  This was despite the patient's refusal and reports it was ineffective.  The ibuprofen was unnecessary, but harmless treatment.  The problem was that the headache medication and an ice pack following her head injury were the only treatment Defendants rendered from March 31

to April 3rd. The failure to start appropriate diagnostic tests and prescribe appropriate treatment, was a breach of the applicable standards of care by Defendants which caused the death of Ms. Merchan.

77.    If the proper blood tests and brain scans had been performed, and the correct diagnosis of neurocysticercosis had earlier been made, then antiparasitic medications such as Albendazole could have been prescribed or a more aggressive treatment such as surgery could have ordered well before April 3, 2006. This would have treated the disease and symptoms, preventing the severe and debilitating headaches and other symptoms Ms. Merchan was suffering on April 3, 2006. It would have prevented the headaches, dizziness, or seizures that most likely caused Ms. Merchan to fall from her upper bunk bed and sustain head trauma. This would have treated or prevented the ruptured cyst and hydrocephalus from becoming life threatening.

78.    As it was, the surgery was not performed until too late, because the hydrocephalus unabated for six to eight hours had already caused irreversible damage to Ms. Merchan's brain. The prescription of Albendazole administered after she was brought to Regions Hospital, was too late to treat the parasitic infection, ruptured cysts or immune system reaction that was causing the swelling in her brain.

79.    On April 3, 2006 when Ramsey County nurses offered Ms. Merchan ibuprofen on certain medication rounds, prescribing ice packs for three days, and nurses or guards allegedly "observed" the patient for six to eight hours in her cell without contacting a doctor or emergency medical staff this was a deviation from the standards of care, which caused the death of Ms. Merchan. This failure to examine, assess, diagnose and treat accelerated the symptoms of the brain infection, head trauma and hydrocephalus which caused her otherwise preventable brain injury and death.

80.     ICE standards of care state, in part:

The Service Provider shall furnish 24-hour emergency medical care and emergency evacuation procedures.  In an emergency the Service Provider shall obtain the medical treatment required to preserve the detainee's health.  The Service Provider shall have access to an off-site emergency medical provider at all times.

Doc. 66-3, p. 8.  Advanced Practice Solutions, P.A. and Gregory Salmi, M.D. have not produced any separate medical records, service contracts, or reports that they were on call or showing the extent of their involvement in emergency medical care.   Dr. Ingenito needs more records regarding the contractual relationships, healthcare standards, and on call, or on duty status of physicians and nurses who worked for or contracted with the federal, county and private defendants.  Regardless of contracts, the standards of care in medicine require that trained and licensed physicians and nurses be on hand for emergency situations.

81.     This was an emergency situation on April 3, 2006, but because of the failure to assess, diagnose and treat the patient who was reportedly screaming for help, emergency treatment was ordered several hours too late.  The disease of neurocysticercosis, the head trauma, and the condition of hydrocephalus were left untreated far too long by guards and medical staff. However, even if not diagnosed or treated until April 3rd, 2006, Dr. Ingenito states to reasonable degree of certainty, emergency surgery on that day with other treatment would have reversed the brain swelling and saved Ms. Merchan's life.

82.     Acute obstructive hydrocephalus is usually treated with surgery. Options include: 1) Shunt placement. The most common treatment for hydrocephalus is the surgical insertion of a drainage system, called a shunt. It consists of a long flexible tube with a valve that keeps fluid from the brain flowing in the right direction and at the proper rate.  2)  Ventriculostomy. This surgical procedure is sometimes used when there's an obstruction of flow between ventricles. In

the procedure, the surgeon makes a hole in the bottom of one of the ventricles, to allow the cerebrospinal fluid to flow toward the base of the brain, where normal absorption occurs.

83.     Dr. Ingenito states that if immediate action was taken, Ms. Maria Iñamagua Merchan's life could have been saved (without significant brain damage or complications) and that the lack of treatment she received, the acts and omissions of the staff, and the deviations from the standard of care in described above were a substantial cause of her death.  These preliminary opinions will be developed more fully in a supplemental Affidavit of Expert Identification and/or expert interrogatory answers prepared and signed by Dr. Ingenito and other experts, following discovery or production of any withheld documents.  There is presently a motion pending before this Court to extend the deadlines described in Minn. Stat. § 145.682 subd. 4 regarding identification of experts to be called, but this affidavit seeks to comply with the both the "review" and "identification" requirements of the statute regarding malpractice as fully as possible at this stage

84.     Dr. Ingenito also states that Defendants' breach of the applicable standards of care in fields of medicine and nursing, breach of specific contractual duties of care for adult detention facilities, a failure to monitor or enforce healthcare standards, a lack of oversight and supervision by Advanced Practice Solutions, P.A. and Dr. Salmi of the nursing staff at the Ramsey County jail, Defendants' failure to perform medical screenings or initial health assessments, failure to take sufficient medical history of immigration detainees, failure to perform physical examinations, refusing specific requests for access to doctors, failure to communicate with or translate for a non-English speaking patient, failing to provide diagnostic testing when indicated, lack of prompt emergency treatment, and other deviations from the standards of care proximately caused the death of Decedent.

FURTHER YOUR AFFIANT SAYETH NOT.

Date:  11-24-09

Christopher R. Walsh

Subscribed and sworn to before me
this 24 day of November, 2009.

Notary Public



KRISTI J HERUTH
Notary Public Minnesota
My Comm Exp 01/31/2014

FURTHER YOUR AFFIANT SAYETH NOT.

Date:  11/24/09

Allan Ingenito, M.D.

Allan P. Ingenito, M.D.
Subscribed and sworn to before me
this 24 day of November, 2009.

Notary Public

RONA L NESSER
Notary Public
Minnesota
My Comm. Expires
Jan 31, 2012