# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patricio Flores and Jose Encalada,
as Co-Trustees and Personal               Court File No. 09-CV-838 JMR/SRN
Representatives for the next of kin
of Maria Iñamagua Merchan,
                         Plaintiffs,

v.

The United States of America;            **REPORT AND RECOMMENDATION**
The U.S. Department of Homeland Security;
Scott Baniecke;  An Unknown number of
Unnamed and Unknown Agents of ICE;
The County of Ramsey, Minnesota;
Robert Fletcher; Ramsey County Adult
Detention Center; Ramsey County
Sheriff's Department; Ramsey County
Department of Health;  Robert W. Fulton;
"XYZ" Family Practice Clinic; Drs. John or
Jane Does I-V; Robert Moxley-Goldsmith;
R.N. Erika Thompson; Chris Strand; Kelli
LNU; John or Jane Roe; Mary Roby; Jill Jones;
T. Bennet; Cheryl Caumiant; and
John or Jane Poes I-V,
                         Defendants.

_____

        Christopher Walsh, Esq., Walsh Law Firm, 100 South 5th Street, Suite 1025, Minneapolis, Minnesota 55402, for Plaintiffs.

        Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendants United States of America, et al.

        Karen Kugler and Kevin Lindsey, Esqs., Ramsey County Attorney's Office, 50 West Kellogg Blvd., Suite 560 RCGC - West, St. Paul, Minnesota 55102 for Defendants The County of Ramsey, et al.

        Barbara Zurek and Melissa Riethof, Esqs., Meagher & Geer, PLLP, 33 South 6th Street, Suite 4400, Minneapolis, Minnesota 55402 for Defendants XYZ Family Practice Clinic, et al.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Federal Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 25]; Defendant Gregory Salmi M.D.'s Motion to Dismiss [Doc. No. 28]; Ramsey County Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 31]; Defendants Gregory Salmi M.D. and Advance Practice Solutions, P.A.'s Amended Motion to Dismiss; [Doc. No. 69]; and Ramsey County Defendants' Amended [Partial] Motion to Dismiss or in the Alternative, for Summary Judgment [Doc. No. 75].[1]  This matter was referred to the undersigned by two Orders of Reference entered by the District Court on December 9 and 14, 2009, pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1(b).

## I.      **INTRODUCTION**

Plaintiffs Patricio Flores and Jose Encalada are the next of kin and personal representatives for Maria Iñamagua Merchan, now deceased.  Plaintiffs initiated this lawsuit on April 10, 2009, nearly three years after her death.   After Ms. Iñamagua was arrested by the Department of Immigration and Customs Enforcement (ICE) on February 24, 2006, she was placed at the Ramsey County Adult Detention Center (RCADC).  It was later learned that she suffered from a disease known as neurocysticercosis.  Ms. Iñamagua died while in custody. Neurocysticercosis is a tapeworm infestation causing cysts in the brain and central nervous system.  (Complaint at ¶ 6, 30, 35 and 32).  If left untreated, neurocysticercosis can be fatal. (Complaint at ¶ 35).  Generally, the Plaintiffs allege that the various Defendants committed

---

[1] After this Court issued its Order [Doc. No. 118] on Plaintiffs' motion to extend the deadlines for serving certain defendants, both Dr. Salmi and the Ramsey County Defendants filed amended motions to dismiss.  Therefore, this Court recommends that the original motions, [Doc. No. 28 and 31], be denied as moot.

malpractice and violated Ms. Iñamagua's constitutional rights by failing to diagnose and treat her neurocysticercosis and by failing to provide to her timely and appropriate medical attention.

Plaintiffs have asserted claims against three groups of Defendants:  (1) the "Federal Defendants," including the United States of America, the Department of Homeland Security, individual ICE agent Scott Baniecke, and "an Unknown number of Unnamed and Unknown Agents of ICE;" (2) the "Ramsey County Defendants," including the County of Ramsey, Minnesota, Ramsey County Adult Detention Center, Ramsey County Sheriff's Department, Ramsey County Department of Health, and individuals Sheriff Robert Fletcher, Robert W. Fulton, Robert Moxley-Goldsmith, R.N. Erica Thompson, R.N. Corrine Strand,[2] Kelli LNU, Mary Roby, Jill Jones, Dawn "T." Bennet, and Cheryl Caumiant; and (3)  Defendant Advance Practice Solutions, P.A., (identified in the Complaint as "XYZ Family Practice Clinic") and Dr. Gregory Salmi.  Plaintiffs allege claims for:  (1) denial of civil rights pursuant to 42 U.S.C. § 1983; (2) negligence; (3) medical, nursing, and healthcare malpractice, and breach of contract; (4) wrongful death–negligent hiring, retention and supervision; (5) violations of the Federal Tort Claims Act; (6) and a Bivens claim for violations of the Fifth, Eighth, and Fourteenth Amendments.  All three groups of Defendants now bring motions to dismiss arguing that certain Defendants and many of the Plaintiffs' claims should be dismissed, or in the alternative, that summary judgment should be granted.

## II.    THE PARTIES

Individual Defendant Scott Baniecke was the Field Office Director for the Department of Immigration and Customs Enforcement, Bloomington, MN office during the relevant time period.  (Decl. of Scott Baniecke at ¶ I).  Director Baniecke was responsible for supervising 175

---

[2]  Nurse Thompson's name is misspelled in the Complaint's caption as "Erika" instead of "Erica."  Corrine Strand is misidentified in the caption as Chris Strand.

employees, including deportation officers, immigration enforcement agents, and mission support staff.  (Id.).  There are three or four levels of supervision between Director Baniecke and a line officer.  (Id.).  ICE is an investigative agency within the Department of Homeland Security (DHS).

Ramsey County is administratively comprised of 26 departments.  (Aff. of Julie Kleinschmidt at ¶ 4).  These departments include the Ramsey County Sheriff's Department and the St. Paul-Ramsey County Public Health Department.  (Id.).  Within the Sheriff's Department are several divisions, including the detention division.  (Aff. of Commander John St. Germain at ¶ 2).  The pre-trial detention center, known as the Ramsey County Adult Detention Center (RCADC) is located at the Ramsey County Law Enforcement Center, 425 Grove Street, St. Paul, Minnesota.  (Id. at ¶ 3).

In early 2004, the Sheriff's Department entered into an Intergovernmental Service Agreement for Housing Federal Detainees ("the Agreement"), with the Department of Justice Immigration and Naturalization Service (the predecessor to ICE) to house federal detainees.  (Id. at ¶ 4).  Through an interdepartmental agreement with St. Paul-Ramsey County Public Health Department, the Ramsey County Sheriff's Department provides nursing staff and a contract physician for all RCADC detainees, including federal ICE detainees.  (Id. at 6).

Defendants Doctor Gregory Salmi and Advance Practice Solutions, P.A. are identified in the Complaint as "XYZ Family Practice Clinic; Ramsey County Adult Detention Family Practice Clinic and Unidentified Medical Clinics I-V; Drs. John Doe or Jane Does I-V-Unidentified Jailor Contract Medical Doctors."  Dr. Salmi was the contract physician who treated Ms. Iñamagua while she was in custody.

### III.   <u>FACTUAL HISTORY</u>

#### A.   <u>Intergovernmental Agency Agreement</u>

In the area served by the Bloomington ICE office, there are no ICE owned detention facilities in which to place detainees.  (Baniecke Decl. at ¶ I).  Therefore, ICE contracts with other detention facilities and, as set forth above, ICE and Ramsey County entered into an Intergovernmental Service Agreement contract to place detainees at the Ramsey County Adult Detention Center (RCADC).  (<u>Id.</u> at II).  The Agreement sets out various services that must be provided by the contract facility, including medical services.  (Fed. Defs. Ex. 32 at p. 3-7).  Except in the case of an emergency, Ramsey County did not have the authority to release detainees without authorization from ICE.  (<u>Id.</u> at p. 8).

"ICE did not provide health services to its detainees once a detainee was placed at a local facility like the [RCADC].  Such care was provided on site by the contractor.  If offsite care was required, ICE had to approve it to ensure payment, but that approval was not part of [the Bloomington] Field Office's duties."  (Baniecke Decl. at ¶ IV).  Similarly, Officer Hartnett explained that, "[a]s a deportation officer, I relied on medical providers for diagnosis and treatment of detainees."  (Decl. of Jennifer Hartnett at ¶ VI).  "ICE agents, including supervisors, were uninvolved in [Ms. Iñamagua's] medical care or the transfer to Regions Hospital; these are matters Ramsey County contracted to provide."  (<u>Id.</u>).

Pursuant to the Agreement, ICE detainees had access to the nurses and doctor at the RCADC.  (St. Germain Aff. at ¶ 6).  The RCADC had various policies in place related to the medical care of detainees, including policies on non-emergency sick calls, emergency medical treatment, and a head trauma protocol.  (St. Germain Aff. Ex. B-D).  Inmates could obtain medical request forms from the housing officers to request medical attention for non-

emergencies.  (Id. at Ex. B).

ICE officers do not supervise the performance of work by a contracting facility. (Baniecke Decl. at ¶ VII).  ICE officers are not stationed at the contracting facilities and do not maintain medical records for detainees in such facilities.  (Id.).  Nor does ICE have any involvement in hiring or supervising the medical staff at the contracting facilities.  (Id.).

During the relevant time period, ICE regularly transferred detainees to the RCADC. Each time a deportation officer would transfer a detainee to RCADC, the officer was expected to pick up any detainee "kites," written requests by a detainee complaining about the conditions of his or her confinement.  (Baniecke Decl. at ¶ II; Decl. of Paul Skwira at ¶ II).  During the relevant time period, no kites regarding medical care or health services came to the attention of Director Baniecke.  (Baniecke Decl. at ¶ II).

In 2006, ICE had a policy requiring weekly visits to governmental approved detention centers.  (Hartnett Decl. at ¶ II; Baniecke Decl. at ¶ III).  The purpose of the weekly visits was to "check in" with detainees by listening to and resolving complaints and discussing the detainees' removal cases.  (Id.).  RCADC provided a private room for such discussions.  (Id.).  Deportation Officer Jennifer Hartnett visited the RCADC on April 4, 2006 (the day after Ms. Iñamagua was taken to Regions Hospital).  (Id. at ¶ III).  Hartnett walked through the facility and stopped at each "pod" where an officer announced that an ICE representative was present and available for detainees to speak with.  (Id.).  No detainees complained about medical care during Officer Hartnett's visit.  (Id.).  Likewise, Director Baniecke is unaware of any reports in which a detainee complained about medical or health services or mistreatment during the relevant time period.  (Baniecke Decl. at ¶ III).

## B.   <u>Annual Reviews</u>

In all local facilities used to house ICE detainees, including the Ramsey County facilities, ICE conducts annual reviews.  (Baniecke Decl. at ¶ V).  The field officers who conduct the reviews receive special training and are expected to conduct a thorough and impartial review. (<u>Id</u>.).  The field officer prepares a report, which is sent to ICE headquarters, where the decision whether to house detainees at the facility is made.  (<u>Id</u>.).  Director Baniecke has received reviews of the Ramsey County facilities back to 1997.  (<u>Id</u>.).  Each of the reviews Baniecke has seen for RCADC, found the facility to be adequate, allowing ICE field officers to place detainees at the facility.  (<u>Id</u>.).  Based on the annual reviews, RCADC was an acceptable and approved facility to house ICE detainees.   (<u>Id</u>.).  A state senior detention facility investigator for the Minnesota Department of Corrections conducted an investigation in November 2005 and gave the RCADC a 100% compliance rating.  (Aff. of Karen Kugler in Supp. of Am. Mot. to Dismiss [Doc. No. 77] at Ex. 11).

## C.   <u>Ms. Iñamagua's Detention and Death</u>

Originally from Ecuador, Ms. Iñamagua was living in Minneapolis, Minnesota in early 2006. (Complaint at ¶ 5-6).  On or about February 24, 2006, Ms. Iñamagua was arrested by ICE. (Complaint at ¶ 25).   During the arrest, ICE deportation officer Ben Jorgenson asked Ms. Iñamagua, in Spanish, if she was taking any medications or had any health problems.  (Decl. of Ben Jorgenson at ¶ II).  Officer Jorgenson asked similar questions of Ms. Iñamagua at the Bloomington ICE office in connection with his completion of form I-213.   (<u>Id</u>.; <u>see also</u> Fed. Defs' Ex. 1).  Ms. Iñamagua "did not indicate she was taking medication or had health concerns."  Pursuant to the Intergovernmental Service Agreement, Ms. Iñamagua was taken to the RCADC where she was booked and photographed.  (Complaint at ¶ 25-26).  The Inmate

Intake Admission – Booking form indicates that a booking officer asked Ms. Iñamagua questions about her health and that she indicated she was not taking any prescriptions, was not under a doctor's care, and did not have any particular medical condition.  (Fed. Defs' Ex. 15).

During her detention, Ms. Iñamagua reported recurring headaches.  (Complaint at ¶ 36).  According to the Complaint, Ms. Iñamagua and her family repeatedly asked that she be able to see a doctor and to receive additional medical treatment.  (Complaint at ¶ 36).  Plaintiffs allege that Ms. Iñamagua called her sister to complain that she "was dying from head pain," and that Ms. Iñamagua's sister called the RCADC about the headaches.  (Id.).

On March 5, 2006, Ms. Iñamagua reported to sick call complaining she had "migraine headaches," which were not alleviated by Tylenol or aspirin.  (Fed. Defs' Ex. 18).  Defendant Erica Thompson, a registered nurse, referred Ms. Iñamagua for a follow-up evaluation with a physician.  (Fed. Defs' Ex. 19).  The next day, Ms. Iñamagua was seen by Defendant Dr. Salmi, who diagnosed the headaches as muscle contractions and prescribed 600 mg of Ibuprofen and Robaxin, a muscle relaxant.  (Fed. Defs' Ex. 20 and 21).  After March 6, 2006, there are no records indicating Ms. Iñamagua complained again about headaches to anyone at RCADC until April 3, 2006.  However, Ms. Iñamagua made other medical complaints during that time period.  On March 23, 2006, she reported to sick call stating she had a rash all over her body and that the cream she was given the night before was not helpful.  (Fed. Defs' Ex. 18).  Defendant Nurse Corrine Strand examined Ms. Iñamagua and noted she had a "fine reddened rash" on her lower extremities, "probably secondary to pant uniform rubbing on skin."  (Fed. Defs' Ex. 24).  Dr. Salmi and Nurse Thompson prescribed Benadryl for three days and hydrocortisone cream for five days.  (Fed. Defs' Ex. 21).  On March 31, 2006, Ms. Iñamagua reported that she was still

experiencing the rash and had itching.  (Id.).  Nurse Thompson restarted Ms. Iñamagua on the Benadryl and hydrocortisone cream.  (Id.).

On April 3, 2006 around 2:30 p.m., Ms. Iñamagua fell from her bunk and suffered a head injury.  (Complaint at ¶ 41).  A cellmate alerted officers that Ms. Iñamagua hit her head falling from the bunk.  (Fed. Defs' Ex. 26).  Ms. Iñamagua had complained of a "bad headache" all day and therefore had retired to her cell early.  (Fed. Defs' Ex. 26).  Defendant Cheryl Caumiant, a correctional officer at RCADC, noted that Ms. Iñamagua "hit her head on her bunk and has small knot," although Ms. Iñamagua's head was not cut or bleeding.  (Fed. Defs' Ex. 25-26).  Officer Caumiant gave Ms. Iñamagua an ice pack and notified the nurse that Ms. Iñamagua should be seen at the 4:00 medical rounds.  (Fed. Defs' Ex. 25).  Additionally, Officer Caumiant offered to move Ms. Iñamagua downstairs closer to the officers' desk, but Ms. Iñamagua declined.  (Fed. Defs' Ex. 26).  Ms. Iñamagua's cellmate told Officer Caumiant that she would alert the officers "if anything else happened."  (Fed Defs' Ex. 26).  According to Plaintiffs, detention center officers allegedly saw Ms. Iñamagua crying and holding her head in obvious pain, but did not provide her with medical attention for a number of hours.  (Complaint at ¶ 41).  Later that day, Ms. Iñamagua and her cellmate were moved to the fifth floor, closer to the guard station.  (Fed. Defs' Ex. 29).

Around 4:00 on April 3, Ms. Iñamagua reported to nurses during medical rounds "crying hysterically."  (Fed. Defs' Ex. 24).  At that time, Nurse Thompson noted that Ms. Iñamagua had a half-golf ball sized lump on the back of her head.  (Id.).  Ms. Iñamagua reported experiencing headaches, dizziness, and nausea, but not vomiting.  (Id.).  Nurse Thompson noted that Ms. Iñamagua was experiencing confusion because she started walking the wrong way down the hall when returning to her cell.  (Id.).  Nurse Thompson gave Ms. Iñamagua Ibuprofen and an ice

pack and told the correctional officers to call a nurse or send Ms. Iñamagua to Regions Hospital if she appeared confused or was difficult to waken.  (Id.).

Around 7:30 pm that same day, a nurse saw Ms. Iñamagua in her pod.  (Fed. Defs' Ex. 24).  Ms. Iñamagua was unable to walk to the nurse and was assisted by two inmates and one correctional officer.  (Fed. Defs' Ex. 24).  The nurse noted that Ms. Iñamagua's complexion was pale and she had purple coloration under her eyes.  (Id.).  The nurse noted that Ms. Iñamagua was vomiting, was unresponsive to commands and had reactive but pinpoint pupils.  (Id.).  RCADC then sent Ms. Iñamagua to Regions hospital.  (Id.).  Around 9:00 p.m., Nurse Thompson called Regions' emergency room for an update on Ms. Iñamagua's status.  (Id.).  The hospital advised that Ms. Iñamagua had undergone a CT scan, which showed an abnormality which the hospital had not yet identified.  (Id.).  Regions further advised it planned to admit Ms. Iñamagua.  (Id.).  Eventually, Ms. Iñamagua was diagnosed with hydrocephalus[3] secondary to neurocysticercosis.

On April 4, 2006, when Deportation Officer and acting supervisor Paul Skwira arrived at work, he had a voicemail from the RCADC stating that Ms. Iñamagua had been transferred to Regions hospital for emergency treatment and that she was in critical condition.  (Skwira Decl. at ¶ III).  When Officer Skwira spoke to RCADC, the facility reported that Ms. Iñamagua was in a coma as a result of a parasite and gave Skwira the telephone number for the deputy assigned to maintain security at Regions Hospital.  (Id. at ¶ IV).  Skwira reported the situation to his supervisors, Jeff Fields and Peter Berg.  (Id.).  The officers developed a plan to notify Plaintiff Flores and to monitor the situation.  (Id.).  Deportation Officer Rob Johnson was selected to monitor Ms. Iñamagua's condition.  (Decl. of Rob Johnson at ¶ I).

---

[3] A condition marked by an excessive accumulation of cerebrospinal fluid resulting in raised intracranial pressure.  Stedmans Medical Dictionary – Hydrocephalus (27th Ed. 2000).

On or about April 12, 2006, Ms. Iñamagua died from the neurocysticercosis.  (Complaint at ¶ 6 and 42; see also Kugler Aff. at Ex. 2).

Director Baniecke never had any personal contact with Ms. Iñamagua.  (Baniecke Decl. at ¶ VI).  Nor did he receive any complaints from Ms. Iñamagua or anyone else regarding her medical care until after her death.  (Id.).  Director Baniecke did not know that Ms. Iñamagua did not receive a medical screening by a medical provider until after her death.  (Id.).  Before Ms. Iñamagua was transferred to Regions Hospital, at no time did RCADC advise Baniecke or ICE that Ms. Iñamagua required offsite medical care.  (Id.).

### D.    Office of the Inspector General Report

In June 2008, the Department of Homeland Security (DHS) Office of the Inspector General (OIG) issued a report entitled ICE Policies Related to Detainee Deaths and the Oversight of Immigration Detention Facilities, which included a review of the circumstances of Ms. Iñamagua's death.  (Kugler Aff. at Ex. 3).  The OIG report concluded that there were problems with the medical care provided by RCADC to Ms. Iñamagua.  (Id. at p. 7).  Specifically, the report stated that the RCADC head trauma protocol justified Ms. Iñamagua's transfer to the hospital at 4:00 p.m. on April 3, 2006, when Nurse Thompson observed Ms. Iñamagua experiencing dizziness and confusion.  (Id.).  Also, the report noted that Ms. Iñamagua did not receive a physical examination within 14 days of her intake at RCADC.  (Id.).  Despite these issues about Ms. Iñamagua's care, the OIG concluded "after discussions with clinical experts and a review of the medical literature, we concluded that neither more timely medical attention for the head trauma nor a more timely initial medical exam would have ensured the detainee's recovery from neurocysticercosis."  (Id.).

## IV.   __PROCEDURAL HISTORY__

Certain dates related to the procedural history of this case are highly relevant to the Defendants' motions to dismiss based on statutes of limitations, untimely service of process, and the failure to timely serve the requisite expert affidavits.  This Court previously issued an Order [Doc. No. 118] on Plaintiffs' Motion for Extension of Time to Serve Complaint on Remaining or Unidentified Defendants Under Fed. R. Civ. P. 4 and 15 and for Extensions of Time to File Affidavits of Expert Review and Expert Identification Pursuant to Minn. Stat. § 145.682 Subds. 3 and 4.  That Order provides a detailed recitation of the procedural history of this case, including the administrative claim filings and dates of service.  The Court will focus, in this Report and Recommendation, on the dates that have particular relevance to the issues in the various motions to dismiss:

- April 10, 2006     Plaintiffs' Counsel, Christopher Walsh, notifies Ramsey County that he is representing Ms. Iñamagua's next-of-kin; Plaintiffs also request medical records and records relating to Ms. Iñamagua's detainment from Ramsey County;

- April 12, 2006     Ms. Iñamagua dies while in custody;

- June 13, 2006     Plaintiffs' Counsel files a Notice of Appearance with ICE;

- June 13, 2006     Plaintiffs make a Freedom of Information Act (FOIA) request to ICE;

- August 25, 2006     Plaintiffs renew requests for documents and medical records from Ramsey County; Ramsey County responds to the request for documents that same day;

- April 2, 2007     Plaintiffs send Ramsey County a notice of legal claims for damages;

- April 14, 2008     Plaintiffs mail an administrative tort claim (Form SF-95) to the Department of Homeland Security (DHS);

- April 21, 2008     DHS receives Plaintiffs' administrative tort claim;

- May 13, 2008          DHS responds to Plaintiffs' June 2006 FOIA request;

- October 9, 2008       DHS denies Plaintiffs' administrative tort claim as untimely;

- October 17, 2008      Plaintiffs' counsel receives DHS administrative tort claim denial (Defs.' Ex. 86);

- April 6, 2009         Plaintiffs request additional records from Ramsey County;

- April 10, 2009        Plaintiffs file Summons and Complaint;

- April 13, 2009        Plaintiffs file Affidavit of No Expert Review;
                        Plaintiffs serve Ramsey County, Ramsey County Sheriff's Department, RCADC, and Ramsey County Department of Health;

- April 14, 2009        Plaintiffs serve Sheriff Robert Fletcher in his official capacity;

- April 22, 2009        Plaintiffs serve Robert Moxley-Goldsmith;

- April 25, 2009        Plaintiffs serve Robert Fulton;

- April 29, 2009        Plaintiffs serve Erica Thompson;

- May 1, 2009           Ramsey County clarifies and/or provides complete names of the nurses involved in Ms. Iñamagua's care;

- May 19, 2009          Plaintiffs serve Mary Logan;

- July 1, 2009          Plaintiffs serve Cheryl Caumiant;

- July 8, 2009          Plaintiffs serve Robert Fletcher in his individual capacity;

- July 17, 2009         Plaintiffs serve Advance Practice Solutions;

- August 27, 2009       Plaintiffs serve Doctor Gregory Salmi;

- August 29, 2009       Plaintiffs serve Corrine Strand;[4]

---

[4]   The Return of Service filed by Plaintiffs [Doc. No. 23] indicates Defendant Strand was served on August 29, 2009.  However, Defendant Strand submitted an affidavit stating she was not served until September 5, 2009 [Doc. No. 80].

- September 17, 2009    Federal Defendants file motion to dismiss;

- September 21, 2009    Plaintiffs serve Mary Roby;
                        Defendants Doctor Salmi and APS file motion to dismiss;
                        Ramsey County Defendants file motion to dismiss;
                        Plaintiffs file motion to extend time for service of complaint and service of expert affidavits;

- November 24, 2009    Plaintiffs file Affidavit of Expert Review and Expert Identification of Allan Ingenito;

- December 10, 2009    Court issues Order granting in part and denying in part Plaintiffs' motion for extensions of time;

- December 17, 2009    Plaintiffs file Affidavit of Expert Review and Expert Identification of Nurse Shelley Bhola;

As of the date of the hearing on the motions to dismiss, Plaintiffs had not yet served Jill Jones or Dawn Bennett.  Nor have Plaintiffs filed a Return of Service for those defendants since the date of the hearing.

## V.    DISCUSSION

All of the Defendants have brought motions to dismiss.  All the defendants assert that Plaintiffs' malpractice claims should be dismissed because the Plaintiffs failed to timely file expert affidavits as required by Minn. Stat. § 145.682.  Additionally, the Federal Defendants contend that the tort claims asserted under the Federal Tort Claims Act (FTCA) should be dismissed for lack of subject matter jurisdiction because neither Plaintiffs' administrative claim nor the Complaint were timely filed, and that the § 1983 and Bivens claims should be dismissed against the individual Federal Defendants because they are entitled to qualified immunity.  The Ramsey County Defendants urge this Court to dismiss certain portions of the Complaint because Plaintiffs assert claims against non-existent legal entities that cannot be sued and because certain individual defendants have not been served with process and, therefore, this Court lacks jurisdiction over those individuals.  The Ramsey County Defendants further argue that Plaintiffs'

negligence claims, other than the claim for wrongful death, abated when Ms. Iñamagua died. Finally, the Ramsey County Defendants argue that Sheriff Fletcher and Robert Fulton should be dismissed from this case because they did not have any personal involvement in Ms. Iñamagua's care and there is no respondeat superior liability under § 1983 and <u>Bivens</u> claims. Dr. Salmi and APS assert that all the claims against them, including the § 1983 and <u>Bivens</u> claims, require an expert affidavit pursuant to Minn. Stat. § 145.682, and because those affidavits were untimely, the claims must be dismissed.

### A.   <u>Standard of Review</u>[5]

The Federal Defendants seek to dismiss Plaintiffs' claims asserted under the FTCA for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Individual Ramsey County Defendants Mary Roby, Jill Jones, and Dawn Bennett move to dismiss the claims asserted against them pursuant to Fed. R. Civ. P. 12(b)(4) and (5) for lack of service of process. All of the defendants seek to dismiss certain other claims pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that the Plaintiffs have failed to state claims upon which relief can be granted.

### 1.   12(b)(1) Lack of Subject Matter Jurisdiction

A district court has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. <u>Johnson v. United States</u>, 534 F.3d 958, 962 (8th Cir. 2008). A district court's consideration of matters outside the pleadings, when subject matter jurisdiction is challenged, does not convert the motion to dismiss into a motion for

---

[5]   Although some of the defendants have moved for summary judgment in addition to bringing motions to dismiss, as set forth below, the Court recommends resolving all of the pending motions pursuant to Fed. R. Civ. P. 12(b).

summary judgment.  Harris v. P.A.M. Transp., Inc., 339 F.3d 635, 638 n. 4 (8th Cir. 2003);

Casazza v. Kiser, 313 F.3d 414, 418 (8th Cir. 2002).  A 12(b)(1) motion is treated differently

than a 12(b)(6) motion, when matters outside the pleadings are considered, because jurisdiction

is a threshold question.  Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990).

### 2. 12(b)(4) Insufficiency of Process and 12(b)(5) Insufficiency of Service of Process

A defendant may challenge the timeliness of service of process or the lack of service of

process pursuant to Fed. R. Civ. P. 12(b)(4) (insufficiency of process) or 12(b)(5) (insufficiency

of service of process).  In addressing a motion to dismiss based on Rule 12(b)(4) or 12(b)(5), a

court necessarily must review matters outside the pleadings.  Alan Wright & Arthur R. Miller,

5B Federal Practice and Procedure § 1353 (3 Ed. 2004); Hahn v. Bauer, No. 09-2220, 2010 WL

396228, *5 (D. Minn. Jan. 27, 2010); Personalized Brokerage Services, LLC v. Lucius, No. 05-

1663, 2006 WL 2975308, *1 (D. Minn. Oct. 16, 2006).  Reviewing matters outside the pleadings

does not convert the motion to a motion for summary judgment.  Id.; Fed. R. Civ. P. 12(b).

Proper service is essential for a court to exercise jurisdiction over a party.  Murphy Bros.,

Inc. v. Michetti Pipe Stringing Inc., 526 U.S. 344, 350 (1999); Printed Media Serv., Inc. v. Solna

Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993).  Before resolving any matter on the merits,

questions pertaining to the court's jurisdiction must be resolved.  Crawford v. F. Hoffman-

LaRoche, Ltd., 267 F.3d 760, 764 (8th Cir. 2001).  On a motion to dismiss brought under Fed. R.

Civ. P. 12(b)(4) or 12(b)(5), the plaintiff must establish prima facie evidence that there was

sufficient process and service of process.  Northrup King Co. v. Compania Productora Semillas

Algodoneras Selectas S.A., 51 F.3d 1383, 1387 (8th Cir. 1995).

### 3.   12(b)(6) Failure to State a Claim Upon Which Relief Can Be Granted

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). This short and plain statement must provide "fair notice of the plaintiff's claim and grounds for relief."  Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008).  On a motion to dismiss, a court must assume that all the facts alleged in the complaint are true and generally construe the complaint in the light most favorable to the plaintiff.  Id.; Crooks v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009); Benton v. Merrill Lynch Co., Inc., 524 F.3d 866, 870 (8th Cir. 2008).  A court, however, may reject any unwarranted inferences and conclusory or catch-all assertions of law.  Elam v. Neidorff, 544 F.3d 921, 926 (8th Cir. 2008).

A motion to dismiss should be granted only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 12(b)(6); Schaaf v. Residential Funding Corp., 517 F.3d 544, 549 (8th Cir. 2008), cert. denied, 129 S. Ct. 222 (2008).  In recent years, the Supreme Court has clarified the standards a complaint must satisfy to survive a motion to dismiss.  To avoid dismissal, a complaint must allege facts which raise more than a speculative right to relief.  Benton, 524 F.3d at 870 (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  The complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id.  A complaint cannot simply "le[ave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  Twombly, 550 U.S. at 562.  "A pleading that offers labels and conclusions

or a formulaic recitation of the elements of a cause of action will not do . . . Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555, 557). The evaluation of a motion to dismiss is ultimately context-specific and "requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

A motion to dismiss based on qualified immunity is analyzed pursuant to Fed. R. Civ. P. 12(b)(6). Pearson v. Callahan, -- U.S. --, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009); Dornheim v. Sholes, 430 F.3d 919, 926 (8th Cir. 2005); Schatz Family ex rel. Schatz v. Gierer, 346 F.3d 1157, 1159 (8th Cir. 2003); Graves v. County of Beltrami, No. 99-3802, 2000 WL 1694068, *1 (8th Cir. Nov. 14, 2000); Whisman v. Rinehart, 119 F.3d 1303, 1309 (8th Cir. 1997). On a motion to dismiss based on qualified immunity, the court must accept all well pleaded facts in the complaint as true. Whisman, 119 F.3d at 1309. A court may dismiss a complaint based on the defense of qualified immunity when immunity is established on the face of the complaint. Dornheim, 430 F.3d at 926; Whisman, 119 F.3d at 1309. "[D]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996).

Plaintiffs contend that discovery is necessary to resolve the issue of whether the individual Federal Defendants are entitled to qualified immunity. Generally, however, the issue of qualified immunity should be resolved prior to discovery. Pearson, 129 S. Ct. at 815. As the Supreme Court stated, "we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." Id. (quoting Anderson v. Creighton, 483 U.S. 635,

640, n. 2, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).  Courts should therefore decide immunity questions at the earliest possible stage of the litigation.  Id. (citing Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)).  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Gainor v. Rogers, 973 F.2d 1379, 1383 (8th Cir. 1992).  In this regard, "[i]f a plaintiff fails to assert a constitutional violation under the law as currently interpreted or if the actions that the plaintiff alleges the defendant to have taken are actions that a reasonable officer could have believed lawful, the defendant is entitled to dismissal prior to discovery." Ripson v. Alles, 21 F.3d 805, 808 (8th Cir. 1994); Creighton, 483 U.S. at 640 n. 6.  In contrast, if the parties disagree about what actions the defendant took, and the plaintiff can offer some evidence to support his allegations, discovery may be appropriate for the limited purpose of addressing the issue of qualified immunity.  Lovelace v. Delo, 47 F.3d 286, 287 (8th Cir. 1995); Ginter v. Stallcup, 869 F.2d 384, 388 (8th Cir. 1989).

### B.    Federal Defendants

The Federal Defendants contend that the tort claims asserted against them under the FTCA should be dismissed because neither Plaintiffs' administrative claim nor their Complaint was timely filed.  Further, the individual Federal Defendants contend that the § 1983 and Bivens claims asserted against them should be dismissed because they are entitled to qualified immunity.

### 1.   Tort Claims Pursuant to the Federal Tort Claims Act

Pursuant to Fed. R. Civ. P. 12(b)(1), the United States moves to dismiss all the tort claims brought against them under the FTCA on the grounds of lack of subject matter jurisdiction because Plaintiffs failed to comply with the FTCA statute of limitation for filing an

administrative claim with DHS and also failed to timely file the Complaint after the administrative claim was denied.

### a. Plaintiffs' Administrative Claim with DHS Was Untimely

The FTCA operates as a waiver of the United States' sovereign immunity. <u>United States v. Kubrick</u>, 444 U.S. 111, 117-18, 100 S. Ct. 352, 357 (1979). The FTCA contains an explicit statute of limitations, which is a condition of the United States' immunity waiver. <u>Id.</u> A plaintiff's compliance with the statute of limitations is an absolute prerequisite to the district court's ability to exercise subject matter jurisdiction over a suit against the United States under the Act. <u>Allen v. United States</u>, 590 F.3d 541, 544 (8th Cir. 2009); <u>T.L. ex rel. Ingram v. United States</u>, 443 F.3d 956, 961 (8th Cir. 2006). Therefore, in a 12(b)(1) motion to dismiss a FTCA claim, for lack of subject matter jurisdiction, based on a plaintiff's failure to comply with the statute of limitations, the district court must resolve material issues of disputed fact, if any, in order to determine whether the action was timely filed. <u>Ryan v. United States</u>, 534 F.3d 828, 831 (8th Cir. 2008). As set forth above, a district court's consideration of matters outside the pleadings, when subject matter jurisdiction is challenged, does not convert the motion to dismiss into a motion for summary judgment. <u>Harris</u>, 339 F.3d at 638 n. 4; <u>Casazza</u>, 313 F.3d at 418.

Under the FTCA, a tort claim against the United States must be presented in writing to the appropriate federal agency within two years after the claim accrues or the claim will be time-barred. 28 U.S.C. § 2401(b); <u>see also</u> <u>Garza v. United States Bureau of Prisons</u>, 284 F.3d 930, 934 (8th Cir. 2002). Federal regulations provide that, for purposes of the FTCA, a claim shall be deemed to have been "presented," when the federal agency receives an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain. 28 C.F.R. § 14.2(a). In this case, because DHS received Plaintiffs' executed

standard Form 95 on April 21, 2008, Plaintiffs' FTCA claim is untimely if it accrued prior to April 21, 2006, two years earlier.

### i.    Plaintiffs' Claims Accrued on April 12, 2006

When a claim accrues under the FTCA is a question of federal law.  Motley v. United States, 295 F.3d 820, 822 (8th Cir. 2002).  Generally, a claim accrues for purposes of the FTCA when the plaintiff is injured.  Garza, 284 F.3d at 934.  Based on this principle, the Eighth Circuit has stated, in dicta, that a cause of action for wrongful death, under the FTCA, accrues on the date of death.  McDuffee v. United States, 769 F.2d 492, 493 n. 2 (8th Cir. 1985); (citing Clifford by Clifford v. United States, 738 F.2d 977, 980 (8th Cir. 1984)).  Accordingly, Plaintiffs' FTCA claim accrued on April 12, 2006, the date of Ms. Iñamagua's death, which was more than two years before Plaintiffs presented their administrative claim. Therefore, Plaintiffs' claim is untimely.

Even if this Court did not apply the dicta from McDuffee and Clifford, Plaintiffs' FTCA claim still accrued on April 12, 2006.  In medical malpractice actions under the FTCA, courts apply a "discovery rule" to determine when the malpractice action accrued.  Under the discovery rule, a claim accrues when the plaintiff knew or with reasonable diligence should have known of the existence and cause of the injury.  Sell v. United States Dept. of Justice, 585 F.3d 407, 409 (8th Cir. 2009); T.L., 443 F.3d at 962; Motley, 295 F.3d at 822.  "[W]here the government has shown that a suit was untimely in that the claim was presented more than two years from the date of injury, the plaintiff may show that he had no reason to believe he had been injured by an act or omission by the government."  Garza, 284 F.3d at 935.  The rationale behind the discovery rule is to protect plaintiffs who are "blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing the causal link between the injury and

[the tortious activity] are in the control of the tortfeasor or are otherwise not evident." Garza, 284 F.3d at 934 (quoting Diaz v. United States, 165 F.3d 1337, 12340 (11th Cir. 1999)). The party claiming the benefit of the discovery rule has the burden of showing he or she is entitled to it. Osborn v. United States, 918 F.2d 724, 731 (8th Cir. 1990).

Knowing the cause and the existence of an injury is not the same as knowing that a legal right has been violated. Id. (citing Motley, 295 F.3d at 822). "Once a plaintiff knows or should know that he has been injured . . . there are others who can tell him if he has been wronged, and he need only ask." T.L., 443 F.3d at 962 (quoting Kubrick, 444 U.S. at 122). The plaintiff does not have to "conclusively know the details giving rise to [the] claim" in order to be required to conduct an inquiry into the cause of the injury. Garza, 284 F.3d at 936. Once a plaintiff is aware of the facts of the harm done to him or her, the plaintiff has a duty to exercise due diligence in investigating its cause. T.L., 443 F.3d at 963; Motley, 295 F.3d at 822; Garza, 284 F.3d at 935. A plaintiff's assertion of when he or she actually knew of the injury and cause is not determinative of when the cause of action accrued if the plaintiff did not act reasonably. Id. at 935. Rather, whether the plaintiff acted reasonably is an objective inquiry. Id. at 934. Thus, the "limitations period begins to run either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause-whichever comes first." Id. at 934-35.

In this case, the existence of the injury, Ms. Iñamagua's death, was clearly known to Plaintiffs on the date of her death. Plaintiffs generally allege that the Federal Defendants caused Ms. Iñamagua's death by failing to provide her with medical care and treatment during her detention and by failing to provide Ms. Iñamagua with immediate medical attention after she fell

from her bunk on April 3, 2006.  (Complaint at ¶ 39-41).  Even before Ms. Iñamagua died, Plaintiffs knew exactly what medical attention she received.  In fact, on April 8, 2006, days before Ms. Iñamagua's death, the Pioneer Press ran a story about Ms. Iñamagua's condition.  (Doc. No. 66, Fed Defs' Ex. 89).  In that article, family members reported that, even before Ms. Iñamagua's fall, they had complained to the RCADC about the lack of treatment she had received for her headaches.  (Id.; see also Complaint at ¶ 36).  The article also stated "[j]ail medical staff, according to emergency room records obtained by the Pioneer Press, waited four hours while [Ms. Iñamagua's] condition worsened before rushing her to nearby Regions Hospital."  (Id.).  Additionally, Plaintiffs contacted and retained a lawyer to represent them before Ms. Iñamagua died.  Where there is evidence a plaintiff has contemplated legal action and retained an attorney shortly after the injury, such evidence supports a finding that the plaintiff knew of and was investigating the cause of the injury.  T.L., 443 F.3d at 963.  At the time Ms. Iñamagua died, Plaintiffs had certainly discovered more than sufficient information about Ms. Iñamagua's injury and its cause to trigger the running of the statute of limitations.  Plaintiffs knew that Ms. Iñamagua suffered from neurocysticercosis, that she had complained to the detention center officers and medical personnel about headaches and that she did not get relief from Tylenol, that she fell from her bunk on April 3 and hit her head, and that she did not receive treatment for the fall and head injury for a number of hours.  These are the very facts that formed the basis of Plaintiffs' administrative claim and they were known to the Plaintiffs at the time of Ms. Iñamagua's death.  At that point in time, Plaintiffs had a full two years to present their administrative claim, but failed to do so.

Plaintiffs contend that discovery is necessary to resolve when Plaintiffs' FTCA claim accrued.  Specifically, Plaintiffs assert that discovery is necessary to determine when the

"varying plaintiffs" knew of the cause of Ms. Iñamagua's death and whether Plaintiffs were diligent in investigating potential claims.  This argument, however, ignores the fact that when a claim accrues is a legal issue and is an objective, not a subjective, inquiry.  There is no reasonable argument that can be made that this cause of action did not accrue on the date of Ms. Iñamagua's death.

### ii.    Plaintiffs Are Not Entitled to Equitable Tolling

Plaintiffs also contend that, if applicable, the statute of limitations should be tolled because the Federal Defendants engaged in fraudulent concealment.[6]  Plaintiffs' tolling argument is not persuasive.

Equitable tolling may apply in suits against the federal government.  Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 96, 111 S. Ct. 453, 458 (1990); Motley, 295 F.3d at 824. "Because statutes of limitations protect important interests of certainty, accuracy, and repose, equitable tolling is an exception to the rule, and should therefore be used only in exceptional circumstances."  Motley, 295 F.3d at 824.  Tolling does not apply when the plaintiff is simply making a "garden variety claim of excusable neglect."  Irwin, 498 U.S. at 96.  It is the plaintiff's burden to establish that equitable tolling should relieve him or her from the statute of limitations. T.L., 443 F.3d at 963; Motley, 295 F.3d at 824.  To gain the benefit of tolling, the plaintiff must be "blameless."  Sell, 585 F.3d at 410.

Plaintiffs first appear to contend that the FTCA statute of limitations should be tolled because the Federal Defendants engaged in fraudulent concealment by not disclosing Ms.

---

[6]  Plaintiffs also assert that the statute of limitations is tolled during infancy and because Ms. Iñamagua's daughter is still a minor, the statute of limitations has not even begun to run. This argument is not ripe for this Court to address because Ms. Iñamagua's daughter is not a Plaintiff in this lawsuit.  Only Patricio Flores and Jose Encalada have been named as co-trustees and personal representatives for Ms. Iñamagua and they are the only named plaintiffs in the Complaint.

Iñamagua's complete medical records and by making false statements about the cause of Ms. Iñamagua's death.   If the Plaintiffs did establish that the Federal Defendants fraudulently concealed material facts preventing Plaintiffs from discovering Ms. Iñamagua's injury and cause, the statutory period would not begin running until the Plaintiffs discovered, or by reasonable diligence could discover, the basis for the claim.   Garza, 284 F.3d at 935; Ryan, 534 F.3d at 832. If a plaintiff timely requests medical records which contain evidence of malpractice which caused an injury, and *those facts are not otherwise knowable*, the cause of action does not accrue until the plaintiff receives the records.   Id. at 935-36 (emphasis supplied).   However, where a plaintiff is provided with other medical records sufficient for the plaintiff to obtain a medical opinion as to the cause of the injury, tolling is not appropriate.   T.L., 443 F.3d at 964-65.   In T.L., the plaintiff argued that the statute of limitations should be tolled because the defendant did not provide a complete copy of the plaintiff's fetal heart monitoring strips and such strips were "essential to determining the existence and cause of [plaintiff's] cerebral palsy."   Id. at 964.   The Eighth Circuit disagreed, holding that the statute of limitations should not be tolled because the plaintiff was provided with other medical records before the statute of limitations expired and "in the exercise of due diligence, she could have obtained a medical opinion."   Id. at 964-65.

Plaintiffs claim that this Court should toll the FTCA statute of limitations as to the Federal Defendants, even though it is alleged that it was Ramsey County and/or APS who withheld certain medical records.[7]   Regardless, tolling is not appropriate in this case.   First, as this Court stated in its previous order [Doc. No. 118], Plaintiffs were not diligent in seeking the medical records from the defendants.   While Plaintiffs timely requested medical records from

---

[7]   The court in Garza suggested that it would be inappropriate to toll the statute of limitations against the government when it was another entity who had engaged in the alleged fraudulent concealment.   Garza, 284 F.3d at 937.

Ramsey County in 2006, they did not follow up on the allegedly deficient production until 2009. Further, Plaintiffs have not established that the medical records they did possess were insufficient for them to assert their FTCA claim. The medical records which Plaintiffs obtained in 2006 shortly after Ms. Iñamagua's death fully described the treatment she received for her headaches and the alleged delay in medical attention she received after she fell from her bunk on April 3, 2006. Furthermore, the additional medical records Plaintiffs received in 2009 did not provide Plaintiffs with any new information about the cause of Ms. Iñamagua's death, but rather, were duplicative or irrelevant. For example, after the lawsuit was filed, Plaintiffs received a document showing Ms. Iñamagua was given a TB test while at the RCADC, an irrelevant fact for purposes of this case. Likewise, Plaintiffs did not have Ms. Iñamagua's medication charts until 2009, but the medical records Plaintiffs received in 2006 detailed the medications prescribed to Ms. Iñamagua and the medication charts were merely duplicative of information already known to Plaintiffs. Thus, Plaintiffs had more than sufficient medical records to obtain a medical opinion before the FTCA statute of limitations expired. Therefore, equitable tolling does not apply.

Plaintiffs also appear to contend that the statute of limitations should be tolled because the defendants made "false statements" which concealed the cause of Ms. Iñamagua's death. Plaintiffs' memorandum, however, does not identify the false statements, detail who made the statements, or to whom the statements were made. Without such information, this Court cannot determine if any false statement warrants equitable tolling of the statute of limitations.[8] In the Affidavit of Christopher R. Walsh and Allan Ingenito, M.D., Regarding Expert Review and

---

[8] The Court is not "obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim." Devin v. Schwan's Home Service, Inc., No 04-4555, 2006 WL 2590611, *12 n. 11 (D. Minn. Sept. 8, 2006) (citing Jaurequi v. Carter Mfg. Co. Inc., 173 F.3d 1076, 1085 (8th Cir. 1999)).

Expert Identification [Doc. No. 86], Plaintiffs appear to suggest that "Defendants were claiming in news reports and a Homeland Security OIG investigation that Ramsey County could not have diagnosed or treated Ms. Merchan's pre-existing condition and there was nothing they could do for her."  Assuming such statements are the basis for Plaintiffs' false statement claim, Plaintiffs are not entitled to equitable tolling.  First, any statements made to the OIG are irrelevant to Plaintiffs' tolling claim because the report from the OIG's investigation came out in June 2008, after Plaintiffs had already filed their administrative claim with DHS.  Further, fraudulent concealment tolls the running of the statute of limitations only "until the plaintiff discovers or by reasonable diligence could discover the basis for the claim."  Ryan, 534 F.3d at 832 (citing Wehrman v. United States, 830 F.2d 1480, 1483 (8th Cir.1987)).  As set forth above, Plaintiffs more than understood the factual basis of the claims they now assert and the cause of Ms. Iñamagua's death as of the date of her death.  From that date of accrual, Plaintiffs had a full two years to assert administrative claims against the Federal Defendants and failed to do so.  Nor have the Plaintiffs provided evidence establishing that they relied on these alleged false statements to their detriment.  Finally, it remains the position of the defendants, even today, that had Ramsey County diagnosed Ms. Iñamagua's condition earlier, she could not have been saved. Under these circumstances, equitable tolling is not appropriate.  Because equitable tolling does not apply to the Plaintiffs' FTCA claims, this Court recommends that the Federal Defendants' motion to dismiss those claims be granted on the grounds of lack of subject matter jurisdiction.

### b.  Plaintiffs Did Not Timely File the Complaint

Moreover, Plaintiffs failed to comply with the statutory deadline for filing the Complaint. 28 U.S.C. § 2401(b) provides, "[a] tort claim against the United States shall be forever barred . . . unless action is begun within six months after the ***date of mailing***, by certified or registered mail,

of notice of final denial of the claim by the agency to which it was presented."   Id. (emphasis supplied).   In this case, it is undisputed that the denial letter was mailed on October 9, 2008.   The deadline for filing the Complaint with this Court was, therefore, April 9, 2009.   Plaintiffs' counsel did not file the Complaint until April 10, 2009, one day after the deadline.   Plaintiffs' counsel suggests that he should be excused from this late filing because he did not receive the denial letter until October 17, 2008 because it was mailed to his former address.   (Complaint at ¶ 60).   The plain language of the statute, however, provides that the time period begins to run on the date the final denial letter is mailed.   When Plaintiffs' counsel actually received the letter is not relevant.   Plaintiffs failed to comply with either of the statutes of limitations in the FTCA, and this Court recommends that their FTCA claims be dismissed as untimely.

### 2.   The Section 1983 and Bivens Claims Should Be Dismissed Against the Individual Federal Defendants

The individual Federal Defendants, Scott Baniecke and the John Doe defendants, move to dismiss the § 1983 and Bivens claims against them, arguing that they are entitled to qualified immunity because they had no personal involvement in Ms. Iñamagua's medical care or treatment and Plaintiffs have failed to allege violations of clearly established constitutional rights.   Plaintiffs' brief does not respond to the Federal Defendants' assertion of qualified immunity.[9]

_____

[9]   Plaintiffs failed to timely respond to the defendants' motions to dismiss.   Instead, after Plaintiffs' response briefs were due, Plaintiffs moved this Court for an extension of time to respond to the motions to dismiss.   This Court generously gave Plaintiffs another week to respond to the defendants' motions, giving Plaintiffs nearly three additional weeks beyond the original due date to submit their briefs.   However, as repeatedly set forth below, the briefs the Plaintiffs filed do not respond to or address numerous arguments made by the various defendants.   Because of this deficiency, at the hearing on these motions, Plaintiffs sought permission to file a supplemental brief on the legal issues Plaintiffs' counsel failed to address in their response briefs.   Plaintiffs' counsel's stated reason for failing to comply with the Court's local rules regarding dispositive motion deadlines, was that Plaintiffs' counsel was "swamped

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   <u>Pearson</u>, 129 S. Ct. at 815 (citing <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).   "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   <u>Pearson</u>, 129 S. Ct. at 815.   To overcome the defense of qualified immunity, a plaintiff must plead:  (1) facts demonstrating the deprivation of a constitutional or statutory right; and (2) that the right was clearly established at the time of the deprivation.  <u>Pearson</u>, 129 S. Ct. at 815; <u>Parrish v. Ball</u>, 594 F.3d 993, 1001 (8th Cir. 2010).   Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." <u>McRaven v. Sanders</u>, 577 F.3d 974, 980 (8th Cir. 2009).

### a. The Individual Federal Defendants Are Entitled to Qualified Immunity on Claims They Violated Ms. Iñamagua's Fifth Amendment Rights

Plaintiffs assert that the Federal Defendants violated the Equal Protection Clause of the Fifth Amendment by treating non-English speaking aliens differently than other detainees, and specifically by detaining Ms. Iñamagua with a life threatening medical condition in an ill-

---

with work."  The Eighth Circuit has repeatedly held, however, that an attorney's busy schedule or occupation with other cases is not excusable neglect allowing an extension to the deadline. <u>See e.g.</u> <u>Hawks v. J.P. Morgan Chase Bank</u>, 591 F.3d 1043, 1048 (8th Cir. 2010); <u>Harlow Fay, Inc. v. Fed. Land Bank of St. Louis</u>, 993 F.2d 1351, 1353 (8th Cir. 1993), cert. denied 510 U.S. 825 (1993).  Therefore, the Court denied Plaintiffs' counsel's request to file a supplemental brief, having already provided Plaintiffs' counsel a substantial extension of time.  The Court did allow Plaintiffs to address the narrow issue of whether a defendant must make a demand for an expert affidavit under Minn. Stat. § 145.682 when the Plaintiff files an affidavit of no expert review. The Court also limited Plaintiff to a maximum of two pages for the supplemental brief.  Notably, Plaintiffs did not adhere to the Court's direction and instead filed an eight page brief, which both exceeded the Court's page limit and the scope of the narrow issue Plaintiffs were to address.

equipped detention facility and by not providing a translator for her so that she could seek medical assistance.   Because Ms. Iñamagua was not similarly situated to other detainees, however, the individual Federal Defendants did not violate a clearly established constitutional right.

The Equal Protection Clause generally requires the government to treat similarly situated inmates alike.   Roubideaux v. North Dakota Dept. of Corr. and Rehab., 570 F.3d 966, 974 (8th Cir. 2009).  If there is a difference in treatment between similarly situated inmates, the treatment violates the Equal Protection Clause if it bears no rational relationship to a legitimate penal interest.   Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998).  "The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action, and so it is necessary to 'precisely define' the claim in order to determine what government action is being challenged."   Id.

In order to establish an equal protection violation, the plaintiff must identify a class of similarly situated persons who are treated dissimilarly.   Averianova v. Holder, 592 F.3d 931, 937 (8th Cir. 2010).  In cases in which an inmate claims that their equal protection rights were violated because of differences in the provision of medical care, courts have held that plaintiffs must allege facts showing that other similarly situated inmates had similar medical problems and were treated differently.   See e.g. Hatcher v. Salyers, No. 08-CV-224, 2008 WL 686758, *3 (W.D. Va. March 13, 2008) (stating plaintiff's allegations "fail to state any constitutional claim of unequal treatment, because Hatcher fails utterly to allege facts indicating that he and other inmates had similar medical problems."); see also Gorman v. Fries, No. 08-CV-151, 2008 WL 4911197, *5 (N.D. Ind. Nov. 13, 2008); Kimble v. Kukua, No. 05-CV-310, 2008 WL 4443248, *9 (S.D. Tex. Sept. 25, 2008).

Plaintiffs' equal protection claim is based solely on conclusory statements that Ms. Iñamagua was treated differently than "northern European, native-born English speaking inmates." (Complaint at ¶ 67). Without any further facts alleged, such individuals are not similarly situated to Ms. Iñamagua because Plaintiffs have not alleged that any native-born or northern European inmates suffered from neurocysticercosis or a similar life-threatening medical problem and were provided more timely medical care. In fact, Plaintiffs' Complaint acknowledges that neurocysticercosis is disproportionately prevalent in Latin American countries (Complaint at ¶ 32), making it unlikely that a "northern European" or native-born inmate would be similarly situated to Ms. Iñamagua. Because Plaintiffs have not alleged that there were other similarly situated detainees who were treated differently than Ms. Iñamagua, Plaintiffs fail to state a claim for a violation of Ms. Iñamagua's equal protection rights. Therefore, this Court recommends that the individual Federal Defendants be granted qualified immunity.

Nor does the fact Ms. Iñamagua was not provided a translator state a constitutional violation. The plaintiff in Rodriguez-Ramirez v. Helder, No. 06-5062, 2007 WL 2752362 (W.D. Ark. Sept. 20, 2007) made allegations similar to those brought by Plaintiffs. The plaintiff in that case, a Hispanic, Spanish-speaking pretrial-detainee, asserted the jail was deliberately indifferent to his medical needs when the jail doctors and nurses denied him access to medical treatment for a painful cyst on his back. Id. The plaintiff also contended that the defendants violated his equal protection rights by not providing him with a translator to obtain necessary medical care and forcing him to rely on other inmates to translate medical requests. Id. at *10. Like the Plaintiffs in this case, the plaintiff in Rodriguez did not challenge a particular jail policy. Id. The Court

also noted that there was no constitutional requirement that a detainee be provided with a translator throughout his or her incarceration.  Id.

Any failure of the Federal Defendants to provide Ms. Iñamagua with a translator during her confinement does not rise to the level of an equal protection violation.  While the Plaintiffs allege that Ms. Iñamagua's medical concerns went unheeded, they do not allege that Ms. Iñamagua was unable to communicate with the medical providers at RCADC.  She sought medical attention using the written medical request forms provided by RCADC and she was able to communicate with staff through her cellmate.  There are no allegations in the Complaint that state a plausible claim for a violation of Ms. Iñamagua's equal protection rights and the individual Federal Defendants should be afforded qualified immunity.

> **b. The Individual Federal Defendants Are Entitled to Qualified Immunity on Claims They Violated Ms. Iñamagua's Eighth and Fourteenth Amendment Rights[10]**

Plaintiffs also assert a constitutional violation of Ms. Iñamagua's right to be free from cruel and unusual punishment through indifference to Ms. Iñamagua's serious medical needs. The individual Federal Defendants are entitled to qualified immunity, however, because there are no allegations in the Complaint suggesting these Defendants had any personal involvement in her medical care.

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285 (1976).  Deliberate indifference can manifest itself in a variety of circumstances, including prison doctors failing to respond to a

---

[10] A court analyzes a claim of deliberate indifference to a detainee's medical needs as a due process claim under the Fourteenth Amendment, not under the Eighth Amendment. McRaven, 577 F.3d at 979 (citing Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007)).  "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Id.

prisoner's medical needs, prison guards intentionally denying or delaying access to medical care, or guards interfering with prescribed medical treatments.  Id. at 104-05.  The failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then they failed to act on that knowledge.  Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996).  But not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Estelle, 429 U.S. at 105.

A claim for deliberate indifference to medical needs contains both a subjective and objective component.  McRaven, 577 F.3d at 980.  First, a plaintiff must establish an objectively serious medical need.  Id.  Second, the plaintiff must demonstrate the defendant "actually knew of, but deliberately disregarded, such need."  Id.  Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness.  Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004).  Under this standard, to be liable for deliberate indifference, the government official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  McRaven, 577 F.3d at 981-82.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  Bender, 385 F.3d at 1137.

The individual Federal Defendants are entitled to qualified immunity because the Plaintiffs have not sufficiently plead that these defendants caused any deprivation of Ms. Iñamagua's Eighth or Fourteenth Amendment Rights.  Specifically, there are no allegations in the Complaint suggesting the individual Federal Defendants had any knowledge of Ms. Iñamagua's serious medical needs prior to the time she was taken to Regions Hospital.  Nor are

there any allegations in the Complaint suggesting the individual Federal Defendants had any personal contact with Ms. Iñamagua or had any involvement in her medical care.  Indeed, the only times Defendant Baniecke and the unnamed ICE agents are mentioned in the Complaint, are in the section identifying the parties and under the FTCA claim.  (Complaint at ¶ 14 and 58).  Because the individual Federal Defendants were not aware of Ms. Iñamagua's medical needs, Plaintiffs cannot plead any facts that the individual Federal Defendants deliberately disregarded those needs.  Therefore, Director Baniecke and the Federal John Doe Defendants are entitled to qualified immunity.

Nor can the individual Federal Defendants be vicariously liable for the acts of RCADC employees or contractors.  Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.  Iqbal, 129 S. Ct. at 1948. "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Id.  Under this rule, each government official is only liable for his or her own misconduct, despite their title.  Parrish, 2010 WL 445736 at *6.  As set forth above, the ICE employees had no involvement in the provision of Ms. Iñamagua's medical treatment.  The Complaint does not make any allegations of actions taken specifically by Director Baniecke or any unnamed ICE agents.  Because the individual Federal Defendants were not involved with Ms. Iñamagua's care, they are entitled to qualified immunity.

Construing the Complaint liberally, it appears Plaintiffs may be contending that the individual Federal Defendants violated Ms. Iñamagua's constitutional rights by placing her at the RCADC, a facility they contend subjected Ms. Iñamagua to unconstitutional conditions of confinement.  A similar argument was presented by the plaintiff in Wilson v. Blankenship, 163

F.3d 1284 (11th Cir. 1998).  The plaintiff in that case, a federal pre-trial detainee, was placed at a county jail to await trial.  Id. at 1287.  The plaintiff brought a § 1983 and Bivens claim against the wardens of the jail and against the U.S. Marshal who had transferred him to the city facility. Id.  The court granted qualified immunity to the Marshal stating, "no clearly established law would have informed a reasonable government official that transporting a federal pretrial detainee to a local jail with which the Marshals Service had an intergovernmental agreement was unconstitutional."  Id. at 1289.  Similarly, here no clearly established law would have informed Director Baniecke or the Federal John Doe Defendants that transporting Ms. Iñamagua to RCADC was unconstitutional.  Plaintiffs have not distinguished Wilson from the instant case nor offered any argument as to what "clearly established law" the ICE agents violated by placing Ms. Iñamagua at the RCADC.  This Court recommends that the Federal Defendants' motion to dismiss be granted.

### C.      Ramsey County Defendants

The Ramsey County Defendants urge this Court to dismiss Plaintiffs' claims against departments or divisions within Ramsey County which are not separate legal entities capable of being sued.  Ramsey County also seeks to have individual defendants Mary Roby, Jill Jones, and Dawn Bennett dismissed from this suit because Plaintiffs did not timely serve them with process.

The Ramsey County Defendants also ask the Court to dismiss Counts I, II, III, IV, and V of the Complaint.  Ramsey County asserts that Count I, for violations of 42 U.S.C. § 1983, should be dismissed because the Ramsey County Defendants were acting under color of federal law, not state law, when they provided detention facility services to ICE.  Therefore, the Ramsey County Defendants contend they may only be sued for violations of Ms. Iñamagua's constitutional rights through a Bivens claim, not under § 1983.  The Ramsey County Defendants

seek to have Counts II, III, and IV dismissed because they contend any negligence claims, other than a claim for wrongful death, abated at the time of Ms. Iñamagua's death.  Next, the Ramsey County Defendants assert that the wrongful death claim, based in medical malpractice, must be dismissed because the Plaintiffs failed to timely file the expert affidavits required by Minn. Stat. § 145.682 for such malpractice claims.  The Ramsey County Defendants further argue that the FTCA claims should be dismissed because only the United States can be sued under the FTCA and because Plaintiffs' administrative claim was not filed before the statute of limitations expired.  Finally, the Ramsey County Defendants assert that Count VI of the Complaint, the Bivens claim, should be dismissed against Sheriff Fletcher and Robert Fulton because the Complaint does not allege that those individuals had any personal involvement in Ms. Iñamagua's care and supervisors cannot be liable in a Bivens claim based on respondeat superior.  The Ramsey County Defendants do not seek to dismiss the Bivens claim against the remaining served individual defendants.[11]  As set forth below, this Court recommends that the Ramsey County Defendants' partial motion to dismiss be granted.

### 1. Plaintiffs Cannot Sue Non-Legal Entities

The Ramsey County Defendants first assert that certain named defendants should be dismissed because they are not legal entities capable of being sued.  Specifically, the Ramsey County Defendants contend that the Ramsey County Sheriff's Department, the Ramsey County Adult Detention Center, and the St. Paul-Ramsey County Department of Public Health should be

---

[11]   In Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), the Supreme Court provided a remedy to a person whose federal constitutional rights have been violated by someone acting under color of federal law.  Buford v. Runyon, 160 F.3d 1199, 1203 n. 6 (8th Cir. 1998).  A Bivens claim can only be brought against an individual federal employee acting in his individual capacity.  F.D.I.C. v. Meyer, 510 U.S. 471, 484, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994).

dismissed because each of those defendants is a department or division within the County of Ramsey and therefore not subject to suit.

Because these departments or divisions are not individuals or corporations, their capacity to be sued is determined by state law.  Fed. R. Civ. P. 17(b)(3).  Minnesota law permits actions against municipalities, including counties, for the acts of its officers, employees, and agents acting within the scope of their duties.  Minn. Stat. §§ 466.01, subd. 1 and 466.02.  Minnesota courts have repeatedly held, however, that divisions and departments of municipalities are not separate legal entities subject to suit.  Hyatt v. Anoka Police Dept., 700 N.W.2d 502, 505-06 (Minn. Ct. App. 2005) (holding city police department does not have authority to be sued); Maras v. City of Brainerd, 502 N.W.2d 69, 79 (Minn. Ct. App. 1993) (holding county's sheriff department not subject to suit); McKinney v. Minnesota, No. 08-3769, 2008 WL 4831762, *4 (D. Minn. Nov. 3, 2008) (holding Hennepin County Sheriff's Department was not legal entity capable of being sued because it was a department of a municipal corporation).

The Ramsey County Sheriff's Department, the Ramsey County Adult Detention Center, and the St. Paul-Ramsey County Department of Public Health are not municipal corporations, rather they are divisions or departments within a municipality.  Therefore, these entities are not subject to suit and it is recommended that they be dismissed from the instant action.

### 2.  Individuals Not Timely Served with Process Should Be Dismissed

The Ramsey County Defendants argue that this Court should dismiss defendants Mary Roby, Jill Jones, and Dawn Bennett for insufficient service of process.  Because Plaintiffs have not established good cause or excusable neglect for not timely serving these defendants, the motion to dismiss should be granted.

In order for a court to exercise jurisdiction over a party, the party must be properly served with process.  Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999); Printed Media Serv., Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993).  Before resolving any matter on the merits, questions pertaining to the court's jurisdiction must be resolved.  Crawford v. F. Hoffman-LaRoche, Ltd., 267 F.3d 760, 764 (8th Cir. 2001).

A plaintiff has 120 days after a complaint is filed to effectuate service.  Fed. R. Civ. P. 4(m).  If a defendant is not served within 120 days after the complaint is filed, the court may dismiss the action without prejudice against that defendant. Fed. R. Civ. P. 4(m).  The rule also provides that a district court must extend the time for service of process if the plaintiff shows good cause for his or her failure to serve within the proscribed 120 day period.  Colasante v. Wells Fargo Corp., 81 Fed. Appx. 611, 612-613, 2003 WL 22734595, *1 (8th Cir. 2003) (citing Adams v. AlliedSignal Gen. Aviation Avionics, 74 F.3d 882, 887 (8th Cir. 1996)).  If good cause is not shown, the district court still retains the discretion to grant an extension of time for service.  Id.  This permissive extension is allowed when the plaintiff demonstrates excusable neglect.  Id. (citing Coleman v. Milwaukee Bd. of Sch. Dirs., 290 F.3d 932, 934 (7th Cir. 2002)); Roberts v. Michaels, 219 F.3d 775, 777 n. 1 (8th Cir. 2000).   The possible running of the statute of limitations, however, does not require the district court to grant a permissive extension. Colasante, 81 Fed. Appx. 611 at 613-614, 2003 WL 22734595 at *2.  "This is all the more true when the plaintiff can offer no legitimate reason for the untimely service of process."  Id.

After the Defendants filed the instant motions to dismiss, Plaintiffs moved this Court to extend the deadlines for completing service of process and asked this Court to rule that any services completed after the deadlines were nevertheless timely.  The Court denied that motion

for defendants Roby, Jones, and Bennett, concluding that Plaintiffs had not shown good cause or excusable neglect for the untimely service on Roby and the complete lack of service on Jones and Bennett [Doc. No. 118].  Plaintiffs appealed, and on March 5, 2010, Judge Rosenbaum affirmed this Court's Order [Doc. No. 157].  Plaintiffs have not offered any new arguments as to why they should be excused from the untimely and incomplete services of process on these Defendants.  (Pls.' Mem. Opposing Def. Ramsey Cty.'s Mot. to Dismiss or in the Alternative for Summ. J. and Mot. to Dismiss of Advance Practice Solutions, P.A., and Gregory Salmi at 7, hereinafter "Pls.' Mem in Opp. to Ramsey County and APS").  Rather, Plaintiffs merely repeat their argument that they could not serve Ms. Bennett because they only knew her as "T. Bennett."  This argument, however, ignores the fact that Ramsey County provided the correct and full name of Ms. Bennett in May 2009, well before the 120 days for service expired.  Plaintiffs also contend that "[t]he law does not require superhuman efforts or that you search everyday, spending thousands of dollars to find someone who harmed your client.  Rather it requires due diligence, or if unsuccessful[,] excusable neglect."  This Court does not disagree.  As set forth in the Court's previous Order, however, Plaintiffs did not establish that they acted with due diligence in attempting to serve Roby, Jones, and Bennett.  The affidavit of Plaintiffs' counsel's process server, provided to the Court in connection with Plaintiffs' motion to extend the deadlines for service, is too vague and conclusory for this Court to conclude that Plaintiffs worked diligently to serve the defendants.  Because Roby, Jones, and Bennett[12] were not served

---

[12]   In their initial memorandum in support of this motion, the Ramsey County Defendants also sought dismissal of Defendant Corrine Strand because she was not served within 120 days of the filing of the Complaint.  Subsequently, this Court issued its Order on Plaintiffs' motion to extend the service deadlines [Doc. No. 118] and in that Order, the Court concluded that the Plaintiffs had good cause for not serving Strand within 120 days because she had been out of state for a substantial period of time.  Therefore, the Ramsey County Defendants orally withdrew their motion to dismiss Corrine Strand at the hearing on the instant motion.

with process within 120 days after the filing of the Complaint, this Court recommends that the motion to dismiss these Defendants be granted.

### 3.   The Ramsey County Defendants Were Not Acting Under Color of State Law for Plaintiffs' Section 1983 Claims

The Ramsey County Defendants also seek dismissal of Plaintiffs' claims under 42 U.S.C. § 1983, arguing that they were not acting under color of state law and, therefore, any claim alleging violations of Ms. Iñamagua's constitutional rights is only cognizable as a Bivens claim. Once again, Plaintiffs did not respond to the Ramsey County Defendants' motion to dismiss the § 1983 claims. This Court agrees that the § 1983 claims should be dismissed.

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a constitutional right and must show that the constitutional deprivation was committed by a person acting under color of state law. Cook v. City of Bella Villa, 582 F.3d 840, 848-49 (8th Cir. 2009) (citing West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)).

Pursuant to 8 U.S.C. § 1357(g)(1), the Attorney General may enter into an agreement with a state or local agency to provide immigration officer functions and assist in enforcing immigration laws. Id.; Arias v. U.S. Immigration and Customs Enforcement Div. of Dept. of Homeland Sec., No. 07-1959, 2008 WL 1827604, *13 (D. Minn. April 23, 2008). Congress has provided that "[a]n officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the

liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law."  8 U.S.C. § 1357(g)(8).  In <u>Arias</u>, city employees assisted ICE agents with an immigration enforcement action.  <u>Arias</u>, 2008 WL 1827604 at *3.  The court *sua sponte* considered whether the plaintiffs could be sued under § 1983.  <u>Id.</u> at 13-14.  The court held that, pursuant to 8 U.S.C. § 1357(g)(8), the city employees were not acting under color of state law while assisting ICE, and therefore they could only be sued under a <u>Bivens</u> claim.  <u>Id.</u> at 14.

There is no dispute in this case that the Ramsey County Defendants provided detention services to ICE through an intergovernmental services agreement.  The plain language of 8 U.S.C. § 1357(g)(8) provides that persons and local subdivisions assisting ICE through such an agreement are acting under color of federal law, not color of state law.  Therefore, this Court recommends that the motion to dismiss the § 1983 claim against the Ramsey County Defendants be granted.

### 4. Plaintiffs' Negligence Claims, Other Than Medical Malpractice, Do Not Survive Ms. Iñamagua's Death

The Ramsey County Defendants next move to dismiss Plaintiffs' claims for Negligence (Count II),[13] Breach of Contract (Count III), and Negligent Hiring, Retention and Supervision (Count IV).[14]  The Ramsey County Defendants assert that these claims should be dismissed because the claims abated upon Ms. Iñamagua's death.  This Court agrees.

---

[13]  Plaintiffs appear to suggest that they intend to add a claim for spoliation of evidence, either as an independent tort or within their current claim for negligence.  Plaintiffs, however, have not yet filed a proposed amended complaint outlining the basis for such a claim.  That claim, therefore, is not ripe for decision by this Court.

[14]  The Ramsey County Defendants do not assert that the Malpractice claim (Count III) and the Wrongful Death claim (Count IV) should be dismissed because of abatement.  Rather, as set forth below, the Ramsey County Defendants (as well as APS and Dr. Salmi), contend the Malpractice and Wrongful Death claim should be dismissed because Plaintiffs failed to meet the statutory deadlines for serving expert reports.

Minn. Stat. § 573.01 provides:

> A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02. All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter.

Id.  Minn. Stat. § 573.02 goes on to state:  "[w]hen death is caused by the wrongful act or omission of any person or corporation, the trustee . . . may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission."  Id. subd. 1.

Whether a claim survives death is determined "in the substance, not the form, of the cause of action."  Id.  In Strickland v. Vencor, Inc., No. 99-1543, 2000 WL 622292, *1-2 (Minn. Ct. App. May 16, 2000), the court held that the plaintiff's claim for breach of contract abated on death.  Id.  The plaintiff was the daughter and personal representative of a woman who died after falling at her nursing home.  Id. at *1.  The plaintiff sued alleging the nursing home breached its express or implied contract by failing to provide care in accordance with standards imposed by state and federal regulations resulting in the plaintiff's mother's death.  Id.  The court held that, even though couched as a breach of contract claim for recovery of the funds paid to the nursing home, the plaintiff's claim was really a claim for personal injury and therefore the claim abated with the mother's death.  Id. at *2.  Negligent hiring and retention claims require a physical injury or threat of physical injury.  Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007); Webb v. Xcel Energy, Inc., No. 06-562, 2007 WL 1412852, *4 (Minn. Ct. App. May 15, 2007).  These claims are therefore also based on personal injury.

As in the cases set forth above, the Plaintiffs' common law claims in this case are all based in personal injury.  All of the claims arise out of the same set of facts, that is, the medical

care and treatment provided to Ms. Iñamagua and her resulting death.  None of the claims relate to a property interest or constitute a claim unrelated to the claim for Ms. Iñamagua's wrongful death.    Because the claims for negligence,[15] breach of contract, and negligent supervision/retention all arise from the personal injuries to Ms. Iñamagua, these claims abated on her death and, therefore, this Court recommends that the Ramsey County Defendants' Motion to Dismiss be granted.

### 5. Plaintiffs' Claims Under the Federal Tort Claims Act Should Be Dismissed

The Ramsey County Defendants argue that Plaintiffs' claims under the FTCA should be dismissed against them because the United States is the only proper party in such a suit and because Plaintiffs' administrative claim to DHS was untimely.  As set forth above, this Court agrees that Plaintiffs' FTCA claims were untimely and therefore this Court recommends that the claims be dismissed.

### 6. The Bivens Claims Against Sheriff Fletcher and Robert Fulton Should Be Dismissed Because They Had No Personal Involvement in Ms. Iñamagua's Care or Confinement

Because Sheriff Fletcher and Robert Fulton had no personal involvement in Ms. Iñamagua's care, the Ramsey County Defendants argue that the Bivens claim should be dismissed against these two individual defendants.  As set forth above, there is no respondeat superior liability in Bivens actions.  Moreover, Plaintiffs fail to plead any facts that Fletcher or Fulton, through their own individual actions, violated Ms. Iñamagua's constitutional rights.

---

[15]  At one point in the Complaint, Plaintiffs appear to suggest that they have a personal claim for negligence against the Defendants, separate and apart from their claims as personal representatives for Ms. Iñamauta.  (See Complaint at ¶ 48(f)).  Beyond the fact that the caption of the Complaint belies any suggestion that the Plaintiffs are asserting claims in their individual capacity, such a claim could not survive a motion to dismiss.  In this case there was no special relationship between the parties which created a duty of care owed to the Plaintiffs by the defendants.  Errico v. Southland Corp., 509 N.W.2d 585, 587 (Minn. Ct. App. 1993).

There is no mention in the Complaint of what actions these defendants took in violation of Ms. Iñamagua's rights.  Because these defendants had no personal involvement in Ms. Iñamagua's care or confinement, this Court recommends that the <u>Bivens</u> claims against these two individuals be dismissed.  The Ramsey County Defendants have not moved to dismiss the <u>Bivens</u> claim asserted against the other individual defendants.

### 7. Plaintiffs' Malpractice Claims Should Be Dismissed for Failure to Timely Serve Expert Affidavits[16]

This Court previously denied Plaintiffs' motion to extend the deadlines for expert review [Doc. No. 118] and Judge Rosenbaum affirmed that Order [Doc. No. 157].  In that Order, this Court concluded that Plaintiffs' malpractice claims required the timely filing of expert affidavits pursuant to Minn. Stat. § 145.682 and Plaintiffs' counsel's failure to comply with the deadlines for the expert affidavits was not saved by excusable neglect.  Plaintiffs have not offered any new or additional arguments which excuse their late filings.

Under Minnesota law, in an action alleging malpractice, error, mistake, or failure to cure, whether based in contract or tort, against a health care provider, which includes a cause of action as to which expert testimony is necessary to establish a prima facie case, the plaintiff must serve two affidavits of expert review on the defendant at designated times.  Minn. Stat. § 145.682 (2008); <u>Hautala v. ALZA Corp.</u>, No. A08-0915, 2009 WL 1515444, *5 (Minn. Ct. App. June 2, 2009); <u>Jensen v. Leonard</u>, No. 08-2253, 2009 WL 3364264, *4 (Minn. Ct. App. Oct. 20, 2009); <u>Garcia v. Anderson</u>, No. 08-4731, 2009 WL 2900304, 4 (D. Minn. Sept. 2, 2009).  A plaintiff must first serve an affidavit of expert review (hereinafter "affidavit of expert review"), simultaneously with the summons and complaint.  Minn. Stat. § 145.682, subd. 3.  A second

---

[16] The Defendants' motions are based on the untimeliness of the expert affidavits.  This Court expresses no opinion on whether the substance of the expert affidavits satisfies the requirements of Minn. Stat. § 145.682.

affidavit identifying the experts to be called (hereinafter "affidavit of expert identification"), must be served by the Plaintiff within 180 days of the commencement of suit. Id. at subd. 4. The purpose of these affidavits is to identify frivolous or meritless lawsuits at an early stage of the litigation and to ensure that the party who initiates a medical malpractice claim can establish a prima facie case. Broehm v. Mayo Clinic Rochester, 690 N.W.2d 721, 725-26 (Minn. 2005); Sorenson v. St. Paul Ramsey Med. Ctr., 457 N.W.2d 188, 190 (Minn. 1990); Uhde v. Brook West Chiropractic Clinic, 2005 WL 3111969, *1 (Minn. Ct. App. 2005). The Minnesota courts require "strict compliance" with the requirements of Minn. Stat. § 145.682. Broehm, 690 N.W.2d at 726; Garcia, 2009 WL 2900304 at *4.

The affidavit of expert review, provided at the time of service of the summons and complaint, does not need to identify the expert or provide the details of the expert's opinion. Sorenson, 457 N.W.2d at 190. Rather, the statute only requires an affidavit, signed by the plaintiff's attorney, which states "the facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subd. 3(a). Alternatively, a plaintiff's attorney can submit an affidavit stating that he or she could not "reasonably" obtain an expert review before the action was commenced because of the running of the statute of limitations. Id. at subd. 3(b). If a plaintiff submits an affidavit of no expert review pursuant to subdivision 3(b), the plaintiff's attorney must then submit, within 90 days after service of the summons and complaint, the affidavit of expert review pursuant to subd. 3(a). Id. If a plaintiff fails to file an affidavit of expert review within 60 days after a

defendant demands the affidavit, a court must dismiss the cause of action with prejudice.  Minn. Stat. § 145.682, subd. 6(a).  Such a demand is not necessary, however, when the plaintiff files an affidavit of no expert review.  Paulos v. Johnson, 502 N.W.2d 397, 399 (Minn. Ct. App. 1993).

The second affidavit, due 180 days after commencement of the suit, requires more detail. Minn. Stat. § 145.682 subd. 2(2) and 4(a); Sorenson, 457 N.W.2d at 190.  The second affidavit must provide the identity of each person whom the plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.  Id.  This affidavit must be signed by each expert listed in the affidavit and by the plaintiff's attorney.  Id.  Unlike the affidavit of expert review, a defendant does not need to demand an affidavit of expert identification in order for the court to dismiss the action.  Minn. Stat. § 145.682, subd. 6(b); Bellecourt v. United States, 784 F. Supp. 623, 637 n. 7 (D. Minn. 1992).

In an action proceeding in federal court, federal law determines when a suit is "commenced" for purposes of Minn. Stat. § 145.684.  Hughes v. Mayo Clinic, 834 F.2d 713, 716 (8th Cir. 1987) cert. denied, 487 U.S. 1210 (1988); see also Anderson v. U.S., Veterans Admin., No. 96-235, 1998 WL 92460, *2 (D. Minn. Jan. 5, 1998); 1 Minn. Prac., Civil Rules Annotated R 3.01 (4th Ed.).  Under Federal law, a lawsuit is commenced upon the filing of the Complaint. Fed. R. Civ. P. 3.

In limited circumstances, a plaintiff's failure to provide an expert affidavit may be excused.  A plaintiff's failure to comply with the affidavit requirements of Minn. Stat. § 145.682 may be excused if:  (1) expert testimony is not needed to establish negligence; or (2) if the

plaintiff shows excusable neglect in failing to timely serve the affidavits.  <u>Garcia</u>, 2009 WL 2900304 at *5; <u>Bellecourt</u>, 784 F. Supp. at 636-37; <u>see also</u> <u>Moen v. Mikhail</u>, 454 N.W.2d 422, 422 (Minn. 1990).  If the affidavit requirements are not excused, the failure to comply results "in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case."  Minn. Stat. § 145.682, subd. 6(a) and (b); <u>see also</u> <u>Jensen</u>, 2009 WL 3364264 at *4; <u>Bjorke v. Mayo Clinic of Rochester</u>, 574 N.W.2d 447, 450 (Minn. Ct. App. 1998).  The Minnesota Supreme Court has explained:

> Dismissal is mandated under Minn. Stat. § 145.682, subd. 6 when the disclosure requirements are not met and while we certainly recognize that the statute may have harsh results in some cases, it cuts with a sharp but clean edge. It is the legislative choice to implement the policy of eliminating frivolous medical malpractice lawsuits by dismissal. A showing of good cause for an extension of the 180-day time limit pursuant to Minn. Stat. § 145.682, subd. 4(b) may justify relief from the mandatory filing time required under the statute, but failing that, the statute compels dismissal for failure to timely file the required disclosure.

<u>Lindberg v. Health Partners, Inc.</u>, 599 N.W.2d 572, 578 (Minn. 1999); <u>see also</u> <u>Ellingson v. Walgreen Co.</u>, 78 F. Supp. 2d 965, 969 (D. Minn. 1999) ("Plaintiffs are understandably concerned that this ruling means an allegedly negligent defendant will escape liability because of their failure to comply with Minnesota's expert affidavit statute. This is the clear intent of Minnesota's legislature, both in its statute and as the statute has been interpreted by its highest Court.").

This lawsuit was commenced on April 10, 2009 when Plaintiffs filed the Complaint.  The second affidavit, the affidavit of expert identification, was therefore due on October 7, 2009.  Plaintiffs filed two affidavits purporting to satisfy both affidavit requirements, an affidavit from Dr. Allan Ingenito on November 24, 2009 and an affidavit from Nurse Shelley Bhola on December 17, 2009.  These affidavits were more than six weeks late under the statute, there was

no excusable neglect shown, and therefore dismissal is mandated by Minn. Stat. § 145.682. Plaintiffs' responses to the motions to dismiss do not raise any new arguments as to why they should be excused from failing to comply with the expert affidavit requirements. Plaintiffs make two arguments in their responsive brief. First, Plaintiffs repeat their argument that they did not have complete medical records prior to the expiration of the deadline for the affidavit of expert identification. (Pls.' Mem in Opp. to Ramsey County and APS at 4-5). Second, Plaintiffs contend that different types of nurses owe different standards of care to their patients and because Plaintiffs did not know what type of nurses treated Ms. Iñamagua, they could not obtain an expert report. (Id. at 5-6).

Although this Court has repeatedly rejected the argument, Plaintiffs continue to hang their hat on the argument that Ramsey County's failure to provide complete medical records prior to the filing of this lawsuit excuses Plaintiffs' untimely submissions.[17] Plaintiffs argue "when Mr. Flores was at the bedside of his dying wife, he requested [Ms. Iñamagua's medical] records . . . His attorney received no response from Ramsey County for four months. A prima facie case is raised of fraudulent concealment." (Pls.' Mem in Opp. to Ramsey County and APS at 4). As this Court has held, the records Plaintiffs received in 2006 were more than sufficient to obtain the necessary expert affidavits. Indeed, the late filed affidavits were based on those very medical records.

Plaintiffs also repeat their argument that they could not obtain expert affidavits because they did not know the identities of the nurses who treated Ms. Iñamagua, or what types of nurses

---

[17] In their many filings, Plaintiffs also hint at allegations that one or more defendants forged a medical record. (See e.g. Aff. of Christopher Walsh and Shelly Bhola, R.N., Regarding Expert Review and Expert Identification, in Supp. of Mot. to Amend Compl. and File Supplemental Pleadings, and in Opp. to Defs' Motions for Summ. J. or to Dismiss [Doc. No. 123] at ¶ 9). Plaintiffs have never detailed, however, what document they allege was forged nor provided any evidence substantiating this claim.

they were.  As set forth in this Court's previous order, however, Plaintiffs knew in April 2007, that Nurse Erica Thompson was an R.N. as set forth in a letter from Plaintiffs' counsel to the Ramsey County Attorney's Office.  [Doc. No. 38, Ex. E].  Further, the medical records produced to Plaintiffs in 2006 clearly document that both Corrine Strand and Erica Thompson were R.N.s. [Doc. No. 38, Ex. D, attachment 8].  In the Complaint, Plaintiffs also referenced the fact that Strand and Thompson were registered nurses.  (Complaint at caption and ¶ 38).  Thus, even before the Complaint was filed, Plaintiffs knew the identities of the nurses who treated Ms. Iñamagua, and knew those nurses were R.N.s.

Plaintiffs' counsel also stated that he needed additional time to complete expert affidavits because "I have asked Ramsey County . . . who all [sic] nurses were involved in the care or denial of care to [Ms. Iñamagua]."  Ramsey County provided this information to Plaintiffs' counsel on May 1, 2009, well before the deadline for the affidavit of expert identification.  In the May 1, 2009 letter, Ramsey County stated, "[i]n response to your inquiry regarding medical providers, the following individuals provided medical treatment and/or evaluation of Ms. Iñamagua . . . Nurse Erica Thompson, Nurse Corrine (a/k/a Chris) Strand, and Dr. Greg Salmi, who is employed by Advanced Practice Solutions."  [Doc. No. 38, Ex. I].  Even if this Court gave Plaintiffs the benefit of the doubt and calculated the 180 days from May 1, 2009, the expert identification affidavit would have been due on October 28, 2009, and the Ingenito and Bhola affidavits would still be untimely.

Finally, Plaintiffs contend that the expert affidavits are not untimely because the defendants never made a demand for the affidavits.  The plain language of the statute provides that a demand is not required for the affidavit of expert identification.  Plaintiffs have failed to establish excusable neglect for not timely filing the affidavits of expert identification.  The

statute therefore mandates dismissal of Plaintiffs' wrongful death/malpractice claim and this Court recommends that the Ramsey County Defendants' motion to dismiss be granted.[18]

### D.     APS and Dr. Salmi

Dr. Salmi and APS also move to dismiss the claims against them in this suit arguing that all the claims asserted against them required § 145.682 expert affidavits and those affidavits were not timely filed.[19]

### 1.    Plaintiffs' Negligence and Malpractice Claims Against Dr. Salmi and APS Should Be Dismissed for Failure to Timely Serve Expert Affidavits

As with the other defendants, the affidavits of expert identification were untimely for Dr. Salmi and APS.  Plaintiffs make no new arguments as to why they could not file an expert affidavit regarding physician malpractice.  Plaintiffs knew Dr. Salmi's name by May 1, 2009 at the latest, making the affidavit of expert identification due on or before October 28, 2009 at the very latest.  Plaintiffs have not suggested that there were any medical records related to Dr. Salmi's treatment of Ms. Iñamagua, which they had not received which were necessary for an expert affidavit.  Nor have Plaintiffs established excusable neglect.  For the reasons set forth

---

[18]   In addition to the affidavits of expert identification being untimely, the Ingenito and Bhola affidavits were also untimely as affidavits of expert review for all the defendants other than Dr. Salmi.  Plaintiffs claim that this Court should consider the Affidavit of No Expert Review [Doc. No. 2] as an affidavit of expert review, despite the fact that the title of the document plainly states to the contrary.  This argument fails because the Affidavit does not aver that the case was reviewed by the attorney with an expert and that the expert opined that the defendants deviated from the standard of care.  Further Plaintiffs' attempts to distinguish Paulos v. Johnson, 502 N.W.2d 397, 399 (Minn. Ct. App. 1993) are without merit.  Pursuant to Paulos, the defendants were not required to make a demand for the expert review affidavit because Plaintiffs filed an Affidavit of No Expert Review.  Therefore, the Plaintiffs also failed to meet the deadline for the affidavits of expert review, in addition to the deadline for the affidavits of expert identification.

[19]   Originally, Dr. Salmi also moved to dismiss the lawsuit against him for lack of service of process.  After this Court issued its Order [Doc. No. 118], concluding that Dr. Salmi was timely served, Dr. Salmi withdrew that portion of the motion.

above, this Court recommends that the motion to dismiss the malpractice claims against Dr. Salmi and APS be granted.

### 2.   Plaintiffs Have Asserted a <u>Bivens</u> Claim Against Dr. Salmi

Dr. Salmi and APS argue that Plaintiffs cannot assert a <u>Bivens</u> claim against Dr. Salmi because the Plaintiffs did not allege Dr. Salmi was acting under color of federal law.  A private physician who contracts with the government to provide medical services to inmates, acts under color of law for purposes of a <u>Bivens</u> claim.  <u>Bellecourt</u>, 784 F. Supp. at 628-29.  Dr. Salmi alleges that the Plaintiffs did not plead in the Complaint that there was a contractual relationship between Dr. Salmi and Ramsey County.  Admittedly, the Complaint is vague on this point, but for purposes of the motion to dismiss, paragraphs 10-11 appear to suggest that such a contractual relationship existed.  Therefore, this Court recommends that Dr. Salmi's motion to dismiss the <u>Bivens</u> claim against him be denied.

### 3.   Plaintiffs' Section 1983 and <u>Bivens</u> Claims Do Not Require a § 145.682 Expert Affidavit

Dr. Salmi and APS argue that Plaintiffs' § 1983 and <u>Bivens</u> claims require a § 145.682 expert affidavit.  Plaintiffs did not respond to this argument in their motion papers.

Dr. Salmi and APS rely on <u>D.A.B. v. Brown</u>, 570 N.W.2d 168, 171 (Minn. Ct. App. 1997) for the proposition that all claims dependent on medical judgment, diagnosis, and treatment are medical malpractice claims.  (Defs. Gregory Salmi M.D.'s and Advance Practice Solutions, P.A.'s Mem. in Supp. of Mot. to Dismiss Pursuant to Minn. Stat. § 145.682 and Fed. R. Civ. P. 4(m) at 11, hereinafter "Dr. Salmi and APS' Mem.").  <u>D.A.B.</u> is inapposite, however, because that case did not involve the issue before this court, whether a § 1983 claim of deliberate indifference to serious medical needs and a <u>Bivens</u> claim alleging deliberate indifference sound in malpractice and require an expert affidavit pursuant to Minn. Stat. §145.682.  <u>D.A.B.</u>, 570

N.W.2d at 171.  Indeed, the plaintiffs in D.A.B. did not assert any constitutional claims.  Id.  The defendant's reliance on a concurring opinion in Femrite v. Abbott Nw. Hosp., 568 N.W.2d 535, 544 (Minn. Ct. App. 1997) and on Kaiser v. Memorial Blood Ctr., 486 N.W.2d 762, 765 (Minn. 1992) is likewise misplaced.  Again, those courts did not address whether a § 145.682 affidavit is required in claims under § 1983 or Bivens.

In this Court's previous Order, the Court cited two cases for the proposition that a § 145.682 affidavit was not required for Plaintiffs' § 1983 and Bivens claims.  Parreant v. Schotzko, No. 00-2014, 2001 WL 1640137, *4 (D. Minn. Sept. 30, 2001); Blaisdell v. Tanner, No. 00-1318, 2001 WL 34623999, *5 (D. Minn. June 14, 2001).  Dr. Salmi and APS assert that those cases are distinguishable because the plaintiffs in those cases did not allege a § 1983 or Bivens claim based on medical malpractice.  While the defendants are correct, Parreant and Blaisdell nevertheless made allegations similar to the Plaintiffs in this case, namely, that the defendants were deliberately indifferent to the plaintiff's medical needs because the defendants failed to treat the plaintiffs' medical conditions.

APS and Dr. Salmi have not cited, nor has this Court found, a case in which a court has dismissed a § 1983 or a Bivens claim through application of Minn. Stat. § 145.682.  In the cases in which a plaintiff has brought both a malpractice claim and a claim of deliberate indifference to serious medical needs, the courts have not applied § 145.682 to dismiss the § 1983 or Bivens claims.  Rather, the courts dismissed the constitutional claims on bases separate from and without reference to, the timeliness of the expert affidavits.  See e.g. Garcia v. Anderson, No. 08-4731, 2010 WL 489527, *2-3 (D. Minn. Feb. 4, 2010) (dismissing negligence claim and stating Bivens claim did not require § 145.682 expert affidavit); Wales v. Trung, No. 08-39, 2009 WL 4906502, *11-12 (D. Minn. Decl. 16, 2009) (granting summary judgment to defendants after

concluding plaintiff's allegations did not rise to level of deliberate indifference and then dismissing negligence/malpractice claims for failure to submit expert affidavits as required by Minn. Stat. § 145.682); Tineo v. Fed. Bureau of Prisons, No. 05-724, 2005 WL 1745451, *3 (D. Minn. July 22, 2005) (dismissing malpractice claim pursuant to § 145.682 and dismissing Bivens claim because hospital not acting under color of federal law).

At the hearing on this matter, Dr. Salmi and APS suggested that Bellecourt supports their position that a § 145.682 affidavit is required for Plaintiffs to succeed on their Bivens and § 1983 civil rights claims based on deliberate indifference to serious medical needs. Nowhere in that case does the court suggest that the plaintiff's deliberate indifference claim required a § 145.682 affidavit. Bellecourt, 784 F. Supp. at 634-635. Admittedly, the plaintiff in that case relied on his § 145.682 affidavit to support his § 1983, Bivens, and malpractice claims. Id. But the court granted summary judgment on the § 1983 and Bivens claims substantively, not pursuant to Minn. Stat. § 145.682 and the plaintiff's failure to timely file his expert affidavits. Therefore, it is this Court's recommendation that Dr. Salmi and APS's motion to dismiss the § 1983 and Bivens claims be denied.

## VI.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     The Federal Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 25] be **GRANTED**;

**2.**     Defendant Gregory Salmi M.D.'s Motion to Dismiss [Doc. No. 28] be **DENIED as moot**;

3.   Ramsey County Defendants' Motion to Dismiss or for Summary Judgment [Doc. No. 31] be **DENIED as moot**;

4.   Defendants Gregory Salmi M.D. and Advance Practice Solutions, P.A.'s Amended Motion to Dismiss; [Doc. No. 69] be **GRANTED in part** and **DENIED in part**.  To the extent the motion seeks to dismiss Count I (42 U.S.C. § 1983) and Count VI (<u>Bivens</u> Claim), the motion should be **DENIED**.  In all other respects, the motion should be **GRANTED**; and

5.   Ramsey County Defendants' Amended [Partial] Motion to Dismiss or in the Alternative, for Summary Judgment [Doc. No. 75] be **GRANTED**.  The Ramsey County Sheriff's Department, the Ramsey County Adult Detention Center, and the St. Paul-Ramsey County Department of Public Health should be dismissed. Individual defendants Mary Roby, Jill Jones, and Dawn Bennett should be dismissed.  Counts I, II, III, IV, and V should be dismissed.  Count IV (the <u>Bivens</u> claim) should be dismissed against Sheriff Fletcher and Robert Fulton.  The <u>Bivens</u> claim remains as to the remaining individual defendants.


Dated:  April 1, 2010                           s/ Susan Richard Nelson_____
                                                SUSAN RICHARD NELSON
                                                United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 16, 2010** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.