# EXHIBIT A

# EMPLOYMENT AGREEMENT

**DATE:** _January 1, 2005_

**PARTIES AND ADDRESSES:**

Advanced Practice Solutions, P.A.                    ("Employer")

_Gregory Salmi, MD_                                   ("Employee")

**RECITALS:**

A.     Employer is a professional corporation duly organized under Minnesota law which provides services in medicine.

B.     Employee is duly licensed as a MD under Minnesota law and certified as a MD by a national professional medical organization recognized by the Minnesota Board of Medicine.

C.     Employer is of the opinion that the services of Employee will be of value to Employer and desires to employ Employee on the terms and conditions set forth in this Agreement.

**AGREEMENTS:**

## ARTICLE 1.
## TERM OF EMPLOYMENT; DUTIES; FEES; OCCUPATIONAL HEALTH

1.1     <u>Term of Employment</u>.  Employer employs Employee as a MD for a term beginning on _January 1, 2005_ and continuing until terminated as provided in Article 3.

1.2     <u>Duties and Supervision</u>.  During the term of this Agreement, Employee agrees to devote his or her full time and best efforts to the practice and affairs of Employer and to perform such services and duties as may from time to time be assigned to him or her by Employer. Employee acknowledges and agrees that Employer cannot guarantee Employee a minimum number of hours of work and that Employer may not have work available for Employee from time to time.  Employee shall be subject to the supervision and direction of Employer as to all matters relating to the performance of his or her services, except to the extent Employee is required to be supervised and directed by physicians with whom Employee may work pursuant to the terms of a Service Agreement between Employer and a physician, clinic, medical group, hospital, nursing

- 1 -

**EXHIBIT A**

facility, or other health care organization ("Employer Clients"). Employee agree to furnish high quality patient care and services in a professional and ethical manner, in accordance with all applicable laws and regulations and industry standards. Employee further agrees to abide by any and all policies, rules and regulations promulgated by Employer.

    1.3    Fees. Except as from time to time determined by Employer, all fees resulting from Employee's professional services or professional activities of any type shall accrue and belong to Employer.

    1.4    Occupational Health. Employee hereby agrees to obtain or submit to all occupational health tests, screenings, inoculations, and other items (including, but not limited to, TB and influenza tests) that are reasonably requested by Employer to perform the services required under this Agreement. Upon the reasonable request of Employer, Employee also agrees to submit to other health care tests and exams Employer deems necessary and appropriate for employment purposes.

## ARTICLE 2.
## COMPENSATION AND PROFESSIONAL LIABILITY INSURANCE

    2.1    Compensation for Services. Subject to the provisions for termination contained in Article 3, Employer shall pay Employee as compensation for services rendered the amount set forth on SCHEDULE 2.1 attached hereto. Such amount shall be payable in accordance with Employer's normal payroll schedule and practices, and shall be subject to deductions and withholds for Social Security taxes and any other sums required by law. Employee's compensation and performance shall be subject to periodic reviews by Employer. Employee shall furnish Employer with time cards or other documentation requested by Employer to establish the hours worked each pay period. Employee shall not bill or collect any compensation from Employer's Clients or any patients to whom Employee furnishes services.

    2.2    Professional Liability Insurance. Employer shall carry and pay the premiums on professional liability insurance providing malpractice coverage and protection for Employer and Employee during Employee's employment with Employer with such limits as Employer deems advisable. In the event Employee's employment is terminated for any reason, Employer shall not be responsible for purchasing a reporting endorsement or tail-coverage which provides professional liability insurance coverage for Employee for the period subsequent to termination of Employee's employment and Employee shall be responsible for obtaining such professional liability insurance coverage.

## ARTICLE 3.
## TERMINATION AND COVENANT NOT TO COMPETE

    3.1    Termination. Employee's employment under this Agreement, and (except as provided in Section 3.3 hereof) all terms of this Agreement, shall terminate as provided below:

        A.    By mutual written agreement of the parties.

- 2 -

    B.     Upon the death of Employee.

    C.     By either Employer or Employee upon thirty (30) days written notice, for any reason or no reason.

    D.     By Employer, in Employer's sole discretion, immediately without notice upon the occurrence of any one of the following events:

    (1)     The placement of any penalty, condition or limitation on Employee's license or ability to practice as a MD (including, but not limited to, revocation or suspension) as a result of action under the authority of any licensing authority of any state or jurisdiction;

    (2)     The expulsion, suspension or disciplining or loss of certification by Employee as the final action of any professional organization;

    (3)     The resignation by Employee from any professional or scientific organization while under threat of disciplinary action;

    (4)     The conviction of Employee of any crime punishable as a felony or the commitment of any act by Employee of dishonesty with respect to Employer, Employer's clients or any other employee of Employer;

    (5)     The commission by Employee of any willful or negligent act which has the effect of injuring the business or reputation of Employer, any Client of Employer or any other employee of Employer; or

    (6)     The failure or refusal of Employee to faithfully or diligently perform or comply with the provisions of this Agreement or the policies, standards and regulations established from time to time by Employer.

    E.     Upon the insolvency or bankruptcy of Employer.

3.2    <u>Records and Files</u>. All corporate records and files are owned by Employer. In the event of the termination of Employee, possession of each corporate record and file shall be retained by Employer.

3.3    <u>Covenant Not To Compete</u>. Employee and Employer acknowledge that the restrictions set forth in this Section 3.3 have been carefully considered and negotiated between the parties. Specifically, Employee understands and acknowledges that Employer has entered into or may enter into Service Agreements with physicians, clinics, medical groups, hospitals, nursing facilities and other health care organizations ("Clients") to furnish MD services, and that Employee may furnish MD services to such Clients as a leased employee. Although Employee may serve as a leased employee of Clients, Employee understands and agrees that he or she is employed by and an employee of Employer, and has a duty of loyalty to Employer. Employee further agrees and acknowledges that Employer has invested significant time, resources and

- 3 -

expertise in locating, recruiting and matching the needs of Clients with the needs of Employee and others employed by Employer. In recognition of these acknowledgements and understandings, Employer and Employee agree that the covenants set forth in this Section 3.3 are reasonable and will not unduly restrict Employee in securing other employment in the event of Employee's termination.

      (a)     During the term of Employee's employment with Employer, and for a period of one (1) year after Employee's termination of employment for any reason, Employee shall not: (i) become an employee of, contract with, form a partnership or joint venture with or otherwise establish any type of relationship with any Client of Employer's or any affiliate of such Client; or (ii) counsel, advise or otherwise encourage any other employee or potential employee of Employer to become an employee of, contract with, form a partnership or joint venture with or otherwise establish any type of relationship with any Client of Employer's or any affiliate of such Client. The parties acknowledge and agree that the restrictions set forth herein may be waived by Employer in writing in Employer's sole discretion, but may not be waived or terminated orally or otherwise.

      (b)     In the event of a breach of Section 3.3(a), it is agreed that Employer, in addition to the other remedies available, shall be entitled, as a matter of right, to injunctive relief in any court of competent jurisdiction, plus reasonable attorneys' fees for securing such relief.

      (c)     Employer's failure to immediately enforce its rights hereunder shall not be construed as a waiver of its right to enforce its right at a later time or to obtain other equitable relief to restrain Employee from such further violation.

## ARTICLE 4.
## GENERAL PROVISIONS

    4.1    Prior Agreements; Modification. This Agreement supersedes and replaces all prior written and oral agreements and understandings between the parties with respect to the subject matter addressed herein, and it may not be changed or terminated orally. No modification, termination or attempted waiver of any of its provisions shall be valid unless in writing signed by the party against whom the same is sought to be enforced.

    4.2    Governing Law. This Agreement and all questions arising in connection with it shall be governed by the laws of the State of Minnesota.

    4.3    Binding Effect. This Agreement shall be binding upon and inure to the benefit of Employer, its successors and assigns, and Employee, his or her heirs and legal representatives. Employer may transfer or assign this Agreement upon written notice to Employee, but the rights of Employee hereunder are personal and may not be assigned or transferred except for benefits transferable to Employee's heirs and legal representatives as provided under this Section 4.3.

    4.4    Enforceability. Employer and Employee agree that if any provision of this Agreement is held in a final judgment or determination of any court of law or administrative

- 4 -

agency of competent jurisdiction to be overbroad or otherwise unenforceable in any respect, such provision shall be deemed to be amended, and shall be binding upon Employee to the maximum extent deemed reasonable and enforceable by such court or administrative agency.  If the provision cannot be modified, that provision may be severed and the other parts of the Agreement shall remain enforceable.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the date and year first above written.

ADVANCED PRACTICE SOLUTIONS, P.A.

By:_____

Its:_____

Employer

_____

Employee

- 5 -

## SCHEDULE 2.1
## COMPENSATION

Employee's compensation during the first *[six months]* of employment with Employer, from
_January_ , 2005 to _June_ , 2005 shall be a gross amount of
$ _75.00_ per hour.  Thereafter, Employee's compensation shall be the amount
determined in the sole discretion of the Board of Directors of Employer and set forth on a new
Schedule 2.1 attached to this Agreement.

Effective Date of Schedule: _January_ , 2005

2138421-1
(19%0101!.doc)

# EXHIBIT B

## Agreement
## Between Ramsey County and Advanced Practice Solutions, P.A.

This is an Agreement between Ramsey County, Minnesota, a political subdivision of the State of Minnesota, on behalf of the Sheriff's Department and the Community Corrections Department (collectively, "County") and Advanced Practice Solutions, P.A., 14790 119th St. N., Stillwater, MN 55082, a Minnesota corporation ("Contractor").

WHEREAS, The County has the legal obligation to meet the reasonable and necessary medical needs of detainees at the Ramsey County Adult Detention Center ("ADC"); and

WHEREAS, The County has the legal obligation to meet the reasonable and necessary medical needs of corrections clients at the Ramsey County Correctional Facility ("RCCF"), Boys Totem Town ("BTT"), and the Juvenile Detention Center ("JDC"); and

WHEREAS, The County issued a Request for Proposals ("RFP") for medical staff services at the ADC, RCCF, BTT, and JDC; and

WHEREAS, The Evaluation Team identified in the RFP evaluated the Contractor's proposal and determined that the Contractor met the requirements, is a Minnesota professional corporation that furnishes medical services through its employed physicians and nurse practitioners, and is qualified to provide the requested services within the County's budget; and

WHEREAS, The Contractor is prepared to provide or arrange for physician, nurse practitioner, and other professional medical services to detainees at the ADC and to correctional clients at the RCCF, BTT, and the JDC, commencing January 1, 2006; and

WHEREAS, The County and the Contractor wish to enter into a written agreement for the provision of such services;

Now, therefore, the County and the Contractor agree to the following terms and conditions:

1.  **Scope of Services**
    A.  During the term of this agreement, the Contractor shall:
        1)  Designate a licensed physician acceptable to the County as Medical Director to provide overall medical direction of the services provided by Contractor pursuant to this Agreement.
        2)  Provide on-call medical consultation services to staff at the ADC, RCCF, BTT, and JDC 24 hours a day/7 days a week by the Medical Director or the Medical Director's designee.
        3)  Provide two (2) clinics per week of on-site physician or nurse practitioner services at the ADC. For the purposes of this Agreement, a clinic shall mean a 4 hour period unless a shorter time period is authorized by the County. The schedule will be mutually agreed to by the Contractor and the Sheriff's Office and documented in writing prior to the commencement of services under this Agreement. Any agreed-upon schedule changes during a calendar year will be documented in writing prior to the effective date of the changes.

**EXHIBIT B**

4) Provide one (1) clinic per week of physician or nurse practitioner services for BTT; two (2) clinics per week of physician or nurse practitioner services for the JDC; and three (3) clinics per week of physician or nurse practitioner services for RCCF. The schedule will be mutually agreed to by the Contractor and the Community Corrections Department and documented in writing prior to the commencement of services under this Agreement. Any agreed-upon schedule changes during a calendar year will be documented in writing prior to the effective date of the changes.

5) Coordinate inpatient admissions.

6) Conduct two continuing education opportunities annually for nursing staff at the facilities on pertinent health related issues and/or medical policy and procedure.

7) Have the Medical Director conduct semi-annual site visits to BTT and the JDC to meet with the RN staff and observe clinic functions and provide direction and implementation of Quality Improvement Programs at all facilities.

8) Review and approve all health care policies and procedures annually and recommend modifications.

B. Assigned Personnel

1) The Contractor shall provide information to the County adequate to permit the Sheriff's Department and the Community Corrections Department to conduct a criminal history review for all personnel assigned to provide services under this Agreement.

2) Only personnel who have been approved by the County following clearance after a routine criminal history and background investigation by the Sheriff's Department or the Community Corrections Department will be permitted to provide services under this Agreement. All personnel providing services under this Agreement shall wear County-issued ID tags when providing services at the ADC. All personnel providing services under this Agreement shall have in their possession a County-issued ID tag when providing services at the Community Corrections Facilities.

3) The Contractor shall maintain records of the credentials of physicians and nurse practitioners providing services under this Agreement and of their ongoing licensing by the State of Minnesota. In the event that any such licenses are canceled, revoked, suspended, or expire while this Agreement is in effect, the Contractor agrees to inform the Sheriff's Department and/or the Community Corrections Department immediately, remove that person from the staff for services under this Agreement, and substitute a licensed individual. The County will pay only for services provided by licensed personnel.

2. **County Roles and Responsibilities**

During the term of this Agreement, the County shall:

A. Designate an individual to be the ADC Health Services Manager.

B. Provide facilities, support staff, supplies, and records necessary to facilitate quality performance of the duties of the Contractor under this Agreement. This

shall include providing a safe and secure clinic setting at the ADC equipped to examine and evaluate detainees, and to allow for the provision of medical care, based on the recommendations and needs of physician(s) and nurse practitioner(s); and providing a clinic setting at the JDC, the RCCF, and BTT equipped to examine and evaluate detainees, inmates, and residents and to allow for the provision of medical care, based on the recommendation and need of nurse practitioner(s) and physician(s).

C.   Participate with the Contractor in the selection process of individuals who will provide service under this Agreement.

D.   Meet periodically with involved professionals and administrative representatives from the Contractor to review health care policies, procedures, and quality assurance data related to detainees, inmates, and residents at the ADC, the RCCF, BTT, and the JDC.

E.   Conduct routine criminal history and Minnesota Department of Corrections background investigations for personnel to be assigned to perform services pursuant to this Agreement.

F.   At the request of the Contractor, participate in the performance evaluation of the Contractor staff that provide services under this Agreement.

3.   **Term**
The term of this Agreement shall be from January 1, 2006, through December 31, 2008. The term may be extended for two additional one-year periods at the option of the County.

4.   **Cost/Payment**
   A.   Cost
      1)   The County will pay the Contractor for the Medical Director services and for Medical Director, physician and nurse practitioner clinics, and on-call services at each of the facilities in accordance with the Cost Summary, attached hereto and made a part of this Agreement as **Attachment A**.
      2)   The County will pay the Contractor for additional clinics, as needed and as requested, at the clinic rates set forth in **Attachment A**.
      3)   In addition to the above amounts, the County agrees to reimburse the Contractor for any annual costs in its medical malpractice insurance coverage in excess of 15%. The Contractor shall include documentation of the increase in any request for reimbursement under this section.

   B.   Payment
      1)   The Contractor shall submit a separate invoice for each facility at the end of each month for professional services provided during the month pursuant to this Agreement, for 1/12th of the annual base cost, and for any additional service clinics provided at the County's request.
      2)   The County will make payment within 30 days of receipt of an invoice.

3)   Payment of interest on late payments and disputes regarding payments shall be governed by the provisions of Minn. Stat. §471.425, the Minnesota Prompt Pay Act.

5.   **Contacts**

The following individuals are the contract contacts for the County and the Contractor:

Contractor:

Lynn Schiff, CNP
Advanced Practice Solutions
14790 119th St. N.
Stillwater, Minnesota 55082

ADC:

ADC Undersheriff
Ramsey County Law Enforcement Center
425 Grove Street
St. Paul, Minnesota 55101

RCCF:

Superintendent
Ramsey County Correctional Facility
297 Century Avenue
St. Paul, Minnesota 55119

BTT:

Superintendent
Boys Totem Town
398 Totem Road
St. Paul, Minnesota 55119

JDC:

Superintendent
Juvenile Detention Center
25 West 7th Street
St. Paul, Minnesota 55102

6.   **Independent Contractor**

It is agreed that nothing contained in this Agreement is intended or should be construed as creating the relationship of agents, partners, joint venturers, or associates between the parties hereto or as constituting Contractor as the employee of the County for any purpose or in any manner whatsoever. The Contractor is an independent contractor and neither it, its employees, agents nor representatives are employees of the County. From any amounts due the Contractor, there will be no deductions for federal income tax or FICA payments, nor for any state income tax, nor for any other purposes, which are associated with an employer-employee relationship unless required by law. Payment of federal income tax, FICA payments, and state income tax are the responsibility of the Contractor.

7.    **Indemnification**

Contractor shall indemnify, hold harmless and defend the County, its officials, employees, and agents from any and all liability, loss, costs, damages, expenses, claims or actions, including attorney's fees, which the County, its officials, employees, and agents may hereafter sustain, incur or be required to pay, arising out of or by reason of any act or omission of Contractor, its agents, officers, independent contractors, or employees, in the execution, performance, or failure to adequately perform Contractor's obligations pursuant to this Agreement.

8.    **Amendment**

This Agreement may be modified only by a written amendment signed by authorized representatives of the County and the Contractor.

9.    **Insurance**

A.    Contractor shall purchase and maintain (or maintain a self-insurance program of) such insurance as will protect the Contractor from claims which may arise out of, or result from, the Contractor's operations under this Agreement, whether such operations are by the Contractor or by any subcontractor, or by anyone directly employed by them, or by anyone for whose acts or omissions anyone of them may be liable.

B.    Contractor shall secure or maintain the following coverages and comply with all provisions noted. Certificates of Insurance (or evidence of a self-insurance program) shall be issued evidencing such coverage to the County throughout the term of this Agreement.

B.1    Commercial General Liability Insurance
    B.1.1    $ 1,000,000 per occurrence
          $ 2,000,000 general aggregate
          $ 1,000,000 products/completed operations total limit
          $ 1,000,000 personal injury and advertising liability
    B.1.2    All policies shall be written on an occurrence basis using ISO form CG 00 01 07 98 or its equivalent.
    B.1.3    Ramsey County, its officials, employees, and agents, shall be added to the policy as additional insured as their interests may appear with respect to Contractor providing services under this Agreement, using ISO endorsement form CG 20 26 or its equivalent.

B.2    Automobile Insurance
    B.2.1    Coverage shall be provided for hired, non-owned and owned auto.
    B.2.2    Minimum limits: $1,000,000 combined single limit.

B.3    Workers' Compensation and Employer's Liability
    B.3.1    Workers' Compensation as required by Minnesota Statutes
    B.3.2    Employer's Liability limits:
          $500,000/$500,000/$500,000

Advanced Practice Sol Fax:651-769-9178        Aug  4 2009 12:45pm    P009/016

B.4    Medical/Professional Liability
    B.4.1  Per Claim Limit:      $2,000,000
             Aggregate Limit:     $4,000,000
    B.4.2  All policies or self insurance programs shall be written as acceptable to County.
    B.4.3  Certificate of Insurance must indicate if the policy is issued on a claims-made or occurrence basis. If coverage is carried on a claims-made basis, then: 1) the retroactive date shall be noted on the Certificate and shall be prior to or the day of the inception of this Agreement; and 2) evidence of coverage shall be provided for three years beyond expiration of this Agreement.
    B.4.4  Ramsey County, its officials, employees, and agents, shall be added to the policy as additional insured as their interests may appear with respect to Contractor providing services under this Agreement.

C.    All Certificates of Insurance shall provide that the insurance company gives the County thirty (30) days prior written notice of cancellation, non-renewal and/or any material change in policy.

D.    The above sub-paragraphs establish minimum insurance requirements, and it is the sole responsibility of Contractor to purchase and maintain additional insurance (or self-insurance program) that may be necessary in connection with this Agreement.

E.    Certificate of Insurance must indicate if the policy is issued pursuant to these requirements. Contractor shall not commence work until the Contractor has obtained the required insurance and filed an acceptable Certificate of Insurance with the County. Copies of insurance policies shall be submitted to the County upon request.

F.    Nothing in this Agreement shall constitute a waiver by the County of any statutory or common law immunities, limits, or exceptions on liability.

G.    Certificates shall specifically indicate if the policy is written with an admitted or non-admitted carrier. Best's Rating for the insurer shall be noted on the Certificate, and shall not be less than an A.

**10.  Non-Assignability**
Except with respect to nurse practitioner services, the Contractor shall not assign any interest in this Agreement and shall not transfer any interest in the same, whether by subcontract, assignment or novation, without the prior written consent of the County.

**11.  Unavailability of Funding**
The purchase of services from the Contractor under this Agreement is subject to the availability and provision of funding from the United States, the State of Minnesota, or other funding sources. The County may immediately cancel this Agreement, or a portion of the services to be provided under this Agreement, if the funding for the services is no longer available to the County. Upon receipt of the County's notice of cancellation of the

Agreement, or of a portion of the services to be provided under this Agreement, the Contractor shall take all actions necessary to discontinue further commitments of funds to the extent they relate to the Agreement or the portions of this Agreement for which funding has become unavailable.

**12.    Non-Conforming Services**

The acceptance by the County of any non-conforming services under the terms of this Agreement or the foregoing by the County of any of the rights or remedies arising under the terms of this agreement shall not constitute a waiver of the County's right to conforming services or any rights and/or remedies in respect to any subsequent breach or default of the terms of this Agreement. The rights and remedies of the County provided or referred to under the terms of this Agreement are cumulative and not mutually exclusive.

**13.    Equal Employment Opportunity**

The Contractor agrees to comply with all federal, state and local laws, resolutions, ordinances, rules, regulations and executive orders pertaining to unlawful discrimination on account of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, sexual preference, disability, or age. When required by law or requested by the County, the Contractor shall furnish a written affirmative action plan.

**14.    Workforce Diversity**

Contractor shall make good faith efforts throughout the term of this Agreement, and any extensions thereof, to employ persons of color for all classifications of work under this Agreement, and shall, when requested by County, submit a written report to the County regarding the efforts and results of such efforts, including employment by job classification.

**15.    Workplace Violence Prevention**

The Contractor shall make all reasonable efforts to ensure that Contractor's employees, officials and subcontractors do not engage in violence while performing under this Agreement. Violence, as defined by the Ramsey County Workplace Violence Prevention and Respectful Workplace Policy, is defined as words and actions that hurt or attempt to threaten or hurt people; it is any action involving the use of physical force, harassment, intimidation, disrespect, or misuse of power and authority, where the impact is to cause pain, fear or injury.

**16.    Subcontractor Payment**

Contractor shall pay any subcontractor within ten days of the Contractor's receipt of payment from the County for undisputed services provided by the subcontractor. The Contractor shall pay interest of 1 1/2 percent per month or any part of a month to the subcontractor on any undisputed amount not paid on time to the subcontractor. The minimum monthly interest penalty payment for an unpaid balance of $100.00 or more is $10.00. For an unpaid balance of less than $100.00, the Contractor shall pay the actual penalty due to the subcontractor. A subcontractor who prevails in a civil action to collect interest penalties from a Contractor must be awarded its costs and disbursements, including attorney's fees, incurred in bringing the action.

17. **Data Practices**

All data collected, created, received, maintained or disseminated for any purpose in the course of Contractor's performance of this Agreement is governed by the Minnesota Government Data Practices Act, Minn. Stat. Ch. 13, or any other applicable state statutes, any state rules adopted to implement the Act and statutes, as well as federal statutes, including the Health Insurance Portability and Accountability Act of 1996, and federal regulations promulgated under such federal statutes.

18. **Compliance With Applicable Law**

The Contractor agrees to comply with all federal, state and local laws or ordinances, and all applicable rules, regulations, and standards established by any agency of such governmental units, which are now or hereafter promulgated insofar as they relate to the Contractor's performance of the provisions of this Agreement. It shall be the obligation of the Contractor to apply for, pay for and obtain all permits and/or licenses required by any governmental agency for the provision of those services contemplated herein. This obligation includes any Medicare records retention and access requirements. The parties agree to amend this Agreement to comply with any applicable state and/or federal laws and/or regulations promulgated by a state and/or federal agency after the effective date of the Agreement.

19. **Audit**

Until the expiration of six (6) years after the furnishing of services pursuant to this Agreement, the Contractor, upon written request, shall make available to the County, the State Auditor or the County's ultimate funding sources, a copy of this Agreement and the books, documents, records and accounting procedures and practices of the Contractor relating to this Agreement.

20. **Termination**

   a.   With Cause

   The County reserves the right to suspend or terminate this Agreement if the Contractor violates any of the terms or conditions of this Agreement or does not fulfill in a timely and proper manner its obligations under this Agreement as determined by the County. In the event that the County exercises its right of suspension or termination under this Paragraph, it shall submit written notice to the Contractor, specifying the extent of such suspension or termination under this Paragraph, the reasons therefore, and the date upon which such suspension or termination becomes effective. Upon receipt of such notice, the Contractor shall take all actions necessary to discontinue further commitments of funds to the extent that they relate to the suspended or terminated portions of this Agreement.

   b.   Without Cause

   Notwithstanding any term or provision in this Agreement to the contrary, the County may terminate this Agreement without cause and for any reason whatsoever upon giving at least thirty (30) days written notice thereof to the Contractor. In such event, the Contractor shall be entitled to receive compensation for the services provided in a satisfactory manner up to and including the effective date of termination.

21. **Conflict of Interest**

The Contractor affirms that, to the best of Contractor's knowledge, Contractor's involvement in this Agreement does not result in a conflict of interest with any party or entity which may be affected by the terms of this Agreement. The Contractor agrees that, should any conflict or potential conflict of interest become known to Contractor, Contractor will immediately notify the County of the conflict or potential conflict, specifying the part of this Agreement giving rise to the conflict or potential conflict, and will advise the County whether Contractor will or will not resign from the other engagement or representation.

22. **Waste Reduction**

The Contractor shall participate in a recycling program for at least four broad types of recyclable materials and shall favor the purchase of recycled products in its procurement processes. All reports, publications and documents produced as a result of this contract shall be printed on both sides of the paper, where commonly accepted publishing practices allow, on recycled and recyclable paper using soy-based inks, and shall be bound in a manner that does not use glue.

23. **Interpretation of Agreement; Venue**

This Agreement shall be interpreted and construed according to the laws of the State of Minnesota. All litigation regarding this Agreement shall be venued in the appropriate state or federal district court in Ramsey County, Minnesota.

24. **Prevailing Wage**

All contractors and subcontractors shall conform to the labor laws of the State of Minnesota, and all other laws, ordinances, and legal requirements affecting the work in Ramsey County and Minnesota. The minimum wage rate per hour to be paid for each classification of work shall be the union wage rate in the locality of the project for those classifications over which the unions have jurisdiction and the local prevailing rate for those classifications of work in the localities over which the unions do not have jurisdiction.

25. **HIPAA Compliance**

Contractor agrees to implement and comply with applicable provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA, Public Law 104-191), as it may be amended from time to time.

26. **Entire Agreement**

This Agreement shall constitute the entire agreement between the parties and shall supersede all prior oral or written negotiations.

This Agreement is duly executed on the last date written below.

**RAMSEY COUNTY**

_Tony Bennett_

Tony Bennett, Chair
Ramsey County Board of Commissioners

_Bonnie Jackelen_   2006-162

Bonnie Jackelen, Chief Clerk
Ramsey County Board of Commissioners

Date: _4/25/06_

Approval recommended:

_Bob Fell_

Bob Fletcher, Ramsey County Sheriff

_Carol Pender-Roberts_

Carol Pender-Roberts, Director
Community Corrections Department

Approved as to form and insurance:

_Karen Kushner_ _5/24/06_
Assistant County Attorney for Sheriff

_____
Assistant County Attorney for Corrections Department

Purchase Order or
Aspen Vendor Contract Number:

_____

Account Number:

_Steven Kuhn_
Budgeting and Accounting

**ADVANCED PRACTICE SOLUTIONS, P.A.**

By: _Lynn Schilt_
Print: _Lynn Schilt_
Its: _President_

Contractor Tax Payer ID#: _411909104_

Date: _4/6/06_

**Attachment A**

**2006 Costs:**
$380 for NP Clinic
$600 for MD Clinic

| Clinic Cost | Medical Director Cost | On Call |
|---|---|---|
| **ADC** | | |
| $600 x 50 clinics $30,000 | $3,000/year | $1,000/year |
| $380 x 50 clinics $19,000 | | |
| **RCCF** | | |
| $600 x 50 clinics $30,000 | $3,000/year | $1,000/year |
| $380 x 90 clinics $34,200 | | |
| **BTT** | | |
| $380 x 45 clinics $17,100 | $1,000/year | $500/year |
| **JDC** | | |
| $380 x 70 clinics $26,600 | $1,000/year | $500/year |

**TOTAL for 2006  $167,900**

**2007 Costs**
$400 for NP Clinic
$650 for MD Clinic

| Clinic Cost | Medical Director Cost | On Call |
|---|---|---|
| **ADC** | | |
| $650 x 50 clinics  $32,500 | $4,000/year | $1,000/year |
| $400 x 50 clinics  $20,000 | | |
| **RCCF** | | |
| $650 x 50 clinics $32,500 | $4,000/year | $1,000/year |
| $400 x 95 clinics $38,000 | | |
| **BTT** | | |
| $400 x 48 clinics $19,200 | $1,000/year | $500/year |
| **JDC** | | |
| 400 x 70  clinics  $28,000 | $1,000/year | $500/year |

**Total for 2007 $183,200**

**2008 Costs**
$450 for NP Clinic
$700 for MD Clinic

| Clinic Cost | Medical Director Cost | On Call |
|---|---|---|
| **ADC** | | |
| $700 x 50 clinics $35,000 | $4,000/year | $1,000/year |
| $450 x 56 clinics $25,200 | | |
| | | |
| **RCCF** | | |
| $700 x 50 clinics  $35,000 | $4,000/year | $1,000/year |
| $450 x 100 clinics $45,000 | | |
| | | |
| **BTT** | | |
| $450 x 50 clinics  $22,500 | $1,000/year | $500/year |
| | | |
| **JDC** | | |
| $450 x 70 clinics  $31,500 | $1,000/year | $500/year |

**TOTAL for 2008  $207,200**

Advanced Practice Sol  Fax:651-769-9178          Aug  4 2009 12:46pm  P016/016

## AMENDMENT TO AGREEMENT BETWEEN RAMSEY COUNTY
## AND ADVANCE PRACTICE SOLUTIONS, P.A.

WHEREAS, Ramsey County ("County") and Advance Practice Solutions, P.A. - 14790 119th St. No., Stillwater, MN 55082, ("Contractor") entered into an Agreement dated April 25, 2006, for on-site professional medical services (physician, nurse practitioner and other professional medical services) to detainees at the Ramsey County adult Detention Center ("ADC"), and to clients at the Ramsey County Correctional Facility ("RCCF"), Boys Totem Town ("BTT") and the Juvenile Detention Center ("JDC") for the period from January 1, 2006 through December 31, 2008 ("Agreement"); and

WHEREAS, The Contractor has provided service is accordance with the terms of the Agreement in a professional and competent fashion' and

WHEREAS, The County wishes to renew the Agreement for an additional one-year period, January 1, 2009 through December 31, 2009; Now

Therefore, the County and the Contractor agree to amend the Agreement as follows:

1.  To term of the Agreement is extended for an additional one-year period, January 1, 2009, through December 31, 2009 ("Renewal Term")

2.  The County will pay the Contractor a sum not to exceed $224,400 for services during the Renewal Term, to be billed at the Revised Fee Schedule, attached hereto and made a part of this Amendment as Attachment A.

3.  Except as modified herein, the terms of the Agreement shall remain in full force and effect.

Wherefore, the parties have executed this Amendment on the last date written below.

**RAMSEY COUNTY**

*Julie Kleinschmidt*

~~Patrick O'Connor, Interim~~ County Manager
*JULIE KLEINSCHMIDT*

Date: ___1/14/09___

**Advanced Practice Solutions, P.A.**

By: ___Lynn Schiff___
Print Name: Lynn Schiff
Its: ___President___

Date: ___12/3/08___

Amendment with Advanced Practice Solutions, P.A. January 1, 2009 – December 31, 2009   2 of 3

Approval recommended:

_B. Fletcher_

Bob Fletcher, Ramsey County Sheriff

Employer Identification Number:

41909104

Approval recommended:

_Carol Pender-Roberts_

Carol Pender-Roberts, Director
Community Corrections Department

Approved as to form and insurance:

_Karen Kushner_ 12/18/08

Assistant County Attorney

~~Purchase Order or~~
Aspen Vendor Contract Number:

SHRFO 00010

Funds are available
Account Number: _____

_MS_ 1-12-09

Budgeting & Accounting

**ATTACHMENT A**

**Advanced Practice Solutions Pricing for 2009**

**Ramsey County Correctional Facility, Boys Totem Town, Ramsey County Juvenile Detention Center, and Ramsey County Adult Detention Center**

**2009 Costs:**
$485 Nurse Practitioner Clinic
$740 MD Clinic

| Clinic Cost | | Medical Director Cost | On Call |
|---|---|---|---|
| **2009 Costs** | | | |
| ADC | | | |
| $740 x 50 clinics $37,000 | | $5,000 | $1,500 |
| $485 x 56 clinics  $27,160 | | | |
| RCCF | | | |
| $740 x 50 clinics $37,000 | | $5,000 | $1,500 |
| $485 x 100 clinics $48,500 | | | |
| JDC | | | |
| $485 x 50 clinics | $24,250 | $1000 | $ 770 |
| BTT | | | |
| $485 x 40 clinics | $19,400 | $1000 | $ 770 |

**TOTAL ANNUAL FEES for 2009:  $209,850 (1) (2) (3)**

> (1) Fees based on schedule of clinics contracted as detailed above
> (2) Fees for periods subsequent to December 2009 may be subject to further adjustment
> (3) Fees for 18 OB GYN visits for CY 2009

Amendment with Advanced Practice Solutions, P.A. January 1, 2009 – December 31, 2009   1 of 3

# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
**(Cite as: 2008 WL 4867699 (D.Minn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Thomas W. WALES, Plaintiff,
v.
Dr. TRAN, Dr. Shelly Stanton, Dr. Anderson, Mr.
Jack Bakker, The F .B.O.P., and The Mayo Clinic,
Rochester, Defendants.
Civil No. 08-39 (JNE/JJK).

Nov. 4, 2008.

West KeySummary
**Prisons 310 ☜⟶192**

310 Prisons
   310II Prisoners and Inmates
      310II(D) Health and Medical Care
         310k191 Particular Conditions and Treatments
            310k192 k. In General. Most Cited Cases
   (Formerly 310k17(2))

**Sentencing and Punishment 350H ☜⟶1546**

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical Care and Treatment. Most Cited Cases

**United States 393 ☜⟶50.10(3)**

393 United States
   393I Government in General
      393k50 Liabilities of Officers or Agents for Negligence or Misconduct
         393k50.10 Particular Acts or Claims
            393k50.10(3) k. Criminal Law Enforcement and Investigation; Prisoners' Claims. Most Cited Cases

A *Bivens* claim for deliberate indifference to a prisoner's serious medical needs may not be brought against a private entity. The inmate asserted that the hospital, which contracted with federal prison to provide medical care, was deliberately indifferent to his medical needs. Specifically, he asserted that the hospital performed an unnecessary surgery on him and caused him to contract a disease as a result of a blood transfusion. He also asserted that the hospital refused to treat the disease he contracted as a result of the transfusion. The inmate did not bring suit against any federal officers, but only the hospital and hospital staff. U.S.C.A. Const. Amend. 8.

Thomas W. Wales, Rochester, MN, pro se.

Lonnie F. Bryan, Esq., Assistant United States Attorney, for Respondents Dr. Tran, Dr. Shelly Stanton, Dr. Anderson, Mr. Jack Bakker, and the F.B.O.P.

Gregory E. Karpenko, Esq., and Nicole M. Moen, Esq., Fredrikson & Byron, PA; and Peter Galindez, Jr., Esq., Mayo Clinic Legal Department, for Respondent Mayo Clinic.

ORDER

JOAN N. ERICKSEN, District Judge.

**\*1** This case is before the Court on a Report and Recommendation issued by the Honorable Jeffrey J. Keyes, United States Magistrate Judge, on October 14, 2008. The magistrate judge recommended that the Motion to Dismiss brought by The Mayo Clinic, Rochester (Mayo Clinic), be granted, that Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" be denied as to the claims alleged against the "Mayo Defendants," [FN1] and that Plaintiff's Motion for Injunctive Relief or in the Alternative Writ of Mandamus be denied. Plaintiff objected to the Report and Recommendation. The Court has conducted a de novo review of the re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT C**

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
**(Cite as: 2008 WL 4867699 (D.Minn.))**

cord. *See* D. Minn. LR 72.2(b). Based on that review, the Court adopts the Report and Recommendation. Therefore, IT IS ORDERED THAT:

> FN1. The "Mayo Defendants" are: (1) Mayo Clinic, (2) Dr. McGoon, (3) Dr. Bannon, (4) Dr. Gross, and (5) Mayo Clinic Doe Defendants.

1. Mayo Clinic's Motion to Dismiss [Docket No. 16] is GRANTED.

2. Plaintiff's claims in the Complaint against Mayo Clinic are DISMISSED WITH PREJUDICE.

3. Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" [Docket No. 69] is DENIED as to the claims alleged against the Mayo Defendants.

4. Plaintiff's Motion for Injunctive Relief or in the Alternative Writ of Mandamus [Docket No. 77] is DENIED.

### REPORT AND RECOMMENDATION

JEFFREY J. KEYES, United States Magistrate Judge.

This matter is before this Court pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(B), on Defendant Mayo Clinic Rochester's ("Mayo") Motion to Dismiss under Fed.R.Civ.P. 12(b)(6) (Doc. No. 16). Specifically, Mayo moves to dismiss Plaintiff's Third and Sixth Causes of Action in Plaintiff's Complaint as asserted against Mayo. In addition, this Court considers Plaintiff's Motion for Leave to File "Plaintiffs First Amended Complaint" pursuant to FRCivP. Rule 15(a) (Doc. No. 69), and Plaintiff's Motion for Injunctive Relief or [sic] in the Alternative Write of Mandamus (Doc. No. 77). For the reasons stated below, this Court recommends that Mayo's Motion to Dismiss should be granted, Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" be denied in

part, and Plaintiff's Motion for Injunctive Relief be denied.

### *BACKGROUND*

Mayo is a medical practice located in Rochester, Minnesota, that provides medical care to federal prisoners under a contract with the Federal Medical Center. (Doc. No. 1, Compl.¶ 7.) Plaintiff alleges that he suffered various injuries while incarcerated at the Rochester, Minnesota, Federal Bureau of Prisons, and treated at the Federal Medical Center, by, among others, Mayo physicians. (*Id.* ¶¶ 1, 7.)

The gravamen of Plaintiff's Complaint against Mayo is set forth in Plaintiff's third cause of action, which is entitled "Experimental Surgury [sic] and Tainted Blood Transfusion." Plaintiff alleges:

> 72. Plaintiff will bring proof to a jury that the medical administration and Mayo Clinic Rochester have an unconstitutional arraingement [sic] for inmates to be subjected to experimental and/or otherwise unnecessary surguries [sic] or treatment and that Plaintiff was placed in this program when FMC staff permitted Mayo Clinic Rochester (hereafter "Mayo" 0[sic] to operate on him and remove the gall bladder, to remove a source of pain in Plaintiff's torso, but that there was nothing wrong with the gall bladder and that pain remains, causing Plaintiff needless scarring, continued pain and suffering, in violation of his rights.

> *2 73. That Plaintiff was exposed to and provide [sic] with "tainted blood" while at Mayo hosiptal [sic] during the relevant times of his surgury [sic] sessions at Mayo, infecting and contaminating Plaintiff with Hepatitis C and that neither FMC or mayo [sic] will now treat him with Interferon to erradicate [sic] that newly acquired serious blood disease.

(*Id.* ¶¶ 72-73.) Plaintiff alleges that Mayo is liable to him for "damages under the Tucker Act[s], 28 USC § 1491 in the sum of no more than $10,000.00

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
**(Cite as: 2008 WL 4867699 (D.Minn.))**

for the reckless endangerment of Plaintiff for performing a useless surgury [sic] and exposing him to a serious deadly blood disease and disorder." (*Id.* ¶ 74.) Plaintiff also asserts a claim for damages "in excess of $100,000.00" in actual, compensatory, and punitive damages for subjecting Plaintiff "to an experimental surgery to avoid treating him for his pain and suffering." (*Id.* ¶ 75.)

In addition, Plaintiff alleges that the needless surgery "triggered an 'arythmia' and related heart damage." (*Id.* ¶ 31.) Plaintiff contends that Mayo hid the heart arrhythmia from him and denied him treatment for this condition as part of a conspiracy between Mayo and the Federal Bureau of Prisons. ( *Id.* ¶ 84.) Plaintiff claims that under this cause of action he is entitled to damages for a "systemic denial of medical care" in an amount in excess of $100,000.00 for actual, compensatory, and punitive damages. (*Id.* ¶ 86.)

### DISCUSSION

### I. DISMISSAL OF TUCKER ACT CLAIM

In his Complaint, Plaintiff describes his Third Cause of Action as a claim for "damages under the Tucker Act[s] 28 U.S.C. § 1491...." (Compl.¶ 75.) The Tucker Act vests the Court of Federal Claims with exclusive jurisdiction over certain contract claims against the United States where the claims are *in excess of $10,000.00.* To the extent that Plaintiff seeks damages "in excess of $100,000" for his Tucker Act claim-as he does in ¶ 75-this Court does not have jurisdiction over such a claim and it must be dismissed. However, the Little Tucker Act, 28 U.S.C. § 1346(a)(1), confers concurrent jurisdiction on the United States District Courts over contract claims against the United States where the Plaintiff alleges damages *of $10,000 or less. See Taylor v. United States,* 248 F.3d 736, 737 (8th Cir.2001). Because Plaintiff also seeks damages "in the sum of no more than $10,000"-as he does in ¶ 74-it may be assumed that the Plaintiff seeks to assert a claim

under the Little Tucker Act, a claim over which this Court could conceivably have concurrent jurisdiction.

Even when making this assumption, however, the Complaint fails to state a claim for relief under the Little Tucker Act because Plaintiff has not alleged a claim for damages *against the United States.* The Little Tucker Act provides no basis for a common law tort suit by Plaintiff against Mayo for alleged wrongdoing by Mayo in providing, or failing to provide, medical services to the Plaintiff. Further, even if we construe Plaintiff's Complaint as alleging a claim for the recovery of damages for Mayo's breach of its contract with the United States by providing negligent medical treatment to the Plaintiff or by providing "tainted blood," the Complaint still fails to state a claim upon which relief can be granted. "Little Tucker Act claims for breach of contract can only be made against the United States, not on its behalf." *Jackson v. Fed. Bureau of Prisons,* Civ. No. 06-1347 (MJD/RLE), 2007 WL 843839, at *21 (D.Minn. Mar.16, 2007) (dismissing federal prisoner's Tucker Act and Little Tucker Act claims against Mayo on the grounds that the Acts apply to claims against the United States-not private contractors); *see also Roedler v. Dept. of Energy,* 255 F.3d 1347, 1351 (Fed.Cir.2001) ("Third party beneficiaries of a contract to which the United States is a party may assert a claim *against the United States,* in accordance with the law governing third party claims.") (Emphasis added.) [FN1] Thus, the Little Tucker Act claims in Plaintiff's Complaint (the Third Cause of Action) should be dismissed.

> FN1. In addition, the Little Tucker Act claim cannot be reformulated as a breach of warranty or strict liability claim against Mayo arising out of the allegedly tainted blood transfusions Plaintiff received because the immunity provision of the Minnesota Uniform Anatomical Gift Act, Minn.Stat. § 525A.18 (formerly promulgated at Minn.Stat. § 525.921) bars this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
(Cite as: 2008 WL 4867699 (D.Minn.))

Page 4

claim. *See Doe v. Travenol Labs., Inc.,* 698 F.Supp. 780, 784 (D.Minn.1988) (dismissing claims for breach of warranty and strict liability based on tainted blood).

## II. DISMISSAL OF PLAINTIFF'S EIGHTH AMENDMENT CLAIMS

**\*3** The Third and Sixth Causes of Action alleged in Plaintiff's Complaint can also be construed as claims against Mayo for intentionally denying or delaying access to medical care, or being deliberately indifferent in responding to Plaintiff's medical needs, in violation of the Eighth Amendment of the U.S. Constitution. Deliberate indifference to a prisoner's serious medical needs is prohibited as "cruel and unusual punishment" under the Eighth Amendment. *See Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Bellecourt v. United States,* 784 F.Supp. 623, 633 (D.Minn.1992) .

Here, claims for violation of the Eighth Amendment are governed by *Bivens,* which provides a cause of action for constitutional violations by federal officers. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). A *Bivens* action may be brought only against individual federal officers-not a private entity like Mayo. *See Corr. Servs. Corp. v. Melesko,* 534 U.S. 61, 71, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (stating that *Bivens* has been based on "the deterrence of individual officers who commit unconstitutional acts"); *see also Sinclair v. Hawke,* 314 F.3d 934, 940 (8th Cir.2003) (stating that the Supreme Court has "refused to extend *Bivens* to claims against federal agencies and private government contractors, as opposed to individual federal officials"). Therefore, Plaintiff's claims against Mayo for intentionally denying or delaying access to medical care, or being deliberately indifferent in responding to Plaintiff's medical needs should be dismissed.

## III. COMMON LAW CLAIMS

Plaintiff's claims against Mayo can also be construed as common law claims of breach of the professional duty Mayo owed to Plaintiff in connection with Plaintiff's medical treatment. However, Plaintiff has not filed any expert affidavit attesting to a medical expert's opinion that Mayo "deviated from the applicable standard of care and by that action caused injury to the plaintiff [,]" which, under Minnesota law, must accompany such an action. Minn.Stat. § 145.682, subd. 3. There is no exception to the requirement of expert opinion affidavits in actions commenced by *pro se* plaintiffs. *See, e.g.,* Minn.Stat. § 145.682, subd. 5 ("If the plaintiff is acting pro se, the plaintiff shall sign the affidavit ... referred to in this section and is bound by those provisions as if represented by an attorney."). The failure to supply such an accompanying expert review affidavit must result in dismissal of the complaint. Minn.Stat. § 145.682, subd. 6; *Plutshack v. Univ. of Minn. Hosps.,* 316 N.W.2d 1, 5 (Minn.1982) (stating that claims for "negligent care and treatment" require expert testimony); *Tineo v. Fed. Bureau of Prisons,* No. Civ. 05-724 (ADM/SRN), 2005 WL 1745451, at \*3 (D.Minn. July 22, 2005) (dismissing prisoner's medical malpractice claims for failure to submit expert review affidavit); *Semler v. Finch,* No. A06-1178, 2007 WL 1976751, at \*3 (Minn.Ct.App. July 10, 2007) (same).

**\*4** In conclusion, based on all of the above reasoning, all of Plaintiff's claims against Mayo in the Complaint should be dismissed for failure to state a claim upon which relief can be granted.[FN2]

> FN2. After Defendant Mayo filed its Motion to Dismiss the Complaint, Plaintiff filed a motion for leave to file a First Amended Complaint. (Doc. No. 69.) The proposed First Amended Complaint does not specifically assert a claim under the Tucker Act or Little Tucker Act, nor does it assert a *Bivens* claim for Eighth Amendment violations. Therefore, it appears that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
(Cite as: 2008 WL 4867699 (D.Minn.))

Plaintiff is abandoning those claims. However, because this is an action in which Plaintiff is proceeding *pro se*, the Court is not certain that Plaintiff intended for his First Amended Complaint to completely supersede his original Complaint. Giving his Complaint the benefit of a liberal construction because of Plaintiff's *pro se* status, *see Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir.1996) (*per curiam* ), this Court hereby addresses the Motion to Dismiss and recommends that all of the claims in the Complaint against Mayo be dismissed for failure to state a claim upon which relief can be granted.

## IV. MOTION TO AMEND COMPLAINT

"Good reason to deny leave to amend exists if amendment would be futile." *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 225 (8th Cir.1994). And denying leave to amend because the amended claims would be futile "means that that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion." *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir.2007).

If this Court's recommendation to grant Mayo's Motion to Dismiss is adopted, then Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" pursuant to FRCivP. Rule 15(a) ( Doc. No. 69) should be denied as to the claims alleged against Mayo and the other "Mayo Defendants" [FN3] w ho Plaintiff would add to the case.[FN4] I n the Fifth Cause of Action of the First Amended Complaint (as proposed), Plaintiff would assert claims against Mayo, and Drs. McGoon, Bannon and Gross [FN5] for "negligent acts or [o]missions, breach of warranty, [and] strict [l]iability for injuries sustained to Plaintiff by Mayo's [f]iduciary breach [t]owards his health, [i]ncluding [i]nfecting Plaintiff with Hep-C and Mayo's [r]efusal to treat that [d]eadly [d]isease." (Proposed First Amended Compl. 29.) Therefore, the proposed First Amended

Complaint identifies the same course of conduct as that set forth in the original Complaint, but the proposed First Amended Complaint specifies, and adds as Defendants, the individual Mayo physicians who were involved in providing medical services to Plaintiff.[FN6]

FN3. The Mayo Defendants are: (1) Mayo Clinic, Rochester; (2) Dr. McGoon; (3) Dr. Bannon; (4) Dr. Gross; and (5) Mayo Clinic Doe Defendants.

FN4. In this Court's October 14, 2008 Order and Memorandum, this Court grants in part Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" pursuant to FRCivP. Rule 15(a) as to Plaintiff's claims asserted against the Federal Defendants because Plaintiff may amend his Complaint "once as a matter of course" at any time before he has been served with a "responsive pleading." Fed.R.Civ.P. 15(a)(1)(A). Although the same argument can be made as to Plaintiff's amended claims asserted against the Mayo Defendants, here a valid futility argument has been raised. Because it would only cause needless delay and would be an inefficient use of the parties' and the Court's time to allow the Amended Complaint as against the Mayo Defendants only to then turn around and dismiss the claims pursuant to further motion practice, this Court recommends denying Plaintiff's motion for leave to amend the Complaint as to Plaintiff's claims against the Mayo Defendants.

FN5. Plaintiff states that "all Mayo Medical Defendants [would be] sued in both professional/personal capacity[.]"

FN6. In addition, the proposed First Amended Complaint is somewhat narrower in its legal claims against the Mayo Defendants than the original Complaint be-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
(Cite as: 2008 WL 4867699 (D.Minn.))

Page 6

cause there is no longer an allegation of violations of the Tucker Act or the Little Tucker Act, nor is there an Eighth Amendment *Bivens* claim. *See* note 2, *supra* at 7-8.

Specifically, the proposed First Amended Complaint includes the following allegations against Mayo and its physicians: (1) Dr. Bannon negligently infected Plaintiff with Hep-C during the course of gallbladder surgery, but the gallbladder surgery was not necessary and it caused a heart "arythemia"; (2) Mayo physician Dr. McGoon began treating the arrhythmia, but abandoned his obligation and fiduciary duty once this lawsuit was filed; (3) Mayo physician Dr. Gross began treating Plaintiff for the Hep-C but then abandoned that care, breached his agreement with Plaintiff to treat the Hep-C virus, and breached his fiduciary duty; and (4) Mayo did not ensure that all surgical staff in the operating theater were free of any blood-borne pathogens, such as Hep-C, but allowed its medical staff with such diseases to operate on "persons." (Proposed First Amended Compl. ¶¶ 128-131.) Therefore, Plaintiff asserts that Mayo is strictly liable for negligent injuries that result from the use of such defective, dangerous, or unmonitored material and is liable to Plaintiff in damages as a result of its negligence, breach of fiduciary duty, and conduct that shocks the conscience. (*Id.* at ¶ 131.)

*5 Even though Plaintiff does not describe his claims against the Mayo Defendants as "medical malpractice," the proposed First Amended Complaint, like the original Complaint, is governed by Minn.Stat. § 145.682, which requires that an "expert review affidavit" must be submitted with the complaint. The statutory requirement of an expert-review affidavit applies "[i]n an action alleging malpractice, error, mistake, or failure to cure, *whether based on contract or tort,* against a health care provider which includes a cause of action as to which expert testimony is necessary to establish a prima facie case...." Minn.Stat. § 145.682, subd. 2 (emphasis added). All of the complained-of conduct

in the proposed First Amended Complaint flows from the medical diagnosis, treatment, and care of Plaintiff by the Mayo Defendants and thus comes within the scope of Minn.Stat. § 145.682. Section 145.682 was designed to eliminate nuisance lawsuits about the provision of medical care by requiring plaintiffs to file affidavits to verify that their allegations are well-founded. *Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552, 555 (Minn.1996). This legislative purpose "would not be fully effectuated if [Plaintiff] were allowed to remove his claim from the purview of section 145.682 by simply categorizing the claim as one for deliberate indifference or breach of warranty." *Way v. Foley Dental Office,* No. C8-91-1506, 1992 WL 43301, at *2 (Minn.Ct.App. Mar.10, 1992) (concluding that an expert review affidavit was required in an action alleging breach of warranty and deliberate indifference in dental treatment); *see also Fridell v. Commonbond Cmtys., Inc.,* No. A07-0665, 2008 WL 434616, at *3-4 (Minn.Ct.App. Feb.19, 2008) (requiring expert-review affidavit in an action for breach of warranty and breach of statutory duty of landlord to tenant regarding assisted living facility's health care of plaintiff); *Comstock v. Nippoldt,* No. CX-01-960, 2002 WL 109488, at *2 (Minn.Ct.App. Jan.29, 2002) (requiring expert-review affidavit in an action for breach of contract, violation of Consumer Fraud Act, and breach of consumer warranties when rendering patient care); *Haile v. Sutherland,* 598 N.W.2d 424, 429 (Minn.Ct.App.1999) (concluding that patient's claim for medical assault and battery was a claim for medical malpractice requiring expert testimony).

The proposed First Amended Complaint contains a single cause of action against the Mayo Defendants, "a cause of action as to which expert testimony is necessary to establish a prima facie case...." Minn.Stat. § 145.682, subd. 2. The claims against the Mayo Defendants require "specialized knowledge"-and thus require expert testimony-to establish a prima facie case of breach of the duty of medical care or supervision owed to Plaintiff by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
**(Cite as: 2008 WL 4867699 (D.Minn.))**

Mayo Defendants. Expert testimony would be required to answer each of the following questions raised by allegations against the Mayo Defendants: (1) was the gallbladder surgery medically necessary; (2) was Plaintiff infected with Hep-C during the surgery; (3) if so, did this occur as a result of a breach of the standard of care that was required; (4) did the surgery cause a heart arrhythmia; (5) did Dr. McGoon mistreat Plaintiff's heart arrhythmia in breach of the standard of care; and (6) did Dr. Gross mistreat Plaintiff's Hep-C in breach of the standard of care. Moreover, even if Plaintiff established that the Mayo Defendants are liable to Plaintiff for breaching their duty to Plaintiff, Plaintiff would still have to prove, through expert testimony, that his injuries, and resulting damages, were caused by the Mayo Defendants' wrongdoing. This issue of causation, like the issue of whether Plaintiff received medical treatment that was improper under the circumstances, is not one that is within the knowledge of a lay person and is not exempt from the expert-affidavit requirements. *See Way*, 1992 WL 43301, at *2; *Fridell*, 2008 WL 434616, at *3-4; *Comstock*, 2002 WL 109488, at *2; *Haile*, 598 N.W.2d at 429.

**\*6** In conclusion, Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" pursuant to FRCivP. Rule 15(a) should be denied in part as to the claims asserted against the Mayo Defendants. Any amendment would be futile in light of the fact that Plaintiff has not met the expert-affidavit requirements set forth in Minn.Stat. § 145.682.

**V. Motion for Injunctive Relief**

Plaintiff requests a preliminary injunction or in the alternative a writ of mandamus. Specifically, Plaintiff requests that an injunction be issued that: (1) compels the medical staff to issue Plaintiff a walker; and (2) compels the Unit team to prepare and submit a CCC referral package, allowing the Kansas USPO to determine whether they will supervise Plaintiff for 180 days of home confinement. The Federal Defendants have not responded to Plaintiff's motion.

First, the Court notes that Plaintiff requests preliminary injunctive relief regarding certain things for which he does not expressly seek relief in his Complaint or in his proposed First Amended Complaint. Although Plaintiff references the medical staff refusing Plaintiff the use of a walker in his proposed First Amended Complaint, Plaintiff does not make any assertions that relate to the Unit team neglecting to prepare and submit a CCC referral package. The Court cautions Plaintiff that preliminary injunctions generally are not properly sought to order incidental relief peripheral to that which a movant seeks pursuant to a final judgment on the merits. *See Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994) (per curiam) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.").

Even so, the Court considers the following factors in determining whether or not to grant a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981). A preliminary injunction is a "drastic and extraordinary" remedy and should only issue in exceptional circumstances when "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined ." *Id.* at 113.

An essential element for granting a preliminary injunction is a "likelihood of success on the merits." *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003) ("The party seeking injunctive relief bears the burden of proving all the *Dataphase* factors."). Although Plaintiff has made a compelling argument as to his requests for a walker and for the submission of a CCC referral package, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)
**(Cite as: 2008 WL 4867699 (D.Minn.))**

which there has been no rebuttal filed, Plaintiff has not made a showing of any likelihood of success on any of his claims against the Federal Defendants asserted in his Complaint or in his Amended Complaint. Accordingly, this Court recommends that Plaintiff's request for an injunction be denied. The Court notes, however, that it may be in the Federal Defendants' best interests to comply with Defendants two requests.

\*7 Plaintiff alternatively seeks the issuance of a writ of mandamus. "A district court may grant a writ of mandamus only in extraordinary situations, and only if: (1) the petitioner can establish a clear and indisputable right to the relief sought, (2) the defendant has a nondiscretionary duty to honor that right, and (3) the petitioner has no other adequate remedy." *Castillo v. Ridge,* 445 F.3d 1057, 1060 (8th Cir.2006). The Eighth Circuit has noted that an order for a writ of mandamus may issue only "in those exceptional circumstances amounting to a judicial usurpation of power." *In re Medtronic, Inc.,* 184 F.3d 807, 810 (8th Cir.1999) (quotations omitted).

Courts in the Eighth Circuit are controlled by five guidelines that are to be balanced in determining whether a petition for a writ of mandamus, or mandamus jurisdiction, will be granted: (1) the party seeking the writ has no other adequate means to attain relief; (2) the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) the challenged district court order is clearly erroneous as a matter of law; (4) the challenged district court order is an oft-repeated error, or manifests persistent disregard of federal rules; and (5) the challenged district court order raises new and important problems, or issues of law of first impression. *In re Bieter Co.,* 16 F.3d 929, 932 (8th Cir.1994).

Here, there is no challenged district court order at issue. Therefore, mandamus jurisdiction may not be invoked. Accordingly, this Court recommends that Plaintiff's request for a writ of mandamus be denied as well.

### RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Mayo Clinic's Motion to Dismiss (Doc. No. 16) be **GRANTED;**

2. Plaintiff's claims in the Complaint against Mayo Clinic, Rochester, be **DISMISSED WITH PREJUDICE;**

3. Plaintiff's Motion for Leave to File "Plaintiff's First Amended Complaint" pursuant to FRCivP. Rule 15(a) (Doc. No. 69) be **DENIED IN PART** as to the claims alleged against the Mayo Defendants; and

4. Plaintiff's Motion for Injunctive Relief or [sic] in the Alternative Writ of Mandamus (Doc. No. 77) be **DENIED.**

D.Minn.,2008.
Wales v. Tran
Not Reported in F.Supp.2d, 2008 WL 4867699 (D.Minn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Henry L. JACKSON, Plaintiff,
v.
The FEDERAL BUREAU OF PRISONS, Warden
Marty C. Anderson in his official and personal ca-
pacities, John/Jane Does, Mr. Herold, FMC Phar-
macist, in his official and personal capacities, and
the Mayo Clinic,[FN1] Defendants.

> FN1. The Defendant Mayo Clinic notes
> that the "Mayo Clinic" should have been
> properly identified as the "Mayo Clinic
> Rochester," since the Mayo
> Clinic Rochester is the party which had contrac-
> ted with the Federal Medical Center, in
> Rochester, Minnesota ("FMC-Rochester"),
> to provide the services at issue in the
> Plaintiff's Complaint. See, *Mayo Clinic's
> Motion to Dismiss, Docket No. 12,* at p. 1
> n. 1. We benignly overlook that error, as
> Mayo Clinic Rochester does not predicate
> its Motion to Dismiss on that ground, and
> the error does not go to `the substance of
> the Plaintiff's claims.

**Civ. No. 06-1347 (MJD/RLE).**

March 16, 2007.

Henry L. Jackson, Devens, MA, pro se.

Friedrich A.P. Siekert, U.S. Attorney, William R.
Stoeri, Dorsey & Whitney LLP, Minneapolis, MN,
for Defendants.

ORDER ADOPTING REPORT AND RECOM-
MENDATION

MICHAEL J. DAVIS, United States District Judge.

*1 Based upon the Report and Recommendation of
United States Magistrate Judge Raymond L. Erick-
son, and after an independent review of the files,
records and proceedings in the above-titled matter,
**IT IS ORDERED:**

1. That the Defendants BOP, Anderson, Herold,
and the Doe Defendants' Motion to Dismiss
[Docket No. 23] is granted.

2. That the Defendant Mayo Clinic's Motion to Dis-
miss [Docket No. 12] is granted.

3. That the Plaintiff's informal Motion for Appoint-
ment of Counsel [Docket No. 32] is denied.

REPORT AND RECOMMENDATION

RAYMOND L. ERICKSON, Chief U.S. Magistrate
Judge.

*I. Introduction*

This matter came before the undersigned United
States Magistrate Judge pursuant to a general as-
signment, made in accordance with the provisions
of Title 28 U.S.C. § 636(b)(1)(B), upon the Motion
of the Defendants Federal Bureau of Prisons
("BOP"), Warden Marty C. Anderson
("Anderson"), Douglas Herold ("Herold"), and
John/Jane Doe ("Doe Defendants")(collectively,
"Federal Defendants"), to Dismiss under Rules
12(b)(1), and 12(b)(6), Federal Rules of Civil Pro-
cedure; and upon the Motion of the Defendant
Mayo Clinic Rochester ("Mayo Clinic") to Dismiss,
on the same grounds, Count III of the Plaintiff's
Complaint. For these purposes, the Plaintiff appears
*pro se,* the Federal Defendants appear by Friedrich
A.P. Siekert, Assistant United States Attorney, and
the Mayo Clinic appears by William R. Stoeri, Esq.
For reasons which follow, we recommend that the
Defendants' Motions to Dismiss should be granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT D**

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

II. *Factual and Procedural Background*

On April 7, 2006, the Plaintiff, a Federal prisoner, commenced this action under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), and Title 42 U.S.C. § 1983, alleging violations of his Federal constitutional rights, and bringing additional claims under the Federal Tort Claims Act ("FTCA"), the Uniform Federal Accessibility Standards ("UFAS"), the Americans with Disabilities Act ("ADA"), the Architectural Barriers Act ("ABA"), and the Tucker Act, *Title 28 U.S.C. § 1491.* See, *Complaint, Docket No. 1.* At the time that he filed his Complaint, the Plaintiff was a Federal Prisoner at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester"), although he has since been transferred to the Federal Medical Center, in Devens, Massachusetts. See, *Federal Defendants' Memorandum of Law in Support, Docket No. 25-1,* at p. 2.

All of the parties, who are named in the Plaintiff's Complaint, were associated with his incarceration at FMC-Rochester. The BOP is the Federal agency charged with the administration of FMC-Rochester, and Anderson has been the Warden at FMC-Rochester since July 10, 2005, replacing previous Warden W.I. LeBlanc, Jr. ("LeBlanc"). Herold is a pharmacist, who is employed by the United States Public Health Service, and who has worked for the BOP at FMC-Rochester since September of 1991. The identity of the Doe Defendants has not been pled but, as the Plaintiff asserts, "will arise with respect to certain claims that only discovery can identify the correct defendant with respect to the pharmacy staff, the Utilization Review Committee and other departments within the FMC prison structure." *Complaint,* p. 3, ¶ 5. The Mayo Clinic is a private medical practice which contracts its services to FMC-Rochester. See, *Mayo Clinic's Memorandum of Law in Support, Docket No. 14,* at p. 2.

*2 The bases for the Plaintiff's claim began on his admission to FMC-Rochester, in August of 2001. The Plaintiff alleges that, prior to his admission, he was disabled due to a traffic accident in 1998, as he

suffers from paralysis in his legs, has plates and rods in his spine, has a superpubic catheter in his pelvis, and has degenerating muscle damage in his shoulders, wrists, and hands, all of which leave him in constant pain, and dependent on a wheelchair. *Id.* at p. 4, ¶¶ 14-15. When the Plaintiff was admitted for detention at FMC-Rochester, prison officials allowed him to bring his personal mechanical wheelchair into the facility, but denied his request to also bring in a personal electric wheelchair. *Id.* at p. 4, ¶¶ 12-13.

The Plaintiff alleges that, on September 18, 2003, he was showering in a bathroom at FMC-Rochester which, he claims, was not wheelchair accessible, when the bench that he was sitting on gave way, resulting in the fracture of his right leg. *Id.* at p. 6, ¶ 31. According to his Complaint, the Plaintiff broke his left leg while showering in the same stall on July 27, 2004, after he unsuccessfully attempted to transfer himself from a bench to his mechanical wheelchair. *Id.* at p. 6, ¶ 34. As a result, the Plaintiff was placed in a full left leg cast. *Id.* at p. 7, ¶ 36. The Plaintiff claims that he complained about severe pain, underneath his cast, to physicians from the Mayo Clinic, but was forced to wait three (3) weeks, after voicing his complaints, before the cast was removed, revealing a massive ulceration on that leg which required skin grafts. *Id.* at p. 7, ¶¶ 38-40. While the Plaintiff's left leg was still in a cast, a leg support on a mechanical wheelchair malfunctioned, assertedly causing the Plaintiff's cast to strike the floor rebreaking his left leg. The leg support was allegedly provided by FMC-Rochester. *Id.* at p. 7-8, ¶¶ 44-46.

The Plaintiff further claims that he has been denied pain medications that were prescribed to him by his physicians. Specifically, he alleges that, on July 6, 2005, July 7, 2005, and July 8, 2005, FMC-Rochester pharmacy staff refused to dispense prescribed slow-release morphine ("s/r morphine ")[FN2] to him, and that, on July 15, 2005, the pharmacy staff replaced his morphine with non-prescribed methadone.[FN3] *Id.* at p. 8, ¶¶ 50-52. Fi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

nally, the Plaintiff alleges that he has been discriminated against, and subjected to daily hardships, by facilities at FMC-Rochester that do not accommodate his disabilities, and that prevent him from accessing the law library, pool hall, ceramics studio, audio/visual section, and fitness equipment, without assistance. *Id.* at pp. 9-10, ¶¶ 60-66.

> FN2. Morphine is "the principal and most active narcotic alkaloid of opium * * * having powerful analgesic action and some central stimulant action." *Dorland's Illustrated Medical Dictionary,* at 1133 (29th Ed.2000).

> FN3. Methadone hydrochloride is "a synthetic narcotic, possessing pharmacologic actions similar to those of morphine and heroin * * * [and] used as an analgesic." *Dorland's Illustrated Medical Dictionary,* at 1098 (29th Ed.2000).

On December 2, 2004, the Plaintiff filed an administrative claim with FMC-Rochester concerning his inability to obtain an electric wheelchair, after medical reports, in May of 2004, allegedly confirmed his need for such an accommodation. See, *Plaintiff's Appendix, Docket No. 2,* at Exhibit A-1. On December 10, 2004, LeBlanc responded to the Plaintiff's grievance by notifying him that his request for an electric wheelchair had been denied because x-rays did not reveal deterioration of muscles, or bones in his wrists or shoulders, there was no objective evidence of carpal tunnel syndrome or ulnar nerve compression, and the use of an electric wheelchair had not been recommended by a physical therapist. *Id.* at Exhibit A-2. The Plaintiff appealed that decision on January 12, 2005, *Id.* at Exhibit B-1, and his appeal was denied by the BOP's Regional Office on February 3, 2005, *id.* at Exhibit B-2, and by the BOP's National Office on April 13, 2005. *Id.* at Exhibit C-2. On September 14, 2005, the Plaintiff also filed an administrative claim which requested an investigation into the failure of LeBlanc to provide him with an electric wheelchair. *Id .* at Exhibit D-1. The claim

was rejected on September 21, 2005, as untimely, since it was not received within twenty (20) days of the event grieved. *Id.* at Exhibit D-2.

*3 On June 14, 2005, the Plaintiff filed an administrative claim for $500,000.00 in tort damages, under the FTCA, for the leg fracture that he suffered on September 18, 2003. *Id.* at Exhibit E-2. The claim was denied on September 10, 2005, as an investigation of the Plaintiff's claim revealed no personal injury that resulted from the negligence of any BOP employees who were acting within the scope of their employment. *Id.* at Exhibit E-1. Subsequently, on September 14, 2005, the Plaintiff filed an administrative request with FMC-Rochester on the same matter, asking for damages of $1,000,000.00, *id.* at Exhibit F-2, that was denied as untimely on September 21, 2005. *Id.* at Exhibit F-1.

On June 21, 2005, the Plaintiff filed a second tort claim, under the FTCA, asking for $500,000.00 in damages for the second leg fracture that he allegedly suffered on July 27, 2004, *id.* at Exhibit G-2, which was denied on September 10, 2005. *Id.* at Exhibit G-1. The Plaintiff's administrative request on the same matter sought $1,000,000.00 in damages, *id.* at Exhibit H-2, but was also dismissed as untimely, on September 21, 2005. *Id.* at Exhibit H-1.

The Plaintiff filed a third tort claim, under the FTCA, on June 28, 2005, asking for $750,000.00 in damages for the third leg fracture that he suffered on October 13, 2004, *id.* at Exhibit I-2, and that claim was also denied on September 10, 2005. *Id.* at Exhibit I-1. The Plaintiff's administrative request on the same matter sought $1,500,000.00 in damages, *id.* at Exhibit J-2, but was dismissed as untimely on September 21, 2005. *Id.* at Exhibit J-1.

On July 20, 2005, the Plaintiff filed a fourth tort claim, under the FTCA, asking for $620,000.00 in damages, and alleging that he did not receive his prescribed medications to treat his pain on July 6, 2005, July 7, 2005, July 8, 2005, and July 15, 2005.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

*Id.* at Exhibit K-2. On November 30, 2005, that claim was also denied. See, *Declaration of Dennis Bitz, Docket No. 26-5,* at Exhibit 4, p. 2. The Plaintiff filed an administrative remedy request concerning that matter on July 27, 2005, see, *Appendix, supra* at Exhibit L-1, in which he asked for the discipline of the FMC-Rochester pharmacy staff, which was denied on August 11, 2005. See, *Appendix, supra* at Exhibit L-2.

In his response to the Plaintiff's grievance, Anderson explained that FMC-Rochester records revealed that the Plaintiff had received his prescribed doses of morphine on July 6, 2005, July 7, 2005, and July 8, 2005, and that the decision to dispense methadone to the Plaintiff, rather than morphine, on July 15, 2005, had been made by a clinician in response to a concern that s/r morphine was being introduced by patients into the general prison population. *Id.* Although the Plaintiff renewed his grievance with the Regional Office on August 25, 2005, *id.* at Exhibit-1, it was rejected on October 12, 2005, *id.* at Exhibit-2, and by the National Office on December 14, 2005. *Id.* at Exhibit-2.

**\*4** The Defendants maintain that the Court should dismiss all of the Plaintiff's claims, and argue that the Plaintiff's *Bivens* /Section 1983 claims are barred by the failure of the Plaintiff to exhaust his administrative remedies, the doctrine of sovereign immunity, and the doctrine of qualified immunity. The Defendants further allege that the Plaintiff's FTCA claims should be dismissed, since the Plaintiff failed to exhaust his administrative remedies, and sovereign immunity also bars those claims. As to the claims under the ADA, ABA, and UFAS, the Defendants claim that the Plaintiff has failed to exhaust his administrative remedies under the ADA, and that the ABA and UFAS do not provide separate causes of action. Finally, the Defendants contend that the Plaintiff's Tucker Act claims should be dismissed because the damages alleged are in excess of the statutory limit, and the Court lacks jurisdiction to hear Tucker Act claims against parties who are not in privity of contract with the United States.

### Discussion

#### A. The Defendants' Motions to Dismiss.

1. *Standard of Review.* A party may challenge a Court's subject matter jurisdiction at any time, under Rule 12(b)(1), Federal Rules of Civil Procedure , since such a defense may not be waived. See, *Moubry v. Independent School District No. 696,* 951 F.Supp. 867, 882 (D.Minn.1996), citing *Northwest Airlines, Inc. v.. Transport Workers,* 451 U.S. 77, 95 (1981); *Bueford v. Resolution Trust Corp.,* 991 F.2d 481, 485 (8th Cir.1993) ("Lack of subject matter jurisdiction * * * cannot be waived[;][it] may be raised at any time by a party to an action, or by the court *sua spo nte.* " ). "In order to properly dismiss an action under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either upon its face or upon the factual truthfulness of its averments." *Moubry v. Independent School Dist. No. 696,* supra at 882, citing *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993); *Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990).

If the defendant brings a facial challenge-a challenge that, even if truthful, the facts alleged in a Complaint are insufficient to establish jurisdiction-the Court reviews the pleadings alone, and "the non-moving party [is afforded] the same protections that it would receive under a Rule 12(b)(6) motion to dismiss." *Carlson Holdings, Inc. v. NAFCO Ins. Co.,* 205 F.Supp.2d 1069, 1073 (D.Minn.2001), citing *Titus v. Sullivan,* supra at 593; *Osborn v. United States,* supra at 729 n. 6. Accordingly, "[t]he court presumes that all of the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential element for subject matter jurisdiction." *Id.*

However, in factual challenges to subject matter jurisdiction-contending that the allegations in the Complaint, that are to establish jurisdiction, are in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

sufficiently supported by the facts-the Court "may consider matters outside the pleadings and the non-moving party does not benefit from the safeguards of 12(b)(6)." *Id.* When a plaintiff's " 'allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof," "[a]nd * * * for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of the evidence.' " *Zunamon v. Brown,* 418 F.2d 883, 886 (8th Cir.1969), quoting *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936). Here, the Defendants have submitted Affidavits, which go to the jurisdiction of this Court to hear the Plaintiff's claims, and the Plaintiff has failed to submit any rebuttal to those attestations.[FN4]

> FN4. By letter dated September 18, 2006, the Plaintiff advised that he would not be submitting any materials without the aid of counsel. See, *Docket No. 32.* Construing his letter as a request for an appointed legal counsel, we recommend that the Motion be denied. The issues presented in this case are not complicated, as the facts are straightforward, and the legal issues are not novel. The Plaintiff's Complaint was forthright in its meaning, and his arguments were readily understood. Even absent the logistical difficulties of attempting to appoint, or to recruit, legal counsel to represent the Plaintiff in a far off District, the Plaintiff has demonstrated his abilities to represent himself. If he were in need of an enlargement of time to present his arguments and materials, he has not made that request to date.

**\*5** As to Rule 12(b)(6), Federal Rules of Civil Procedure, "[i]n ruling on a motion to dismiss a complaint for failure to state a claim on which relief can be granted, a court must accept the complaint's factual allegations as true and construe them in a light most favorable to the plaintiff." *Doe v. Cassel,* 403 F.3d 986, 987 (8th Cir.2005), citing *Midwestern*

*Mach., Inc. v. Northwest Airlines, Inc.,* 167 F.3d 439, 441 (8th Cir.1999); see also, *Maki v. Allete, Inc.,* 383 F.3d 740, 742 (8th Cir.2004). "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief." *Young v. City of St. Charles,* 244 F.3d 623, 627 (8th Cir.2001), citing *Breedlove v. Earthgrains Baking Companies, Inc.,* 140 F.3d 797, 799 (8th Cir.1998); see also, *Maki v. Allete,* supra at 742; *Helleloid v. Independent School Dist. No. 361,* 149 F.Supp.2d 863, 866-67 (D.Minn.2001).

"Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles,* supra at 627, citing *Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989). "To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions." *Id.,* citing *Springdale Educ. Ass'n v. Springdale Sch. Dist.,* 133 F.3d 649, 651 (8th Cir.1998).[FN5]

> FN5. A Motion to Dismiss can be converted to a Rule 56 Motion for Summary Judgment if "matters outside the pleadings are presented to and not excluded by the court." *Rule 12(b), Federal Rules of Civil Procedure.* However, a Court may consider some information, which is not contained within the Complaint-such as materials that are part of the public record, and materials that are necessarily embraced by the pleadings-without transforming the Motion into one for Summary Judgment. See, *Enervations, Inc. v. Minnesota Mining and Manufacturing Co.,* 380 F.3d 1066, 1069 (8th Cir.2004); *Stahl v. United States Department of Agriculture,* 327 F.3d 697, 700 (8th Cir.2003). Here, the Mayo Clinic has proffered the contract, which extends between the Clinic, and the United States,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

concerning the provision of medical services at FMC-Rochester, which is referenced in the Plaintiff's Complaint. Our consideration of that document does not transform the Mayo Clinic's Motion to Dismiss into a Motion for Summary Judgment under either Rule 12(b)(1), or 12(b)(6), Federal Rules of Civil Procedure.

2. *Legal Analysis.*

a. *The Plaintiff's Bivens Claims.* The Defendants seek dismissal of the Plaintiff's *Bivens* claims on the following grounds: 1) the failure of the Plaintiff to exhaust his administrative remedies; 2) the doctrine of sovereign immunity; and 3) the doctrine of qualified immunity.[FN6] Our discussion commences with the Defendants' assertion that the Plaintiff has failed to exhaust his administrative remedies.

> FN6. In the caption of his Complaint, the Plaintiff cited " 42 USC § 1983 'Bivens' " as one cause of action. See, *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971). *Bivens* provides a cause of action for the constitutional violations of Federal officers, while Title 42 U.S.C. § 1983 provides a parallel cause of action against State and local officers. See, *Johnson v. Fankell,* 520 U.S. 911, 914-15 (1997); *Farmer v. Brennan,* 511 U .S. 825, 839 (1994); *Gordon v. Hansen,* 168 F.3d 1109, 1113 (8th Cir.1999)("An action under Bivens is almost identical to an action under section 1983, except that the former is maintained against federal officials while the latter is against state officials."), quoting *Christian v. Crawford,* 907 F.2d 808, 810 (8th Cir.1990). The Defendants in this case are all Federal officers, and therefore, we recommend that the Plaintiff's Section 1983 claims be dismissed with prejudice.

1) *Failure to Exhaust Administrative Remedies.* In *Jones v. Bock,* ---U.S. ----, 127 S.Ct. 910, 914-15

(2007), the Supreme Court recently considered the role that a prisoner's failure to exhaust his administrative remedies should play in the context of deciding a Motion to Dismiss a *Bivens* claim. The Court began its analysis by noting that requiring prisoners to exhaust their administrative remedies had the positive effect of allowing prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court" which, in turn, "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Id.,* citing *Woodford v. Ngo,* 548 U.S. ----, 126 S.Ct. 2378, 2385, 2388 n. 4 (2006).

Those purposes served as the backdrop to the Court's consideration of the exhaustion requirement, which Congress included in the Prison Litigation Reform Act ("PLRA"), and which provides as follows:

> *6 No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

*Title 42 U.S.C. § 1997e(a).*

The Court first considered whether exhaustion, which is "mandatory under the PLRA," is a pleading requirement that must be satisfied by the prisoner in his Complaint, or if it must be pled and proved by the defendant. See, *Jones v. Bock,* supra at 919. After noting that the drafters of the PLRA failed to impose a stringent pleading requirement on prisoners, the Court concluded that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Id.* at 921.

The Court concluded by considering "mixed claims," in which a prisoner has failed to exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

some, but not all, of the claims asserted in his Complaint. In general, "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad," *id.* at 924, and the Court distinguished the exception to this general rule-the total exhaustion requirement in habeas corpus-because of the implication that habeas relief has on principles of comity and federalism. *Id.* The Court determined that the language in Section 1997e(a) of PLRA, which provides that "[n]o action shall be brought" unless administrative procedures are exhausted, allowed Courts to follow the typical claim-by-claim approach, and precluded blanket dismissal of a prisoner complaint that contained both exhausted and unexhausted claims. *Id.* at 926.

In this context, FMC-Rochester, like other Federal prisons, follows the sequential grievance system enunciated in Title 28 C.F.R. §§ 542.10, through 542.19. Under that framework, when a prisoner brings a complaint, he is first required to "present [the] issue of concern informally to staff," who "attempt to informally resolve the issue." *28 C.F.R. § 542.13(a)*. If the inmate is not satisfied with that informal resolution, he may then file a Request for Administrative Remedy with the Warden. See, *28 C.F.R. § 542.14(a)*. "The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form * * * is 20 calendar days following the date on which the basis for the Request occurred." *Id.*

To appeal a Warden's decision, an inmate must file an appeal with the Regional Director, "within 20 calendar days of the date the Warden signed the response." *28 C.F.R. § 542.15(a)*. "An inmate who is not satisfied with the Regional Director's response may submit an Appeal" to the General or Central Office "within 30 calendar days of the date the Regional Director signed the response," which constitutes "the final administrative appeal." *Id.* Therefore, in order to have exhausted the administrative grievance procedure, an inmate must have followed the sequential process through to a determination

by the General or Central Office.

\*7 In his Complaint, the Plaintiff represents that he has exhausted all three (3) steps of the administrative grievance procedure for each of his *Bivens* claims.[FN7] The Defendants challenge that representation, and assert that the Plaintiff failed to exhaust his administrative remedies with respect to his three (3) separate claims for leg fractures, which took place on September 18, 2003, July 27, 2004, and October 13, 2004, as well as his request for an investigation into the failure of LeBlanc to provide him with an electric wheelchair, after his initial transfer to FMC-Rochester. As a result, the Defendants contend that the Plaintiff has not exhausted his administrative remedies with respect to those issues, as raised in his Complaint, and that those claims should be dismissed.

> FN7. Count Three of the Plaintiff's Complaint is alleged against the BOP, the Mayo Clinic, and the Doe Defendants. A prisoner cannot bring a *Bivens* claim against a private entity, see, *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001); *Sinclair v. Hawke*, 314 F.3d 934, 940 (8th Cir.2003)(no *Bivens* claims against private government contractors), and his claims do not relate to prison conditions, so consequently, the exhaustion doctrine does not apply to the Plaintiff's claims against the Mayo Clinic. To the extent that the Plaintiff alleges any *Bivens* liability against the BOP, and the Doe Defendants, he has submitted no evidence that he filed any administrative claims regarding their involvement in the Mayo Clinic's allegedly negligent medical treatment of his leg. Consequently, we recommend that any *Bivens* claims, which relate to Count Three of the Plaintiff's Complaint, be dismissed as to all of the Defendants.

> Count Five of the Plaintiff's Complaint alleges violations of the ADA, ABA, and UFAS. *Bivens* actions are precluded if

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

"the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Sinclair v. Hawke,* 314 F.3d 934, 940 (8th Cir.2003), quoting *Schweiker v. Chilickly,* 487 U.S. 412, 423 (1988). Thus, to the extent that the Plaintiff brings any claims relating to ADA, ABA, or UFAS, under *Bivens,* those claims should also be dismissed with prejudice.

We agree. The Plaintiff has failed to exhaust his administrative remedies for his three (3) broken leg claims, as well as for his request for an investigation into the failure of LeBlanc to provide him with an electric wheelchair upon his admission at FMC-Rochester. Title 42 U.S.C. § 1997e(a) expressly requires that prisoner litigants must exhaust all of their available administrative remedies before seeking relief in Federal Court. See, *Booth v. Churner,* 532 U.S. 731, 741 (2001)("Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures"); *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.").

Here, the Plaintiff has pled that he has exhausted all of his administrative remedies, see, *Complaint,* supra at p. 4, ¶¶ 10-11, and, as required by the Supreme Court's recent decision in *Jones v. Bock,* supra, the Federal Defendants raised the Plaintiff's failure to exhaust his administrative remedies, as an affirmative defense, in the context of their Motion to Dismiss. See, *Memorandum in Support,* supra at p. 13. Based upon copies of the administrative record, as submitted by the Plaintiff, we find that the Plaintiff's three (3) claims relating to leg fractures were correctly dismissed by the BOP as untimely, and so were not exhausted. Each of the Plaintiff's claims was filed on September 14, 2005, and was

attempting to grieve events that occurred "in 2003-2004"-specifically, occurrences on September 18, 2003, July 27, 2004, and October 13, 2004. Each of those claims was rejected as untimely, since they were filed well in excess of the twenty (20) day time limit on administrative remedies. Similarly, the Plaintiff's request for an investigation into LeBlanc's failure to provide him with an electric wheelchair was rejected as untimely, when it was filed on September 14, 2005, since the original denial of a wheelchair occurred on the Plaintiff's admission to FMC-Rochester in August of 2001, and the Plaintiff received an electric wheelchair in July of 2005.

**\*8** Accordingly, we find that the Plaintiff has failed to state a cause of action on which relief can be granted for those claims, and recommend that they be summarily dismissed, without prejudice, because of his failure to exhaust his administrative remedies. As admitted by the Defendants, the Plaintiff has properly exhausted his administrative remedies with respect to his other claims, namely, the denial of an electric wheelchair after medical reports in May of 2004, assertedly confirmed his need for such an accommodation, and his claims relating to the Defendants' failure to dispense prescribed medication on July 6 through 8, 2005, and July 15, 2005. Accordingly, we proceed to the merits of the Plaintiff's Complaint on those claims.[FN8]

> FN8. In his *Complaint,* the Plaintiff invokes the futility doctrine "that excuses the administrative remedy process for certain policies of the BOP as an agency." *Docket No. 1,* at p. 4, ¶ 11. "Courts recognize only three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is contrary to law." *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.,* 198 F.3d 648, 656 (8th Cir.1999), citing *Urban by Urban v. Jefferson Co. Sch. Dist.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

*R-1,* 89 F.3d 720, 724 (10th Cir.1996). "An administrative remedy will be deemed futile if there is doubt about whether the agency could grant effective relief." *Ace Prop. & Cas. Insur. Co. v. Federal Crop Ins.,* 440 F.3d 992, 1000 (8t h Cir.2006), citing *McCarthy v. Madigan,* 503 U.S. 140, 147 (1992). Here, the Plaintiff has not pled any reason that an administrative appeal would have been futile or inadequate, or that he was denied access to the appeal process. Further, he has not alleged an unconstitutional BOP policy which would render an administrative appeal useless. The Plaintiff successfully exhausted several of his claims, and does not claim that he had any difficulty in doing so. Consequently, we find that the Plaintiff's failure to exhaust all of his claims is not excused as a futile act, and that the dismissal of his unexhausted claims, without prejudice, is appropriate.

2) *Sovereign Immunity.* As a sovereign power, the United States may be sued only to the extent that it has consented to suit by Statute. See, *United States Dept. of Energy v. Ohio,* 503 U.S. 607, 615 (1992); *United States v. Mitchell,* 445 U.S. 535, 538 (1980). "Sovereign immunity is a jurisdictional doctrine, and the terms of the United States' 'consent to be sued in any court define that court's jurisdiction to entertain the suit.' " *Brown v. United States,* 151 F.3d 800, 803 (8th Cir.1998), quoting *FDIC v. Meyer,* 510 U.S. 471, 475 (1994); see also, *United States v. Mottaz,* 476 U.S. 834, 841 (1986)("When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction."), citing *United States v. Sherwood,* 312 U.S. 584, 586 (1941).

Waivers of sovereign immunity must be strictly construed in favor of the sovereign, and may not be enlarged beyond what the language of the waiver requires. See, *United States v. Nordic Village, Inc .,* 503 U.S. 30, 34 (1992); see also, *Bowen v. City of*

*New York,* 476 U.S. 467, 479 (1986); *Block v. North Dakota,* 461 U.S. 273, 287 (1983). Thus, the doctrine of sovereign immunity holds that the United States, and its agencies and instrumentalities-including the BOP-are immune from suit, unless a waiver of such immunity has been "expressed unequivocally" by Congress. *Manypenny v. United States,* 948 F.2d 1057, 1063 (8th Cir.1991); *United States v. Dalm,* 494 U.S. 596, 608 (1990); *United States v. Mitchell,* supra at 538; *Kaffenberger v. United States,* 314 F.3d 944, 950 (8th Cir.2003).

Congress has not waived the sovereign immunity of the United States Government, or its agencies, for claims that their employees have violated the Constitution. See, *Bivens v. Six Unknown Named Agents,* supra at 410; *Buford v. Runyon,* 160 F.3d 1199, 1203 (8th Cir.1998)("It is well settled that a *Bivens* action cannot be prosecuted against the United States and its agencies because of sovereign immunity."). A Federal prisoner in a BOP facility may bring a *Bivens* claim against an individual officer, subject to the defense of qualified immunity, but "the prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP * * * with respect to the alleged constitutional deprivation, his only remedy lies against the individual." *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 72 (2001); see also, *Buford v. Runyon,* 160 F.3d 1199, 1203 (8th Cir.1998).

*9 Here, the Plaintiff's *Bivens* claims against the BOP are barred by sovereign immunity. Further, to the extent that the Plaintiff sues the individual Federal Defendants in their official capacities, the United States is the real party in interest, and sovereign immunity bars those claims. See, *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)(suits against public officials acting in their official capacities should be treated as suits against the public entity); *Elder-Keep v. Aksamit,* 460 F.3d 979, 986 (8th Cir.2006)("A suit against a public officer in his official capacity is actually a suit against the entity for which the official is an agent."). Therefore, the Plaintiff's *Bivens* claims against the BOP, and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

individual Federal Defendants in their official capacities, should be dismissed for lack of subject matter jurisdiction, leaving only the individual capacity claims against Anderson and Herold.[FN9]

> FN9. The *Bivens* claims against the Doe Defendants should also be dismissed, as they were not sued in their individual capacities or, alternatively, because the Plaintiff failed to allege their specific involvement in any of the alleged constitutional violations. "An action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *Estate of Rosenberg by Rosenberg v. Crandell,* 56 F.3d 35, 37-38 (8th Cir.1995) (denying Motion to Dismiss various Doe defendants where plaintiff alleged specific acts that established cause of action, and dismissing "various other John Does to be named when identified."), citing *Munz v. Parr,* 758 F.2d 1254 (8th Cir.1985). In this case, the Plaintiff's *Bivens* claims against the Doe Defendants should be dismissed for failure to state a claim, because the Plaintiff failed to allege that they were personally involved in any of the alleged acts. See, *Estate of Rosenberg by Rosenberg v. Crandell,* supra at 37-38; see also, *Phelps v. United States,* 15 F.3d 735, 739 (8th Cir.1994).

The Federal Defendants argue that Herold, who is named only for his alleged failure to dispense prescription medications to the Plaintiff, is protected against liability in his individual capacity by the absolute, statutory immunity, which is granted to employees of the United States Public Heath Service ("PHS") by Title 42 U.S.C. § 233(a).[FN10] Pursuant to Section 233(a), "commissioned officers and employees of the PHS are immune from individual liability for *Bivens* or constitutional torts, provided that the claim is for damages for personal injuries

resulting from the performance of medical, surgical, dental or related functions." *Novak v. Mundt,* 2005 WL 1277834 at *6 (D.Minn., May 10, 2005), citing *Carlson v. Green,* 446 U.S. 14, 20 (1980); see also, *Lather v. Beadle County,* 879 F.2d 365, 367 n. 4 (8th Cir.1989); *West v. United States,* 592 F.2d 487, 489 (8th Cir.1979). Herold has averred, under penalty of perjury, that at all times relevant to the Plaintiff's Complaint, he was employed as a pharmacist by the PHS, and the Plaintiff has offered nothing to contest that attestation. See, *Declaration of Herold, Docket No. 28,* at p. 1, ¶ 1. As a consequence, Herold is entitled to absolute immunity, and all of the *Bivens* claims against Herold, in his individual capacity, should be dismissed with prejudice.

> FN10. Section 233(a) provides as follows:
>
> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

3) *The Plaintiff's Constitutional Claims.* When qualified immunity is asserted in a *Bivens* action, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all * * *." *Jones v. Shields,* 207 F.3d 491, 494 (8th Cir.2000), quoting *Wilson v. Layne,* 526 U.S. 603 (1999) [citations omitted]. "Only then do

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

we ask whether that right was clearly established at the time of the alleged violation." *Id.;* see, *Coonts v. Potts,* 316 F.3d 745, 750 (8th Cir.2003), citing *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). Here, we find no constitutional violation but, nonetheless, we proceed to address the question of the qualified immunity of Anderson in his individual capacity in the interests of completeness.

**\*10 [a]** *The Eighth Amendment Claims.* It is well-established that deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth Amendment. See, *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976); *Albertson v. Norris,* 458 F.3d 762, 765 (8th Cir.2005). "A prisoner's Eighth Amendment rights are violated if prison officials show 'deliberate indifference' to the prisoner's 'serious medical needs.' " *Olson v. Bloomberg,* 339 F.3d 730, 735 (8th Cir.2003), quoting *Estelle v. Gamble,* supra at 106. To prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulaney v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir.1997), citing *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir.1997); *Crow v. Montgomery,* 403 F.3d 598, 602 (8th Cir.2005); *Pagels v. Morrison,* 335 F.3d 736, 740 (8th Cir.2003); *Tlamka v. Serrell,* 244 F.3d 628, 633 (8th Cir.2001) . "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulaney v. Carnahan,* supra, citing *Long v. Nix,* 86 F.3d 761, 765 (8th Cir.1996).

"Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." *Meloy v. Bachmeier,* 302 F.3d 845, 848 (8th Cir.2002). However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere

disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir.2000), quoting *Estate of R osenburg v. Crandell,* supra at 37, see also, *Smith v. Clarke,* 458 F.3d 720, 724 (8th Cir.2006); *Roberson v. Bradshaw,* 198 F.3d 645, 647 (8th Cir.1999)(" 'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.' "), quoting *Dulany v. Carnahan,* supra at 1239; *DeGidio v. Pung,* 920 F.2d 525, 532 (8th Cir.1990)("[T]he eighth amendment does not transform medical malpractice into a constitutional claim.").

Although the Plaintiff does not specifically plead a violation of the Eighth Amendment, he argues that the BOP, Anderson, and the Doe Defendants, "breach [ed] a duty of trust and duty to provide reasonable medical care," by denying him access to an electric wheelchair for four (4) years. Additionally, the Plaintiff claims that he was subjected to "extreme pain with cruel and unusual punishment," when he was denied pain medications that had been prescribed for the Plaintiff by his doctor. Viewing the facts pled in a light most favorable to the Plaintiff, as we must on a Motion to Dismiss, we still are unable to find any violation of the Plaintiff's Eighth Amendment rights.

**\*11** Our initial inquiry is whether the Plaintiff suffered from an objectively serious medical need, and whether the Federal Defendants knew about that need, but deliberately disregarded it. See, *Jolly v. Knudson,* supra at 1096. In support of his claim, that he was wrongfully denied an electric wheelchair for the first four (4) years of his incarceration at FMC-Rochester, the Plaintiff claims that he began requesting an electric wheelchair in 2001, but was told that "no el[e]ctric wheelchairs were allowed on the compound." *Complaint,* supra at p. 4, ¶ 16. When other inmates began arriving at FMC-Rochester, who were allowed to retain electric wheelchairs, the Plaintiff renewed his request that he be allowed to use his personal electric wheelchair, or be issued one by the BOP. *Id.* at p. 5, ¶¶

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

17-18. The physical therapy department at FMC-Rochester denied the Plaintiff's requests for an electric wheelchair, *id.* at ¶ 23, and the Plaintiff claims that he was told that his weight and size prevented him from receiving such an accommodation. *Id.* at ¶ 25. The Plaintiff received an electric wheelchair in July of 2005. *Id.* at ¶ 26.

On this Record, we find no evidence that the Federal Defendants deliberately disregarded the Plaintiff's genuine medical needs. On each occasion that the Plaintiff complained about his need for an electric wheelchair, the Federal Defendants responded with an evaluation, or treatment. The Plaintiff admits that, when he was originally detained at FMC-Rochester, no inmates were allowed to have electric wheelchairs. After inmates began to be admitted, who utilized electric wheelchairs, the Federal Defendants responded to the Plaintiff's renewed requests for such an accommodation, by sending him to "Rehab Services," where x-rays of his wrists and shoulders resulted in no significant findings. See, *Appendix, Exhibit A-2.* The Physical Therapy department then assessed the Plaintiff's needs, and recommended that the Plaintiff undertake activities-of-daily-living modifications, bracing, upper body strengthening exercises, and a weight loss program.

The Plaintiff was also seen by Occupational Therapy, which found no evidence of carpal tunnel syndrome, or an ulnar nerve compression in his wrists, and recommended proper positioning of the Plaintiff's upper body when using his mechanical wheelchair. Medical staff at FMC-Rochester recognized the validity of the Plaintiff's complaints, regarding pain and tingling in his wrists, but believed that there were alternatives that should be tried before they issued an electric wheelchair. In April of 2005, the National Office responded to the Plaintiff's administrative appeal, and encouraged the Plaintiff to discuss his discomfort with the Chief of the Physical Therapy program, as his recommendation, coupled with the Utilization Review Committee's decision, would determine if an electric wheelchair should be issued. *Id.* at Exhibit

C-1. After such an evaluation, the Plaintiff was provided with an electric wheelchair.

*12 Although "the failure to provide a wheelchair for an inmate may constitute deliberate indifference to a serious medical need in some circumstances," *Shakka v. Smith,* 71 F.3d 162, 167 (4th Cir.1995), citing *Weeks v. Chaboudy,* 984 F.2d 185, 187-88 (6th Cir.1993); *Cummings v. Roberts,* 628 F.2d 1065, 1068 (8th Cir.1980), the actions alleged by the Plaintiff do not rise to the level of cruel and unusual punishment, as determined by Courts in this Circuit. In *Cummings v. Roberts,* supra at 1068, our Court of Appeals found that a prisoner had pled sufficient facts to state a claim for an Eighth Amendment violation, when he alleged that prison officials had deliberately denied him use of his wheelchair, forcing him to crawl on the floor of his cell. Cf., *Guiddy v. Terhune,* 90 Fed.Appx. 592, 600 (3d Cir.2004)(Prisoner's allegation that correctional officer maliciously seized his wheelchair without instructions from a doctor for the purpose of causing unnecessary pain was sufficient to state a claim of deliberate indifference to serious medical needs under the Eighth Amendment); *Weeks v. Chaboudy,* supra at 187 (violation of Eighth Amendment to deprive paraplegic inmate wheelchair with knowledge that he could not move without one).[FN11] In contrast, mere negligence does not constitute a violation of the Eighth Amendment. See, *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Johnson v. Hamilton,* 452 F.3d 967, 973 (8th Cir.2006); *Madison-Bey v. Correctional Medical Services,* 180 Fed.Appx. 608 at *1 (8th Cir.2006). Here, however, the Plaintiff was not compelled, by any circumstance, to travel without a wheelchair; he simply wanted one that operated electrically and, until the decision to allow an electric wheelchair was made, there is no showing that travel by wheelchair deprived the Plaintiff of his freedom of movement.

> FN11. To the extent that the Plaintiff alleges that the Federal Defendants failed to provide him with an assistant to facilitate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

the use of his mechanical wheelchair, he has failed to plead any facts which show that he was unable to navigate the grounds of FMC-Rochester without one. Cf., *Moore v. Curtis,* 68 Fed.Appx. 561, 562-63 (6th Cir.2003)(no violation of Eighth Amendment to deny wheelchair-bound prisoner use of assistant when no showing that he was denied any basic human need).

In addition, the Plaintiff alleges that he was deliberately denied prescribed pain medications, and that the Federal Defendants ignored "legal written prescriptions for pain management," and acted with "careless disregard, [malevolent] and evil indifference" to the Plaintiff's suffering. Specifically, the Plaintiff claims that the FMC-Rochester pharmacy failed to dispense s/r morphine to him on four (4) occasions: July 6, 2005; July 7, 2005; July 8, 2005; and July 15, 2005.

"[I]ntentionally interfering with * * * treatment once prescribed" is a violation of the Eight Amendment, *Estelle v. Gamble,* supra at 104-05, and "[p]rison officials cannot substitute their judgment for a medical professional's opinion." *Meloy v. Bachmeier,* 302 F.3d 845, 849 (8th Cir.2002), citing *Zentmyer v. Kendall County,* 220 F.3d 805, 812 (7th Cir.2000). However, "a prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." *Dulany v. Carnahan,* supra at 1240. In *Johnson v. Hay,* 931 F.2d 456, 461 (8th Cir.1991), our Court of Appeals found that a prisoner had stated a claim for cruel and unusual punishment when he suffered two convulsions after a prison pharmacist deliberately refused to fill legitimate prescriptions, that had been written by prison physicians for anti-seizure medications, based upon the pharmacist's belief that the prisoner did not suffer from a seizure disorder. See also, *Easter v. Powell,* 467 F.3d 459, 463-64 (5th Cir.2006)(deliberate indifference manifested by nurse who sent prisoner with heart problems to pharmacy and refused to provide him with cardiac medications when he

found the pharmacy closed); *Meloy v. Schuetzle,* 230 F.3d 1363 at * 1 (8th Cir.2000)(Table Decision)(prisoner stated claim for violation of Eighth Amendment when prison officials denied him access to a physician-prescribed breathing apparatus).

**\*13** In contrast, the Court in *Givens v. Jones,* 900 F.2d 1229, 1233 (8th Cir.1990), granted Judgment for prison officials in an action alleging a one-month delay in the treatment for a leg injury, finding no deliberate indifference where a prisoner suffered negative side effects from a prescribed medication, when his physician did not believe he had an allergy to that medication, or when the prison officials denied the prisoner access to medical care for leg pain, since there was no showing that the prisoner's condition was acute. Cf., *Mathison v. Swenson,* 143 Fed.Appx. 730, 733 (8th Cir.2005) (no evidence of deliberate indifference when prison officials administered prescribed drugs in crushed form); *Jolly v. Badgett,* 144 F.3d 573, 573 (8th Cir.1998) (Summary Judgment granted when prisoner failed to show prison officials were aware that delay in administering medications could result in physical harm).

The Chief of the Pharmacy Department at FMC-Rochester, James Halvorsen ("Halvorsen"), has averred that, during the time period in question, prison staff, including Herold, had a physician's prescription on file that authorized them to dispense s/r morphine to the Plaintiff twice daily. See, *Declaration of Halvorsen, Docket No. 29,* at p. 1, ¶ 1. The Plaintiff was also authorized to receive doses of i/r (i.e., immediate acting) morphine three (3) times daily to control break-through pain prior to July 6, 2005, but that prescription expired on July 6, 2005, and was not renewed by the Plaintiff's treating physician until July 8, 2005. *Id.,* at p. 2, ¶ 7. Nurses at FMC-Rochester are not authorized to administer i/r morphine without a prescription from a physician, and therefore, on July 6, and 7, 2005, as is uncontested by the Plaintiff, he received his regular dose of s/r morphine, but not the supplemental daily dose of i/r morphine. *Id.* at ¶ 8. [FN12]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

On July 8, 2005, a physician did write a new prescription that allowed the Plaintiff to receive a daily dose of i/r morphine, and the Federal Defendants argue that he received i/r morphine as ordered on that day, as well as his regular dose of s/r morphine. *Id.* at ¶ 7. As a result, even viewing the facts in a light most favorable to the Plaintiff, it is undisputed that FMC-Rochester staff dispensed prescribed pain medications to him through the period in question and, on this Record, we find no manifestation of deliberate indifference that is sufficient to state a claim for an Eighth Amendment violation.

> FN12. In his *Complaint,* the Plaintiff appears to confuse the two (2) types of morphine, claiming that he was denied s/r morphine, but was allowed continued access to i/r morphine. See, *Complaint* at pp. 8-9, ¶¶ 48-54. The distinction does not affect our analysis, as the Plaintiff does not deny that he received some form of pain medication throughout the period in question.

Likewise, the Federal Defendants allege that, on July 14, 2005, the Plaintiff was observed holding his authorized dose of three (3) tabs of s/r morphine under his tongue, rather than consuming it as prescribed. *Id.* at ¶ 9. The primary care physician was contacted, and he recommended that the Plaintiff's prescription be switched to methadone, as it could be crushed and dissolved in water, prior to administration, so as to allow the medication to be immediately consumed. *Id.* at ¶ 10. Therefore, the FMC-Rochester pharmacists did not arbitrarily change the Plaintiff's medication on July 15, 2005, but responded to the Plaintiff's non-compliance with his prescribed drug regimen, by contacting the primary physician, who recommended a suitable alternative drug that reduced the potential of abuse of the drug, or of sale to other inmates. *Id.* at ¶ 11. After our thorough review, we find nothing in the record to demonstrate that the Plaintiff was denied medical treatment on any of the occasions alleged, and we recommend that his Eighth Amendment claims be dismissed.

**\*14** [c]  *The Equal Protection Claim.*  As does the Fourteenth Amendment, the Equal Protection component of the Fifth Amendment requires that the government treat similarly situated individuals alike. See, *Rouse v. Benson,* 193 F.3d 936, 942 (8th Cir.2004), citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). In order to sufficiently state an Equal Protection claim, a prisoner must show that he is somehow being treated differently than a similarly situated class of inmates, that the different treatment impinges on one of his fundamental rights, and that the different treatment bears no rational relation to any legitimate penal interest. See, *Murphy v. Missouri Dept. of Corrections,* 372 F.3d 979, 984 (8th Cir.2004), cert. denied, 543 U.S. 991 (2004), citing *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir.1998)[en banc].

Although the Plaintiff does not specifically plead a violation of the Fifth Amendment in his Complaint, in his administrative remedy requests, the Plaintiff alleges that "a pattern of Bias, discrimination and prejudice" was employed to determine which prisoners received electric wheelchairs, with only White inmates receiving those accommodations, despite having lesser physical needs than the Plaintiff. See, *Appendix,* supra at Exhibit A-1. B-1. However, the Plaintiff has failed to adduce any evidence which shows that he was treated disparately from other prisoners-in particular, from non-Black prisoners. In his response to the Plaintiff's initial grievance, filed on December 2, 2004, see, *Appendix,* supra at Exhibit A-1, LeBlanc explained that "[r]ace never has been, nor ever will be, an issue in providing appropriate medical care [at FMC-Rochester], at any [BOP] facility * * * [but][a]t this time, an electric wheelchair is not medically necessary in your case ." *Id.* at Exhibit A-2.

Although the Plaintiff repeated his claim of racial motivation for the denial of an electric wheelchair in grievances filed on January 12, 2005, *id.* at Exhibit B-1, and February 23, 2005, *id.* at Exhibit C-1, he appears to have abandoned that claim by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

September 9, 2005, when he filed a final grievance alleging only denial of medical treatment. *Id.* at Exhibit D-1. In considering a Motion to Dismiss, "the Court need not consider conclusory allegations or blindly accept the legal conclusions drawn by the plaintiff." *Hastings v. Wilson,* 2007 WL 333617 at *2 (D.Minn., February 1, 2007), citing *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990) ; *Quinn v. Ocwin Federal Bank FSB,* 470 F.3d 1240, 1244 (8th Cir.2006); *Hanten v. Sch. Dist. of Riverview Gardens,* 183 F.3d 779, 805 (8th Cir.1999). Here, the Plaintiff has failed to plead any facts that would state a claim for discrimination based on his race, and the claims he made in the course of his administrative appeals-that other inmates, who were not Black, were receiving electric wheelchairs after his request were denied-were entirely unsupported by any factual showing, and do not establish any grounds for allowing his Fifth Amendment claim to proceed.

**\*15** 3) *Qualified Immunity.* Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. See, *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *Young v. Harrison,* 284 F.3d 863, 866 (8th Cir.2002); *Winters v. Adams,* 254 F.3d 758, 766 (8th Cir.2001). As with all Motions to Dismiss, one predicated on qualified immunity requires that we "view[ ] the allegations in the complaint in the light most favorable to the plaintiff." *Hafley v. Lohman,* 90 F .3d 264, 266 (8th Cir.1996), cert. denied, 519 U.S. 1149 (1997).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Wilson v. Layne,* supra at 614. The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand

that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.' " *Bagby v. Brondhaver,* 98 F.3d 1096, 1098 (8th Cir.1996).

Here, while we have concluded that the Defendants' treatment of the Plaintiff did not violate the Constitution, even if they had, the Defendants are clearly entitled to qualified immunity, as the unlawfulness of that treatment was far from apparent. See, *Logan v. Clarke,* 119 F.3d, 647, 649-650 (8th Cir.1997); *Camberos v. Branstad,* 73 F.3d 174, 177 (8th Cir.1995); *Long v. Nix,* supra at 765. Accordingly, the Defendants' Motion to Dismiss should also be granted under the doctrine of qualified immunity.

b. *The Plaintiff's FTCA Cause of Action.* The Federal Defendants assert that they are entitled to a dismissal of the Plaintiff's FTCA claims, because the Plaintiff failed to exhaust his administrative remedies, and the doctrine of sovereign immunity bars the Plaintiff's claims.

1) *Failure to Exhaust Administrative Remedies.* To bring a claim under the FTCA, a party must fully comply with all of the conditions and requirements prescribed by the Act. See, *Bellecourt v. United States,* 994 F.2d 427, 430 (8th Cir.1993), cert. denied, 510 U.S. 1109 (1994). One of the primary requirements of the FTCA is found in the first sentence of Title 28 U.S.C. § 2675(a), which states as follows:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or em-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

ployment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

*16 *Title 28 U.S.C. § 2675(a).*

As the statutory language makes clear, a party cannot bring a lawsuit under the FTCA, without first exhausting his or her administrative remedies by presenting a written claim for relief to "the appropriate Federal agency." See, *Duncan v. Department of Labor,* 313 F.3d 445, 447 (8th Cir.2002)( "Although the Federal Tort Claims Act creates several exceptions to the United States' sovereign immunity, it requires the claimant to first 'present[ ] the claim to the appropriate Federal agency.' "), quoting *Title U.S.C. § 2675(a);* see also, *McCoy v. United States,* 264 F.3d 792, 794 (8th Cir.2001)( "An action may not be commenced in federal court under the FTCA unless the plaintiff has first presented his claim to the appropriate federal agency, and that claim has been denied."), cert. denied, 535 U.S. 1053 (2002).

In addition, an FTCA claimant must file his or her administrative claim within two (2) years after the claim accrued. See, *McCoy v. United States,* supra at 794 (" '[A] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues.' "), quoting *Title 28 U.S.C. § 2401(b);* see also, *Garza v. United States Bureau of Prisons,* 284 F.3d 930, 934 (8th Cir.2002)( "Under the FTCA, a tort claim against the United States must be presented in writing to the appropriate federal agency within two years after the claim accrues or it is time barred."). Furthermore, "[a] plaintiff's compliance with the two-year limitations period is a jurisdictional prerequisite, since FTCA acts as a waiver of the federal government's sovereign immunity." *McCoy v. United States,* supra at 794.

Therefore, if an FTCA claimant does not file an ad-

ministrative claim for relief within two (2) years after the claim accrues, any subsequent FTCA lawsuit, which is based on that claim, must be dismissed for lack of subject matter jurisdiction. Finally, Section 2401(b) stipulates that a tort claim shall be barred "unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." *United States v. Kubrick,* 444 U.S. 111, 117 (1979); *Slaaten v. United States,* 990 F.2d 1038, 1041 (8th Cir.1993); *Sterling v. United States,* 985 F.2d 411, 412 (8th Cir.1993).

Here, the Plaintiff has attached copies of "Standard Form 95"-"Claim For Damage, Injury, or Death"-to his Complaint, which suggests that he filed FTCA claims that would have satisfied the requirements of Section 2675(a) as the claims relate to his three fractured legs.[FN13] See, *Appendix,* supra at Exhibits E-2, G-2, and I-2. Giving the Plaintiff's Complaint the benefit of a liberal construction, we find that the Plaintiff did attempt to satisfy the FTCA's administrative claim requirement. However, the Plaintiff failed to file his lawsuit within six (6) months after the denials of those claims, as the denial letters were sent to the Plaintiff, on September 17, 2005. See, *Appendix,* supra at Exhibit E-1, G-1, I-1; *Schmidt v. United States,* 994 F.2d 843, 843 (8th Cir.1993)(Table Decision)(affirming dismissal when complaint was filed more than six (6) months after mailing of agency decision by certified mail); *Arigo v. United States,* 980 F.2d 1159, 1160 (8th Cir.1992)(mailing of decision triggers start of six (6) month period).

> FN13. Standard Form 95 is the prescribed form for presenting FTCA claims. See, *28 C.F.R. § 14.2(a)* ("For purposes of the provisions of [Title] 28 U.S.C. §§ 2401(b), 2672, and 2675, a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other writ-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

ten notification of an incident * * *.").

**\*17** The denial letters included language, based upon the statutory requirements, instructing the Plaintiff that, if he disagreed with the action, he could file suit "in an appropriate U.S. District Court no later than 6 months after the date of mailing of this notification." *Id.* The Plaintiff filed his lawsuit on April 7, 2006, which is almost one (1) month after the expiration of the statutory deadline. See, *Docket No. 1.* Because compliance with Section 2401(b) is a jurisdictional prerequisite to suit, under the FTCA, see, *Osborn v. United States,* 918 F.2d 724, 728-31 (8th Cir.1990); *Radman v. United States,* 752 F.2d 343, 344 (8th Cir.1985); see also, *Logan v. United States,* 792 F.Supp. 663, 665-666 (E.D.Mo.), aff 'd, 978 F.2d 1263 (8th Cir.1992), we lack subject matter jurisdiction over the Plaintiff's FTCA claims which relate to his three (3) leg fractures.

The Plaintiff has included no documentation that would suggest that he ever attempted to exhaust his claims for the alleged mistreatment by LeBlanc for denying his requests for an electric wheelchair until 2005, or for his claims under the ADA, ABA, and UFAS, which relate to the physical layout of FMC-Rochester, and we find that, to the extent the Plaintiff alleges those claims under the FTCA, they should also be dismissed, without prejudice, for failure to exhaust administrative remedies.

Finally, the Plaintiff has submitted a copy of his FTCA claim that was based on the failure of the Defendants to dispense s/r morphine on several occasions in July of 2005, which was denied by letter dated November 30, 2005. See, *Declaration of Dennis Bitz, Docket No. 26-5,* Exhibit 4. Since that claim was denied less than six (6) months prior to the filing of the Complaint on April 7, 2006, we find the evidence, that his claim was received, is sufficient to satisfy the test for exhaustion on that claim, which should not be barred as untimely.[FN14]

FN14. As a corollary to their argument,

that the Plaintiff has failed to exhaust his claims, the Defendants contend that, by requesting relief for "actual damages to be determined at a later date," and for compensatory damages "in excess of $75,000.00" in his Complaint, the Plaintiff failed to name a "sum certain" for the damages allegedly caused by the purported denial of pain medication, in violation of Title 28 U.S.C. § 2675. See also, *28 C.F.R. § 14.2(a); Bellecourt v. United States,* supra at 430. However, in his original FTCA claim, the Plaintiff requested "$20,000.00 per day actual for each of wrong [and] $500,000.00 punitive damages for all compensatory, emotional distress," totaling $620,000.00. See, *Appendix,* supra at Exhibit K-2. "The purpose of the sum certain requirement is to facilitate settlement * * * and to inform the agency whether the claim is for more than 25,000 and the approval of the Attorney General is needed to settle a claim under 28 U.S.C. § 2672." *Lundgren v. United States,* 810 F.Supp. 256, 257-58 (D.Minn.1992) (citations omitted); *Melo v. United States,* 505 F.2d 1026, 1029 (8th Cir.1974). As long as some sum is stated, Courts in our Circuit will permit an otherwise properly filed FTCA claim to go forward. See, *Val-U Const. Co. of South Dakota, Inc. v. United States,* 905 F.Supp. 728, 738 (D.S.D.1995)("Those courts which have reached the issue of how precisely stated a sum certain must be have almost uniformly permitted a claim, albeit in amended form, when some figure has been stated."). As a result, even though the FTCA does not allow punitive damages, see *Title 28 U.S.C. § 2674,* the Plaintiff has named a sum certain for actual damages, and that claim has been exhausted.

2) *Sovereign Immunity.* As the Defendants have correctly noted, only the United States itself, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

not FMC-Rochester, or the BOP, can be sued under the FTCA. See, *Duncan v. Department of Labor,* supra at 447 ("Because a Federal agency cannot be sued under the Federal Tort Claims Act, the United States is the proper defendant."), citing *F.D.I.C. v. Meyer,* 510 U.S. 471, 476-77 (1994). However, this action should not be dismissed because of the Plaintiff's failure to name the United States as a Defendant for, if that were the only flaw in the Plaintiff's case, we would be inclined to construe the action as having been brought against the United States. See, *Title 28 U.S.C. § 2679(d).*

The FTCA is a specific statutory waiver of the Federal Government's sovereign immunity. See, *Primeaux v. United States,* 181 F.3d 876, 878 (8th Cir.1999)( "The FTCA is a limited waiver of the federal government's sovereign immunity."), cert. denied, 528 U.S. 1154 (2000). Under the FTCA, a party can maintain an action against the United States, in Federal Court, for money damages arising from "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment * * *." *Title 28 U.S.C. § 1346(b).* "The government is not liable, however, for '[a]ny claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.' " *Tracor/MBA, Inc. v. United States,* 933 F.2d 663, 665 (8th Cir.1991). As a result, the Plaintiff's FTCA claims against the Federal Defendants, in their individual and official capacities, should be dismissed, with prejudice, and the United States should be substituted as the sole Defendant.

**\*18** 3) *The Negligence Claim.* To be actionable under the FTCA, "a claim must allege, *inter alia,* that the United States 'would be liable to the claimant' as 'a private person' 'in accordance with the law of the place where the act or omission occurred.' " *FDIC v. Meyer,* supra at 477-78. The "law of the

place" means the law of the place where the action is alleged to have occurred. See, *Title 28 U.S.C. § 1346(b);* see also, *United States v. Olson,* 46 U.S. 43, 43 (2005); *F.D.I.C. v. Meyer,* supra at 478 ("[W]e have consistently held that § 1346(b)'s reference to the 'law of the place' means law of the State-the source of substantive liability under the FTCA.") (citing cases); *Laframboise v. Leavitt,* 439 F.3d 792, 793 (8th Cir.2006); *Phillips v. United States,* 422 N.W.2d 709, 710 (8th Cir.2005). In Minnesota, to prevail on a negligence claim, a plaintiff must prove: 1) that the defendant had a legal duty to the plaintiff to take some action; 2) breach of that duty; 3) that the breach of that duty was the proximate cause of plaintiff's harm; and 4) injury. See, *Gylten v.. Swalboski,* 246 F.3d 1139, 1141 (8th Cir.2000), citing *Gilbertson v. Leininger,* 599 N.W.2d 127, 130 (Minn.1999); *Funchess v. Cecil Newman Corp.,* 632 N.W.2d 666, 672 (Minn.2001).

Construing the Complaint liberally, we understand the Plaintiff to allege that the Defendants had a duty to dispense lawfully issued prescriptions, that they breached that duty by denying him those medications on four (4) separate occasions, and that, as a result of that action, he endured "extreme pain and suffering." *Complaint,* supra at p. 15, ¶¶ 92-93. The Defendants deny any negligence, and have submitted the statement of Halvorsen, who avers that the Plaintiff's prescription for i/r morphine expired on July 6, 2005, and was not renewed until July 8, 2005. See, *Declaration of Halvorsen,* supra at p. 2, ¶ 7. Halvorsen further attests that the pharmacy staff dispensed methadone, rather than morphine, on July 15, 2005, based on legitimate fears that the Plaintiff was secreting his prescribed medications, and that this decision was accompanied by a new prescription from an attending physician. See, *id.* at ¶¶ 9-11. In contrast, in his Complaint, the Plaintiff alleges that the staff at the FMC-Rochester pharmacy "suddenly and unexpectedly refused to dispense s/r morphine " to him and, on July 15, 2005, required him to take methadone, while informing him that he would not be issued s/r morphine even with a valid prescription. See, *Complaint,* supra at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
(Cite as: 2007 WL 843839 (D.Minn.))

pp. 8-9, ¶¶ 50-54.

Although this is a closer question, we find that the Plaintiff's Complaint fails to state a claim for negligence owing to the asserted denial of medications to which he felt that he was entitled. It is undisputed that the pharmacy staff, who are employed at FMC-Rochester, are not allowed to dispense narcotics without a valid order from a physician, and the Record does not contest the averments of Halverson, and Herold, as to the status, during the time in question, of the Plaintiff's prescriptions. Moreover, the period in which the medications were alleged to have been denied is so brief as to preclude any contention that the Plaintiff suffered a compensable personal injury. Notably, the Plaintiff was not denied medication during that period, simply medication of his choice. Since the switch to methadone was prescribed by a treating physician, and was not a judgment call made by the prison's pharmacists, and was in response to concerns over prison security, we are not well positioned to second-guess that brief change in the Plaintiff's prescriptive medicines.

*19 Lastly, under Minnesota law, for a negligence claim against pharmacists to be actionable, the plaintiff must proffer expert opinion evidence, in conjunction with his or her Complaint, attesting to the Defendants' departure from the standard of care, which led to the Plaintiff's injury.[FN15] Here, no such expert opinion evidence has been proffered by the Plaintiff, notwithstanding many months of forewarning that such an affidavit was essential to the legal vitality of his claim. See, *Memorandum of Law in Support of Motion to Dismiss,* at pp. 46-48. Accordingly, we recommend that the Defendants' Motion to Dismiss the alleged negligence claim, under the FTCA, also be granted.

FN15. Minnesota Statutes Section 145.682, Subdivision 1, defines a "health care provider," whose asserted medical negligence requires an expert opinion affidavit, as follows:

For purposes of this section, "health care provider" means a physician, surgeon, dentist, or other health care professional or hospital, including all persons or entities providing health care as defined in section 145.61, subdivision 2 or 4, or a certified health care professional employed by or providing services as an independent contractor in a hospital.

In turn, Minnesota Statutes Section 145.61, Subdivision 2, provides as follows:

"Professional" means a person licensed or registered to practice a healing art under chapter 147 or 148, to practice dentistry under chapter 150A, to practice as a **pharmacist** under chapter 151, or to practice podiatry under chapter 153.

[Emphasis added].

c. *The Plaintiff's ADA, ABA, and UFAS Claims.* In Count Five of his Complaint, the Plaintiff alleges that he has been discriminated against by the BOP, Anderson, and the Doe Defendants, due to his disabilities as a "handicapped, chronic pain and wheelchair bound inmate," and he seeks relief in the form of actual, punitive, compensatory, and consequential damages, under the ADA, the ABA, and the UFAS. *Complaint,* supra at pp. 15-17, ¶¶ 96-112. The Defendants respond that the Plaintiff has failed to exhaust his administrative remedies relating to this claim. The Plaintiff contests that assertion and, although he has not submitted a copy of the grievance he allegedly filed, he included a Response to a Request for Administrative Remedy from Anderson, which addresses a request for construction of a new recreation track, and ramp, to the upper recreation area at FMC-Rochester. See, *Appendix,* supra at Exhibit P. Anderson has attested that the grievance in question was actually filed by another inmate, Rolando Araujo ("Araujo"), and the reply included by the Plaintiff was, in fact, directed to Araujo's complaint. See, *Declaration of Anderson,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

Page 20

supra at p. pp. 4-5, ¶¶ 21-22.

Even if the administrative request had been filed by the Plaintiff, we would still find that this claim has not been exhausted, as the Plaintiff only alleges that it was grieved to Anderson, but he makes no showing of any appeals to the Regional or the National Offices of the BOP. In *Randolph v. Rogers,* 253 F.3d 342, 348 n. 11 (8th Cir.2001), our Court of Appeals declined to consider, as waived on appeal, the State defendants' claim that the PLRA required exhaustion for claims brought under the ADA. However, other Circuits, which have considered whether the PLRA requires that a prisoner first exhaust his administrative remedies before filing a claim under the ADA, have found that the exhaustion requirement applies.

For example, the Court of Appeals for the Ninth Circuit cited the language of Section 1997e(a), which provides that "[n]o action shall be brought **with respect to prison conditions** under * * * [42 U.S.C. § 1983], **or any other federal law,** by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." *Smith v. Haan,* 199 Fed.Appx. 594, 595 (9th Cir.2006)[emphasis in original], citing *Porter v. Nussle,* supra at 532 ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"); cf., *Wiley v. McKellar,* 167 Fed.Appx. 385, 386 (5th Cir.2006); see, *Jones v. Smith,* 266 F.3d 399, 400 (6th Cir.2001) (dismissing prisoner's ADA claim for failure to exhaust administrative remedies); cf., *Butler v. Adams,* 397 F.3d 1181, 1183 (9th Cir.2005)(prisoner's ADA complaint could go forward when he had exhausted his claims).[FN16]

> FN16. Even if the Plaintiff had exhausted his ADA claims, a Court in this district has previously held that "the ADA does not provide a cause of action against the federal government," because there is no expli-

cit waiver of sovereign immunity contained in the Statute. *County of St. Louis v. Thomas,* 967 F.Supp. 370, 376 (D.Minn.1997), citing *Title 42 U.S.C. § 12131(1)(A)-(B)* (defining public entities covered by the ADA as any State or local government); see also, *Fulton v. United States,* 198 Fed.Appx. 210, 215 (3d Cir.2006); *Agee v. United States,* 72 Fed. Cl. 284, 289 (Fed.Cl.2006).

**\*20** Although the Plaintiff also invokes the ABA and the UFAS, both provide for purely administrative remedies, and do not allow recovery for money damages as claimed by the Plaintiff. The ABA was enacted "to insure whenever possible that physically handicapped persons will have ready access to, and use of, [public] buildings." *Title 42 U.S.C. § 4152.* It contains no waiver of sovereign immunity, nor does it provide for a private cause of action. *Id.;* see also, *Crowder v. True,* 1998 WL 42318 at *2 (N.D.Ill., January 29, 1998) ("There is no private right of action by handicapped individuals complaining of a violation of the ABA; enforcement is purely administrative.").

Similarly, the UFAS is an administrative provision that "prescribes standards for the design, construction, lease, and alteration of buildings to ensure, whenever possible that physically handicapped persons will have ready access to and use of such buildings." *41 C.F.R. Ch. 101-19.600, et seq.* In short, the UFAS does not state a cause of action separate from the ADA or the ABA. See, *DeFrees v. West,* 988 F.Supp. 1390, 1393 (D.Kan.1997). Thus, we recommend that the Plaintiff's claims under the ADA, ABA, and UFAS be dismissed.

d. *The Plaintiff's Tucker Act Claim.* In Count Three of his Complaint, the Plaintiff alleges a cause of action, under the Tucker Act, against the BOP, the Doe Defendants, and the Mayo Clinic. According to the Plaintiff, he suffered pain, delayed healing, and emotional distress, when physicians from the Mayo Clinic, as an independent contractor with the United States, negligently treated his broken leg. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

addition to the Federal Defendants, the Mayo Clinic has filed a separate Motion to Dismiss, arguing that the Plaintiff has failed to state a claim under the Tucker Act, since he has alleged damages in excess of the statutory limit, and because we have no jurisdiction to consider Tucker Act claims by parties who are not in privity of contract with the United States.[FN17]

> FN17. In Paragraph 88 of his Complaint, the Plaintiff alleges as follows:
>
> Plaintiff is not neccessarily [sic] alleging any medical "malpractice" but rather a contractor liability under the Tucker Act (Plaintiff may seek leave to amend a malpractice claim (later).
>
> To date, the Plaintiff has not asserted a malpractice claim against the Mayo Clinic and, as the Mayo Clinic correctly notes, the Plaintiff's filings are devoid of the expert affidavits which, under Minnesota law, must accompany a malpractice action, attesting to a medical expert's opinion that the Mayo Clinic "deviated from the applicable standard of care and by that action caused injury to the plaintiff." *Minnesota Statutes Section 145.682, Subdivisions 2 and 3.* The same provision of expert opinion affidavits apply to actions commenced by *pro se* plaintiffs. See, *Minnesota Statutes Section 145.682, Subdivision 5.*

In Count Three, the Plaintiff asks for $75,000.00 in actual, punitive, compensatory, and consequential damages, as a result of the Mayo Clinic's alleged breach of contract in treating his leg injury. The Tucker Act, *Title 28 U.S.C. § 1491,* vests the Court of Federal Claims with exclusive jurisdiction over certain contract claims against the United States, that are in excess of $10,000.00.[FN18] While we have the authority to transfer the Plaintiff's claims, under Title 28 U.S.C. § 1631, we find that the Plaintiff has no likelihood of prevailing on a Tucker

Act claim, and therefore, we recommend that those claims be dismissed, while noting that the Plaintiff is free to refile that claim with Court of Federal Claims. See, *Mullally v. United States,* 95 F.3d 12, 14 (8th Cir.1996); *St. Louis Union Trust Co. v. Stone,* 570 F.2d 833, 836 (8th Cir.1978); *Thompson v. United States,* 408 F.2d 1075, 1081 (8th Cir.1969); *United States v. House,* 100 F.Supp.2d 967, 978 n. 7 (D.Minn.2000); *Winston Bros. Co. v. United States,* 371 F.Supp. 130, 133 (D.Minn.1973) .

> FN18. In relevant part, Section 1491 provides as follows:
>
> (a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
>
> * * *
>
> (b) The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978 * * *.

**\*21** In addition, the Little Tucker Act, *Title 28 U.S.C. § 1346(a)(1),* confers concurrent jurisdiction upon the United States District Courts over contract claims against the United States, but only where the Plaintiff alleges damages of $10,000.00 or less.[FN19] See, *Taylor v. United States,* 248 F.3d 736, 737 (8th Cir.2001); *Polos v. United States,* 556 F.2d 903, 905 (8th Cir.1997); *Mullally v. United States,* 95 F.3d 12, 14 (8th Cir.1996); *St. Louis Trust Co. v. Stone,* 570 F.2d 833, 836 (8th Cir.1978); *United States v. House,* 100 F.Supp.2d 967, 978 (D.Minn.2000). Even if we found that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)
**(Cite as: 2007 WL 843839 (D.Minn.))**

Plaintiff had waived his damages in excess of $10,000.00, see, e.g., *United States v. Johnson,* 153 F.2d 846, 848 (9th Cir.1946), the Plaintiff has still failed to state an actionable claim under the Little Tucker Act, for the Plaintiff admits that he does not have a contractual relationship with the United States. Instead, he alleges that he is entitled to recover damages for the Mayo Clinic's breach of contract with the United States by providing negligent medical treatment.

> FN19. In relevant part, Section 1346 provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

> (a)(2) any * * * civil action or claim against the United States, not exceeding $10,000 in amount, founded upon either the Constitution, or any Act of Congress, * * * or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

"Federal common law recognizes the ability of third parties to sue on a contract [with the United States] that was intended for their benefit," as long as "the circumstances indicate that the promisee intended to give the beneficiary the benefit of the promised performance." *5th Bedford Pines Apartments, Ltd. v. Brandon,* 262 F.Supp.2d 1369, 1377-78 (N.D.Ga.2003), citing *Roberts v. Cameron-Brown Co.,* 556 F.2d 356, 362 (5th Cir.1977). However, Little Tucker Act claims for breach of contract can only be made against the United States, not on its behalf. See, *Roedler v. Dept. of Energy,* 255 F.3d 1347, 1351 (C.A.Fed.2001) ("Third party beneficiaries of a contract to which the United States is a party may assert a claim against the United States, in accordance with the law governing third party claims."). Since the Plaintiff does not allege that the United States has breached its contract with the Mayo Clinic, see, *De-*

*claration of William R. Stoeri, Docket No. 16,* Exhibit 1, he has failed to state a claim under the Little Tucker Act, and the Mayo Clinic's Motion to Dismiss should be granted.

In sum, we find that the Defendants' Motions to Dismiss should be granted in all respects.

NOW, THEREFORE, It is-

RECOMMENDED:

1. That the Defendants BOP, Anderson, Herold, and the Doe Defendants' Motion to Dismiss [Docket No. 23] be granted.

2. That the Defendant Mayo Clinic's Motion to Dismiss [Docket No. 12] be granted.

3. That the Plaintiff's informal Motion for Appointment of Counsel [Docket No. 32] be denied.

D.Minn.,2007.
Jackson v. Federal Bureau of Prisons
Not Reported in F.Supp.2d, 2007 WL 843839 (D.Minn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.