## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Patricio Flores and Jose Encalada,                    Civil No. 09-838 (ADM)
as Co-Trustees and Personal Representatives for
the next of kin of Maria Iñamagua Merchan,

                     Plaintiffs,                        **REPORT AND**
                                                   **RECOMMENDATION**

v.

The United States of America;
The U.S. Department of Homeland Security;
Scott Baniecke; An Unknown Number of
Unnamed and Unknown Agents of ICE; The
County of Ramsey, Minnesota; Robert Fletcher;
Ramsey County Adult Detention Center;
Ramsey County Sheriff's Department; Ramsey
County Department of Health; Robert W.
Fulton; "XYZ" Family Practice Clinic; Drs.
John or Jane Does I-V; Robert Moxley-
Goldsmith; R.N. Erika Thompson; Chris Strand;
Kelli LNU; John or Jane Roe; Mary Roby; Jill
Jones; T. Bennet; Cheryl Caumiant; and
John or Jane Poes I-V,

                     Defendants.

---

       Christopher Walsh, Esq., Walsh Law Firm, 100 South 5th Street, Suite 1025, Minneapolis, MN 55402, for Plaintiffs.

       Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendants United States of America, et al.

       Karen Kugler and Kevin Lindsey, Esqs., Ramsey County Attorney's Office, 50 West Kellogg Blvd., Suite 560 RCGC - West, St. Paul, MN 55102, for Defendants The County of Ramsey, et al.

       Barbara Zurek and Melissa Riethof, Esqs., Meagher & Geer, PLLP, 33 South 6th Street, Suite 4400, Minneapolis, MN 55402, for Defendants XYZ Family Practice Clinic, et al.

**JANIE S. MAYERON**, United States Magistrate Judge

This matter is before the Court on the motion of the Ramsey County Defendants to dismiss, or for summary judgment (Doc. No. 189). The matter has been referred to the undersigned pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). For the reasons stated below, this Court recommends that the motion be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts of this case were recounted in detail in an earlier Report and Recommendation dated April 1, 2010 (Doc. No. 161), and will not be repeated here except as necessary. Moreover, as a result of that earlier decision, as adopted by the district court (Doc. No. 201), many claims and defendants were dismissed, leaving two groups of Defendants subject to only certain claims: (1) with respect to Defendants Dr. Salmi and Advance Practice Solutions, P.A. ("APS"), only the Section 1983 and Bivens claims remained; (2) with respect to the remaining Ramsey County Defendants, only Bivens claims are left.[1] Each group of Defendants then moved for dismissal or summary judgment on all remaining claims against them. (Doc. Nos. 180 & 189.)[2] Since

_____

[1]     Plaintiffs' Complaint asserted six claims against numerous Defendants, which were then organized into three major groups: (1) the Federal Defendants, (2) the Ramsey County Defendants, and (3) Dr. Salmi and APS. (Doc. No. 161, at 3; Doc. No. 118, at 2.) The Federal Defendants were dismissed entirely. (Doc. No. 161, at 53.) Some of the Ramsey County Defendants, both individuals and governmental entities, were also dismissed entirely. (Id. at 54.) Counts I-V were dismissed with respect to the remaining Ramsey County Defendants and Count VI (a Bivens claim) was also dismissed with respect to two other Ramsey County Defendants. (Id.) Everything except Counts I (a Section 1983 claim) and VI was dismissed with respect to Dr. Salmi and APS. (Id.)

[2]     The Ramsey County Defendants also have moved to strike the Affidavit of
(continued...)

the hearing in this matter, summary judgment has been granted to Dr. Salmi and APS. (Doc. No. 274 (district court order adopting report and recommendation (Doc. No. 265))).)

Although Plaintiffs contend that genuine disputes of material fact exist, the following facts are undisputed. On February 24, 2006, Decedent was arrested by the Department of Immigration and Customs Enforcement ("ICE") and taken to the Ramsey County Adult Detention Center ("RCADC") because ICE had no facilities of its own in the area. (Doc. No. 161, at 5, 7.) ICE had contracted with Ramsey County to provide detention facilities, including medical services, to ICE detainees. (Id. at 5.)

Decedent became ill during her detention at RCADC and complained of persistent headaches. She was seen by Defendant Nurse Thompson on March 5, 2006, who referred her to Dr. Salmi. On March 6, 2006, Dr. Salmi diagnosed her as suffering from muscle contractions and prescribed a pain reliever and a muscle relaxant. Decedent's head pain persisted and she also complained of a rash. The nursing staff provided care for both symptoms. After decedent fell from her bunk on April 3, 2006, she was treated for the resulting injuries, but her condition deteriorated. Thus she was transferred later that day to Regions Hospital, where she was diagnosed with hydrocephalus secondary to neurocysticercosis and later died from that condition. (Id. at 10-11.) Plaintiffs then brought this action against numerous municipal and federal officials and entities.

---

[2](...continued)
Christopher Walsh. (Doc. No. 228.) Plaintiffs have moved to compel discovery. (Doc. No. 235.) And finally, the Ramsey County Defendants had moved to extend discovery deadlines. (Doc. No. 237.) At the hearing, the Court granted the latter motion and, more importantly for the present motion, granted in part Plaintiffs' motion to compel, permitting them to conduct certain additional discovery. (Doc. No. 259.)

## II.  DISCUSSION

### A.  The Ramsey County Defendants' Motion Is Ripe For Resolution

Plaintiffs' Complaint asserted claims against numerous Ramsey County employees, identified and unidentified, as well as Ramsey County itself and various departments and agencies of the County.  (Doc. No. 161, at 3.)  After the district court dismissed many of these Defendants and most of the claims against those that remained, three subgroups of the Ramsey County Defendants remain:  (1) Officer Cheryl Caumiant (a RCADC correctional officer), Nurse Corrine Strand and Nurse Erica Thompson (collectively, "the Examining and Treating Defendants"); (2) Head Nurse Robert Moxley-Goldsmith, Mary "Kelly" Logan (originally named as a Defendant in the Complaint as "Kelli LNU"), and Jane Berg (originally named as a Defendant in the Complaint as one of the "Jane Roes" or "Jane Poes") (collectively, "the Non-Treating Defendants"); and (3) the various unidentified individuals (originally denominated as "Drs. John Doe or Jane Does I-V," "John Roe or Jane Roes I-V," and "John Poe or Jane Poes I-V") (collectively, "the Unidentified Defendants").[3]

Discovery had been scheduled to be completed by December 1, 2010, and dispositive motions were to be filed no later than February 1, 2011.  (Doc. No. 142, at 1,

---

[3]  The remaining claims against the Ramsey County Defendants are all <u>Bivens</u> claims, that is, claims for deprivations of decedent's civil rights by those acting under color of federal law.  The Court already determined that "[t]here is no dispute in this case that the Ramsey County Defendants provided detention services to ICE through an intergovernmental services agreement," such that an officer or employee of Ramsey County acting under color of authority under that agreement "'shall be considered to be acting under color of Federal authority for purposes of determining the liability'" of that officer or employee in any civil action.  (Doc. No. 161, at 40-41.)

3.)  The Ramsey County Defendants filed their motion on July 21, 2010.  In their response filed on September 7, 2010, Plaintiffs contended that summary judgment would be premature because they needed to complete various forms of discovery.  (Doc. No. 212.)  They also formally moved to compel various forms of discovery.  (Doc. No. 235.)

After arguments on those motions, the Court ruled that, with respect to the Ramsey County Defendants, Plaintiffs were permitted to complete the depositions of Jane Berg and Erica Thompson, and to depose Mary Logan, Mary Roby and Dawn Bennett, but were not permitted to depose Robert Fletcher or Robert Fulton.  (Doc. No. 259.)  The Court also permitted Plaintiffs to conduct a Rule 30(b)(6) deposition of Patricia Lesky as the designated witness on behalf of Ramsey County.  (Id.)  Furthermore, the Court allowed Plaintiffs to identify, by November 1, 2010, additional records for production if they were identified in depositions and directed that Defendants shall then produce such documents by December 1, 2010.  (Id.)  Finally, the Court ruled that Defendants could file, by December 10, 2010, a supplemental brief regarding any new facts and that Plaintiffs could file, by December 20, 2010, a responsive brief regarding such facts.  (Id.)

Since then, Plaintiffs essentially have failed to conduct the discovery they sought. On December 10, 2010, the Ramsey County Defendants advised the Court that it had "no additional information to submit" in support of its motion for summary judgment.  (Doc. No. 268.)  They further stated that Plaintiffs "did not actively pursue taking any depositions from Ramsey County employees."  (Id.)  They explained that while Plaintiffs' counsel asked in early November about the availability to reconvene the depositions of

Thompson and Berg, and that on November 5, 2010 Defendants then promptly offered several dates, Plaintiffs' counsel did not respond until November 19, 2010, and then only left a brief voice-mail stating he wanted to follow up on depositions of Ramsey County witnesses, but without specifying particular witnesses or proposed dates. (Id.)

In response, on November 19, 2010, Defendants' counsel left a voice-mail and also sent a letter asking whom Plaintiffs wished to depose and when. (Id.) Defendants received no response. (Id.) Defendants also note that Plaintiffs' counsel failed to identify, by the Court's deadline of November 1, 2010, any documents identified in depositions but allegedly not produced by Defendants. (Id.)

Finally, Plaintiffs failed to file any submission regarding new facts by December 20, 2010. Accordingly, the factual record with respect to the Ramsey County Defendants is now closed, allowing a resolution of the Ramsey County Defendants' requests for relief.[4] The Court notes that it has given Plaintiffs every opportunity to conduct discovery despite their repeated delays and failures. (See, e.g., Doc. No. 191, at 17-19 (summarizing Plaintiffs' failure to diligently litigate this action); Doc. No. 259 (permitting additional discovery that Plaintiffs then failed to conduct).)

### B. Three of the Remaining Ramsey County Defendants are Entitled to

---

[4] The Ramsey County Defendants styled their July 2010 motion as one "to dismiss or for summary judgment," suggesting that either form of relief would be appropriate for any or all of the Defendants. (Doc. No. 189; accord Doc. No. 191, at 3-6.) Their arguments, however, generally request dismissal for two of the three subgroups of Defendants, and summary judgment for the third. (Doc. No. 191, at 20-21, & 25-26.) The Court agrees that the separate subgroups are entitled to different forms of relief, but differs slightly with Defendants regarding the particular relief they request for two of the subgroups.

## Summary Judgment as a Matter of Law

The Ramsey County Defendants argue that Plaintiffs have failed to produce evidence supporting their *Bivens* claims with respect to Defendants Caumiant, Strand and Thompson. With respect to these Ramsey County employees, in contrast to the others, Defendants generally seek summary judgment. (Doc. No. 191, at 25-26.)

### 1. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[5] Summary judgment is appropriate if the non-movant "fails to make a sufficient showing to establish the existence of an element essential to that parties' case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2). Accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (emphasizing non-movant's burden to "set forth specific facts showing that there is a genuine issue for trial"). Here, the Court has allowed Plaintiffs every opportunity to

---

[5]     The form, if not the substance, of Rule 56 changed substantially effective December 1, 2010, but this motion was filed and argued before that date. Thus it is governed by the version in effect before December 1, 2010.

complete discovery.  (E.g., Doc. No. 259 (permitting certain discovery by Plaintiffs following hearing on Defendants' motions for summary judgment).)  Because the material facts are not in dispute, the dispositive issues are questions of law.

As noted above, only Bivens claims remain against the Ramsey County Defendants.  (Doc. No. 161.)  A Bivens claim is essentially the federal analog of a Section 1983 action, permitting certain actions for deprivations of civil rights against a federal officer rather than one acting under color of state law.  E.g., Hartman v. Moore, 547 U.S. 250, 254 n.2 (2006).  Plaintiffs' Complaint alleges (1) that Defendants violated decedent's right to be free from cruel and unusual punishment by denying her medical care (the "Deliberate Indifference claim"), and (2) that Defendants intentionally treated her and other Hispanic illegal immigrants differently from "white, native-born, English-speaking detainees" (the "Equal Protection claim").  (Doc. No. 1, ¶¶ 61-67.)

## 2.     The Deliberate Indifference Claim

It is well established that a Section 1983 claim may be brought against state prison officials and physicians by a state prisoner alleging violation of his Eighth Amendment right to be free of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97 (1976). But to prove that Defendants were "deliberate[ly] indifferen[t] to [decedent's] serious medical needs" requires more than negligence or medical malpractice.  Estelle, 429 U.S. at 104.  Rather, a plaintiff must show the official *deliberately* disregarded a risk of a serious medical condition of which the official had *actual* knowledge.  Jones v. Minn. Dept. Of Corr., 512 F.3d 478, 481 (8th Cir. 2008).

In a claim against those acting under color of federal law, Plaintiffs are held to the same heightened "deliberate indifference" standard of Estelle v. Gamble that applies in a Section 1983 claim.  Carlson v. Green, 446 US. 14, 16-17 & n.3 (1980).[6]  Thus Bivens, like Section 1983, does not constitutionalize all of state tort law–claims of mere negligence, or even gross negligence, are not cognizable under either remedial avenue.

Here, there is no dispute that none of the Defendants actually knew that decedent was suffering from neurocysticercosis while she was detained at RCADC.  And as Defendants point out, even Plaintiffs' expert witness recognizes that decedent was "diagnosed with hydrocephalus secondary to neurocysticercosis" only after arriving at Regions Hospital and receiving a CT scan.  (Doc. No. 123, at 24.)

_____

[6]     The claim of a pretrial detainee such as decedent, while arising under the Due Process Clause of the Fifth or Fourteenth Amendments rather than under the Cruel and Unusual Punishment Clause of the Eighth Amendment, is nevertheless measured according to the same deliberate indifference standard.  (Doc. No. 161, at 32 n.10.)

But as Plaintiffs argue, "the exact diagnosis or cause of the symptoms is not the issue. It is the repeated indifference to headaches, head injury, and other symptoms and signs of obvious pain," as decedent was "complaining of severe headaches, lack of balance, confusion, a rash, [and] nausea" for "over a period of nearly a month." (Doc. No. 212, at 4, 8.) Plaintiffs thus first dispute what they view to be the standard articulated by Defendants–that "'no reasonable jury could find that [decedent] had a medical need so obvious that a layperson would easily recognize the need for a doctor's immediate attention *to treat a parasitic neurological condition*.'" (Id. at 6 (quoting Doc. No. 191, at 34) (emphasis added by Plaintiffs).) Plaintiffs assert that the actual standard does not require that Defendants recognized "a parasitic neurological condition," but only that the inmate or detainee needed medical attention or treatment. (Doc. No. 212, at 6.)[7]

In support, Plaintiffs rely on a Seventh Circuit decision, Hayes v. Snyder, 546 F.3d 516 (7th Cir. 2008), for the proposition that the "Eighth Amendment's protections are not triggered only by conditions that a layperson would be able to diagnose and treat, especially when the defendant is not a layperson but is instead a physician." (Doc. No. 212, at 6-7.) But none of the Ramsey County Defendants is a physician and summary judgment already has been granted to Dr. Salmi. (Doc. No. 274, adopting Doc. No. 265 ("The failure to treat a prisoner's medical condition does not constitute deliberate

---

[7]    It is far from clear that Defendants in fact advocate any such standard. Just prior to the statement that Plaintiffs dispute, Defendants state that "the issue is whether [decedent's] symptoms–i.e., headaches, rash, and a bump on the head–when taken in context and with the Defendants' background knowledge, rise to the level of an 'objectively serious medical need' under current case law." (Doc. No. 191, at 34.)

indifference unless the physician 'knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.'" Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996)).)  Although Plaintiffs are correct that the prison officials need not diagnose the precise medical ailment from which decedent was in fact suffering, Plaintiffs still can not meet the applicable standard.[8]

To establish deliberate indifference, a plaintiff must satisfy a two-part standard consisting of both an objective and a subjective component:  "'(1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  Jolly v. Knudson, 205 F.3d 1094, 1096 (8th Cir. 2000).  Moreover, the particular prison official's "background knowledge is part of the analysis" because the "determination whether a medical need is sufficiently obvious cannot be analyzed in a vacuum."  See Jones, 512 F.3d at 482.

---

[8]      Neither Hayes nor Greeno v. Daley, 414 F.3d 645 (7th Cir. 2004), on which Hayes largely relies, have been cited by, much less expressly adopted by, the Eighth Circuit.  But this is of little moment, as whatever slight differences might exist in the standards applied by the Seventh and Eighth Circuits are not consequential here.  As explained by the Seventh Circuit, "[a] serious medical condition is one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would perceive the need for a doctor's attention."  Hayes, 546 F.3d at 522 (emphasis added).  As explained by the Eighth Circuit, "[a]n objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, *or* is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'"  Jones v. Minn. Dept. Of Corrections, 512 F.3d 478, 481 (8th Cir. 2008) (emphasis added).  Here, Dr. Salmi saw decedent but did not diagnose her as suffering from neurocysticercosis or any other condition of comparable severity.  And while the other non-physician Defendants were not required to recognize neurocysticercosis or any other "parasitic neurological condition," it is far from clear that the symptoms decedent was presenting–primarily persistent head pain and rashes–amount to anything that a layperson or even a nurse would easily recognize as requiring more or different medical attention than what Defendants in fact provided.

With respect to the three individuals comprising the Treating and Examining Defendants subgroup, none was strictly a "layperson" as each had some medical training. Defendant Thompson was a nurse employed at RCADC. (Doc. No. 193.) Defendant Strand was also a RCADC nurse. (Doc. No. 7, ¶ 9.) And while Defendant Caumiant was a correctional officer at RCADC, she had "received general first aid training." (Doc. No. 194 ([Second] Affidavit of Cheryl Caumiant).)[9] In their capacities as nurses and correctional officers, Defendants Thompson, Strand and Caumiant either examined decedent or provided her basic medical treatment. (Doc. No. 255, at 3-4.) But a nurse does not diagnose patients, and a correctional officer, even one with some medical training, clearly can not be held to any higher standard. (See Doc. Nos. 193 & 194.)

Particularly where the detainee was supervised and treated by multiple officials over an extended period of time, the analysis with respect to each individual Defendant must be confined to their particular actual knowledge of decedent's condition and whether he or she then deliberately disregarded her medical needs. See Jolly, 205 F.3d at 1096 (noting that "subjective component" of deliberate indifference test requires that doctor "actually knew of but deliberately disregarded" inmate's medical needs). Although the liability of each of the Ramsey County Defendants must therefore be considered individually based on their own knowledge and actions, as well as separately from that of Dr. Salmi, Plaintiffs often address the overall 37-day stay of decedent at

_____

[9] Plaintiffs ask this Court to "completely disregard [Caumiant's] second affidavit" based on their allegations regarding her first affidavit, concerning service of process. (Doc. No. 212, at 2-3.) The Court declines to strike or otherwise disregard the Affidavit.

RCADC without differentiating between the actions (or alleged inactions) of the various Defendants at issue. (E.g., Doc. No. 212, at 6 (incorporating their response to Dr. Salmi's motion for summary judgment), & 8 (claiming that "these prison officials, guards, nurses, and especially the supervising doctor must deal with illegal immigrants from countries where neurocysticercosis is quite prevalent").) Plaintiffs took the same approach in opposing Dr. Salmi's motion for summary judgment. (Doc. No. 211, at 21, 23 (addressing Nurse Thompson's knowledge of decedent's condition and her responses), 24 (addressing the treatment provided by "Dr. Salmi and the nurses who reported him").) Plaintiffs thus attempt to conflate together the knowledge and actions of numerous RCADC staff and nurses, and frequently that of Dr. Salmi as well, as if they were a single, aggregate diagnostic and treating entity.[10]

Viewed through the appropriate lens dictated by the applicable demanding standard, the facts here do not support a Deliberate Indifference claim against any of these three Defendants. Upon her arrival at RCADC on February 24, 2006, decedent was supervised by Defendant Caumiant. (Doc. No. 194, ¶¶ 1-2.) On March 5, 2006, decedent reported to sick call complaining of migraine headaches. (Doc. No. 193, ¶ 3.) Defendant Thompson referred her for a follow-up evaluation with a physician. (Id.) Dr. Salmi, assisted by an interpreter, examined decedent the next day. (Doc. No. 265, at 21.)

---

[10]     Of course, application of the actual knowledge standard to individual defendants does not preclude liability in a situation where one defendant recognizes that a detainee is suffering from a serious medical condition and communicates that fact to others, who then deliberately disregard the detainee's medical needs. But here there is no allegation, much less facts of record, that Dr. Salmi, for example, diagnosed decedent with neurocysticercosis and informed the nursing staff of that fact.

Dr. Salmi diagnosed the headaches as muscle contractions and prescribed a pain reliever and a muscle relaxant. (Id.)

On March 31, 2006, Nurse Thompson ordered Benadryl and hydrocortisone cream for a skin rash. (Doc. No. 193, ¶ 4.) Thompson considered decedent's rash to be consistent with the reaction of other new detainees to the clothing or laundry detergent used at RCADC. (Id.) On April 3, 2006, decedent complained that she had fallen from her bunk and hit her head. While examining decedent, Nurse Thompson "observed that she had a half golf ball-sized lump on the back of her head, but had no open wounds and no bleeding." (Id. ¶ 5.) Thompson ordered Ibuprofen and also provided her an ice pack, as she found the lump consistent with other minor head injuries sustained by other detainees and not anything requiring immediate medical attention. (Id.)

After decedent's condition deteriorated later that day, she was transported by paramedics to Regions Hospital, where a CT scan first revealed hydrocephalus secondary to neurocysticercosis. The Ramsey County Defendants had no further contact with or responsibility for decedent once she left their custody.

Plaintiffs have made no factual showing on which to conclude that Defendants actually recognized or diagnosed either the illness which eventually proved fatal or any other serious ailment.[11] Granted, neurocysticercosis is presumably a serious medical

---

[11] In responding to the summary judgment motion, Plaintiffs fail to direct the Court to specific facts of record supporting individual assertions. (E.g., Doc. No. 212, at 7 (stating, but without any citation to the record, that decedent "was nothing like the plaintiffs in Jones or Grayson. She was lucid, sober, and requesting medical attention specifically for her head pain").) In fact, with respect to the liability issues presently

(continued...)

condition, but a "medical condition is not *per se* obvious to a layperson because it later results in death."  Jones, 512 F.3d at 483.  And no one at RCADC, including these Defendants, knew of that parasitic infection, which manifested itself through symptoms that do not indicate neurocysticercosis exclusively.[12]

Accordingly, Plaintiffs thus also cannot meet the second component of the governing deliberate indifference analysis.  Plaintiffs have not identified any facts capable of supporting their claim that the Ramsey County Defendants then deliberately disregarded what they actually believed to be her serious medical needs, such as the life-threatening illness she in fact possessed.  In short, Plaintiffs have failed to produce any evidence that the Ramsey County Defendants deliberately disregarded what they actually

_____

[11](...continued)
before the Court on summary judgment, Plaintiffs' brief "Statement of Facts" cites only the Affidavit of Defendant Caumiant.  (Doc. No. 212, at 3.)  (The only other facts of record it cites concern Plaintiffs' argument regarding service of process.  (Id. at 2-3.))  Similarly, Plaintiffs cite the Affidavit of Shelley Bhola, R.N., one of their experts.  (Id. at 9-10 (quoting Doc. No. 123).)  But the quoted portions of Bhola's Affidavit consist largely of legal conclusions.  (Id. at 9 (quoting Bhola's opinion that the Ramsey County Defendants "negligently failed to recognize, and were deliberately indifferent to [decedent's] need for medical and nursing care," and further stating that the nurses and guards "displayed deliberate indifference").)  On a motion for summary judgment, courts will not search for facts buried in the voluminous record to support the non-movant's claim.  Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999) (quoting White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990)).

[12]     Plaintiffs also focus on the fact that decedent suffered a head injury when she fell from her bunk.  (Doc. No. 212, at 10; accord Doc. No. 211, at 21 (noting "fall from her bunk bed in which she sustained her head injury.").)  But they fail to show that any of the Defendants was aware that such a fall was due to neurocysticercosis as opposed to any number of other causes.  And the resulting head injury only serves to further conceal the neurocysticercosis insofar as it provided an apparent cause for her continuing head pain and other symptoms such as dizziness.

knew was something more serious or life-threatening than the persistent headaches and

rashes for which decedent was provided medical treatment.[13]

These Defendants provided decedent with medical care in response to the

symptoms they observed.  In hindsight, one might quibble with the timeliness or quality

of treatment decedent received, but any such claims thus allege, at most, medical

negligence in failing to properly treat decedent.  Such allegations do not rise to the

_____

[13]     Although Plaintiffs also assert a separate Equal Protection claim, they
nevertheless include, as part of their defense of their Deliberate Indifference claim, the
assertion that

> these prison officials, guards, nurses, and especially the supervising doctor,
> must deal with illegal immigrants from countries where neurocysticercosis
> is quite prevalent.  The overlooking of such a disease may be somewhat
> justified if the detainees were from Europe or other such countries.  The
> definition of neurocysticercosis specifically mentions undeveloped
> countries.  Most definitions even go as far as to mention Latin America.

(Doc. No. 212, at 8.)  Insofar as Plaintiffs suggest that any of the Defendants were
obligated to recognize, diagnose and treat neurocysticercosis, any such argument seems
inconsistent with their disagreement with Defendants' purported framing of the issue.
See supra pp. 9-11.  But in any event, and even in the context of a Deliberate Indifference
claim, Plaintiffs simply have produced no evidence that Defendants *actually knew* that
decedent, during the time she was at RCADC, was suffering from neurocysticercosis or
any other serious medical need.  And insofar as Plaintiffs are contending that Defendants
*should have* known of decedent's serious condition, they still cannot prevail.  Putting
aside the fact Defendants could not be held liable simply on the basis that they "should
have known" of the actual risk, Jones v. Minn. Dept. Of Corrections, 512 F.3d 478, 481
(8th Cir. 2008), there is no basis in the record to support a claim that Defendants should
have recognized, based on her symptoms in conjunction with the fact that decedent likely
was from Central or South America, that she could only be suffering, or even likely be
suffering, from a serious ailment such as that which led to her death.  Symptoms such as
headaches may be the result of innumerable causes, such as the fall decedent incurred on
April 3, 2006.  Defendant Thompson states that decedent's rashes were consistent with
the common reaction of inmates to the facility's laundry detergent and clothing.  (Doc.
No. 193.)  And people from Central or South America, like those from anywhere else,
suffer head pain and rashes for any number of reasons.

requisite constitutional level. <u>Estelle</u>, 429 U.S. at 106. On this factual record, Plaintiffs could not prove to a jury a <u>Bivens</u> claim that these Defendants acted with the requisite "deliberate indifference."

### 3. The Equal Protection Claim

Plaintiffs' Complaint also alleges an Equal Protection claim, but they now largely defer to their argument asserted in response to Dr. Salmi's motion for summary judgment. (Doc. No. 212, at 5.) In that response, Plaintiffs made only factually-unsupported assertions and conclusions in support of an Equal Protection claim. For example, they asserted that Dr. Salmi "knew when he examined [her] she was 'illegal,' she wore an arm band, and did not speak his language. There is an inference that Dr. Salmi disbelieved her . . . because of [decedent's] race and national origin." (Doc. No. 211, at 4.) Similarly, they asserted that "[p]eople of a different race/national origin were treated differently every step of the way. . . . Arm bands for detainees showed they were going to be deported." (<u>Id.</u> at 14.) Likewise, they claimed that "[b]ecause these were ICE detainees, and because Dr. Salmi admits he was not familiar with ECI/Ramsey County's 12-hour medical screening rule, there is an inference that this Medical Director just ignored the basic needs of this and other immigrants." (<u>Id.</u>) Even assuming the underlying facts of these assertions are all true, nothing here supports the inferences Plaintiffs attempt to draw from such facts. Such inferences would only be valid if it were already established that all Caucasian medical providers always discriminated against every Hispanic citizen and illegal immigrant.

With respect to Dr. Salmi's motion, the Court concluded that Plaintiffs "cite to no facts of record that Dr. Salmi and APS treated decedent (or other Hispanic immigrants) differently than U.S. citizens or non-Hispanic inmates. Rather, they simply claim that they are entitled to additional depositions to substantiate such a claim." (Doc. No. 265, at 4 (internal citations omitted).) And now that Plaintiffs have had an opportunity to complete discovery with respect to these Defendants, the Court comes to the same conclusion with respect to them. Plaintiffs have failed to identify any factual support that could permit them to present their Equal Protection claim against these Defendants to a jury. On this record, Defendants are entitled to summary judgment.

### C. Plaintiffs Cannot Maintain Any <u>Bivens</u> Claims Against the Non-Treating Defendants and the Unidentified Defendants

The Ramsey County Defendants seek dismissal of the other two subgroups of Defendants because Plaintiffs have failed "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Defendants contend that Plaintiffs have failed either (1) to allege that certain Defendants, while individually identified, had anything to do with the care and treatment of the decedent, or (2) to discern the actual identity of the various John Doe Defendants (assuming any in fact exist).

#### 1. Defendants Moxley-Goldsmith, Logan and Berg Are Entitled to Summary Judgment

The Ramsey County Defendants argue that with respect to several of these Defendants Plaintiffs have failed to allege the direct involvement that is required to support a <u>Bivens</u> claim, that is, that Defendants Moxley-Goldsmith and Logan (originally

identified as "Kelli LNU") "had any personal or specific involvement in this case." (Doc. No. 191, at 2.) They assert that "Plaintiffs failed to allege any factual information about these Defendants [and] failed to state a plausible claim against these Defendants." (Id. at 3.)[14] They generally request dismissal with respect to these Defendants. (Id. at 20-21.)

Defendants maintain that while Moxley-Goldsmith and "Kelli LNU" (but not Mary Logan) "were named in the caption of the Complaint," "Plaintiffs never alleged any factual information relating to" Moxley-Goldsmith, other than his status as Head Nurse at RCADC and alleged only that Kelli LNU was "an unidentified jail nurse in the caption." (Doc. No. 191, at 21.) Plaintiffs never alleged that either of these two actual (or three nominal) Defendants "were ever actually involved with the medical treatment or detention of [decedent]." (Id.) Apart from the caption, they were "never referenced, named or discussed on *any* page in the *entire* Complaint." (Id. (emphases in original).)

As noted above, only Bivens claims remain against these Defendants. For such claims, a plaintiff must allege that each particular defendant is liable based on their own

---

[14]     The Ramsey County Defendants' July 2010 motion expressly requests relief only with respect to Defendants Moxley-Goldsmith and Logan. It appears that only later did Plaintiffs identify Jane Berg as one of the Defendants originally denominated as a "Jane Roe" or "Jane Poe." (See Doc. No. 218, at 9 (deposition notice of Jane Berg, dated September 6, 2010).) In their October 12, 2010 response to Plaintiffs' motion to compel, the Ramsey County Defendants identify Berg as one of six remaining Defendants in that group. (Doc. No. 255, at 2.) But they assert that "Berg is an administrator who provided no direct care to [decedent]." (Id.) Plaintiffs identify no specific evidence to the contrary. The Court will thus address the liability of Berg along with that of Moxley-Goldsmith and Logan. The Court also notes that Defendants assert that Moxley-Goldsmith provided decedent with medications pursuant to Dr. Salmi's orders. (Id.) But even if this constitutes the provision of care, it could not constitute deliberate indifference. See supra Section II.B.2.

actions or omissions.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1948 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In response, Plaintiffs, relying on "notice and general pleading rules," contend that Moxley-Goldsmith's and Logan's "names are contained in the medical charts and nursing notes."  (Doc. No. 212, at 4.)  But whether Plaintiffs' Complaint could survive a Rule 12(b)(6) motion to dismiss under other, more general, circumstances is not the issue here. Rather, for the Complaint to survive a Rule 12(b)(6) motion, they would have had to have met the pleading requirements for a <u>Bivens</u> claim, and now that discovery is closed, they need to have identified facts supporting a claim that these Defendants directly participated in the constitutionally-deficient care of decedent.  Not only does Plaintiffs' Complaint fail to plead the direct involvement of these Defendants in the care and treatment of decedent, Plaintiffs have not disclosed through discovery any direct involvement by these Defendants.

Nevertheless, Plaintiffs assert–although without any recitation of factual support in the record–that "Goldsmith knew or *should have known* from his *supervisory* position, review of medical and nursing charts, communications with the doctor and nurses, or direct presence in the facility when [decedent] was in distress."  (Doc. No. 212, at 4-5 (emphases added), & 10 (claiming Moxley-Goldsmith and Logan "supervised all the nurses").)  But because Plaintiffs' Deliberate Indifference claim requires that each Defendant "actually knew of" decedent's objectively serious medical need and then

"deliberately disregarded" decedent's rights, <u>Popoalii v. Correctional Medical Services</u>, 512 F.3d 488, 499 (8th Cir. 2008), these Defendants could not be held liable simply on the basis that they "should have known" of the actual risk.  <u>Jones v. Minn. Dept. Of Corrections</u>, 512 F.3d 478, 481 (8th Cir. 2008).

And liability under a <u>Bivens</u> claim, like that under Section 1983, "is personal." <u>Dahl v. Weber</u>, 580 F.3d 730, 733 (8th Cir. 2009).  Such liability lies only against those who were "personally involved in, or directly responsible for," a deprivation of a plaintiff's federal civil rights.  <u>Id.</u>  Thus, there is no supervisory liability in a <u>Bivens</u> action, as vicarious liability for the actions of one's subordinates under a theory of *respondeat superior*, does not apply.  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. at 1948.  "To establish personal liability of the supervisory defendants, [plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [her] constitutional rights."  <u>Majorga v. State of Missouri</u>, 442 F.3d 1128, 1132 (8th Cir. 2006).  A defendant's general supervisory responsibility or function is insufficient to establish the requisite personal involvement.  <u>Clemmons v. Armontrout</u>, 447 F.3d 962, 967 (8th Cir. 2007).

Plaintiffs requested, and received, the right to finish discovery on this and other issues to flesh out their claim that these Defendants "worked in the facility the whole time," "supervised nurses," and "implemented standing orders."  (Doc. No. 212, at 5.) But their discovery efforts have unearthed nothing even suggesting that Moxley-Goldsmith, Logan or Berg played any direct role in the alleged deprivation of decedent's constitutional rights.  Nor have they alleged, much less supported with facts, any claim

that these Defendants "made policy decisions resulting in the alleged unconstitutional" actions. <u>Ouzts v. Cummins</u>, 825 F.2d 1276, 1277 (8th Cir. 1987). No such allegations of any pattern of a failure to act following notice of unconstitutional conduct appear here. <u>Id.</u> at 1278 (and explaining further that the allegations of a "single incident" are insufficient to establish such a policy).

In sum, the Court concludes that Plaintiffs cannot maintain any <u>Bivens</u> claims against Defendants Moxley-Goldsmith, Logan and Berg. The Court also notes, however, that it is not perfectly clear whether they are entitled to dismissal, as Defendants request, or summary judgment. There are cases granting either form of relief, although without discussing the alternatives or citing the other line of authority. <u>Compare</u> <u>Estate of Rosenberg v. Crandell</u>, 56 F.3d 35 (8th Cir. 1995) (affirming dismissal of prison officials), <u>and</u> <u>Ouzts v. Cummins</u>, 825 F.2d 1276 (8th Cir. 1987) (same), <u>with</u> <u>Dahl v. Weber</u>, 580 F.3d 730 (8th Cir. 2009) (reversing denial of summary judgment for defendant and remanding with directions to grant summary judgment), <u>Clemmons v. Armontrout</u>, 477 F.3d 962 (8th Cir. 2007) (affirming summary judgment granted to defendants), <u>and</u> <u>Mayorga v. State of Missouri</u>, 442 F.3d 1128 (8th Cir. 2006) (same). The Court believes that summary judgment is appropriate because its resolution of Defendants' motion grants relief on the merits of the action, concluding that they could not be liable on any <u>Bivens</u> claim against them. <u>E.g.</u>, 10A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2712, at 212 (3rd ed. 1998) ("A summary-judgment motion goes to the merits of the case, and, because it does not simply raise a matter in abatement, a granted motion

operates to" trigger claim and issue preclusion.).

> **2.**     **The Unidentified Doe, Roe and Poe Defendants Are Entitled to Dismissal**

With respect to the unidentified Doe, Roe and Poe Defendants, the Ramsey County Defendants argue that Plaintiffs have failed to state a plausible claim against them, noting that Plaintiffs "have failed to allege any specific facts to identify or demonstrate that these unidentified individuals even exist." (Doc. No. 191, at 2-3.) Here too, they generally request dismissal with respect to these Defendants. (Id. at 20-21.) Plaintiffs offer no particular response with respect to the remaining unidentified Defendants.

Dismissal of "John Doe" defendants "is proper only when it appears that the true identify of the defendant cannot be learned through discovery or the court's intervention." Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985). Thus it is improper to dismiss such defendants at "an early juncture," that is, where discovery could disclose, or any named defendants could be compelled to reveal, the identity of such defendants. Id.

Here, however, discovery has closed and Plaintiffs have not, with a few exceptions, identified any of the Doe, Roe, or Poe Defendants denominated in their Complaint.[15]  As in <u>Gold Star Taxi and Transportation Service v. Mall of America Co.</u>, "[e]ven after the completion of discovery, Plaintiffs have not ascertained the identity of or established any facts regarding these unnamed Defendants."  967 F. Supp. 741, 753 (D. Minn. 1997) (dismissing, on court's own initiative, "claims against the ten John Doe Defendants").  Because Plaintiffs have failed to identify who in fact the purported Doe, Roe and Poe Defendants could be, those Defendants are entitled to dismissal.

Defendants request dismissal with prejudice.  (Doc. No. 191, at 25.)  The Court recommends that all of Plaintiffs' claims against the Doe, Roe and Poe Defendants be dismissed without prejudice, however, even at this late stage of the pre-trial proceedings. <u>Phelps v. U.S. Fed. Gov't</u>, 15 F.3d 735, 739 (8th Cir. 1994) (concluding that "district court did not err by dismissing the 'unknown defendants' without prejudice"); <u>Garcia v. Anderson</u>, No. 08-CV-4731 (ADM/JJG), 2009 WL 2900304, *7 (D. Minn. Sept. 2, 2009) (dismissing without prejudice, on motion for summary judgment, claims against unknown parties).[16]

---

[15]    Since the Complaint was filed, it has been determined that "Kelli LNU" is actually Mary Logan.  (Doc. No. 118, at 8.)  And the "Dr. John Doe" identified in the Complaint is Dr. Gregory Salmi.  (<u>Id.</u> at 2, 8.)  Likewise, the "XYZ clinic" is APS.  (<u>Id.</u> at 9.)  The district court already has granted summary judgment to Dr. Salmi and APS. (Doc. No. 274.)  Finally, it appears Jane Berg is one of the Jane Roe or Jane Poe Defendants denominated in the Complaint.

[16]    In contrast to the recommendation of granting summary judgment to Defendants Moxley-Goldsmith, Logan and Berg, the resolution of the motion with

(continued...)

## III. CONCLUSION

Despite having had every opportunity to conduct discovery, Plaintiffs have not produced any evidence that could satisfy the demanding standard governing a Deliberate Indifference claim. Nor have they produced any evidence that could support an Equal Protection claim. The facts of decedent's unfortunate death after being detained at RCADC simply do not support a <u>Bivens</u> claim against these Defendants.

In addition, the Court notes that earlier orders have disposed of (1) all claims against the Federal Defendants (Doc. No. 201 (dismissing Counts I-VI)), (2) all claims against Dr. Salmi and APS (Doc. Nos. 201 (dismissing Counts II-V) & 274 (granting summary judgment on Counts I & VI)), (3) all claims against the other Ramsey County Defendants (Doc. No. 201 (dismissing certain Defendants entirely), and (4) the other claims against the remaining Ramsey County Defendants (Doc. No. 201 (dismissing Counts I-V)). Accordingly, because the Court has ruled upon all claims against all of the Defendants, a final judgment against Plaintiffs should now be entered.

---

[16](...continued)
respect to the unidentified Doe, Roe and Poe Defendants does not conclude that they are entitled to a judgment on the merits, but rather only that Plaintiffs never actually identified any additional individual Defendants.

**IV. RECOMMENDATION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. The Ramsey County Defendants' motion to dismiss or for summary judgment [Doc. No. 189] be **GRANTED** as follows:

    (a) that Defendants Thompson, Caumiant, Strand, Moxley-Goldsmith, Logan and Berg be granted **summary judgment** on Count VI; and

    (b) that the Doe, Roe and Poe Defendants be **dismissed without prejudice**; and

2. The Court direct the entry of a **FINAL JUDGMENT AGAINST PLAINTIFFS**.

Dated: January 4, 2011

                           *s/ Janie S. Mayeron*
                           JANIE S. MAYERON
                           United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **January 19, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.